UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PERRY W. ANTELMAN,                              No. 05-CV-11786-WGY
                        Plaintiff.

v.

BARBARA KAUSITS,
a/k/a BARBARA ANTELMAN,
                        Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO REOPEN

## 1.0  Response

1.1    The Defendant, Barbara Kausits (Wife) opposes the Plaintiff's, Perry

Antelman's (Husband) motion to re-open the case because he has not and

cannot demonstrate he can sustain his burden to prove good cause.

## 2.0  Relevant Background Facts and Supporting Documents.

2.1    Husband's motion claims Wife failed to settle after their ADR session.

Husband knows Wife had to leave a good hour before the end of said

session and that she was not present at the end, at which point the broad

outline of a settlement had been discussed.

2.2    Husband also knows, that prior the ADR session he and his counsel had

received a comprehensive written proposal which encompassed all of the

various terms and conditions that need to be resolved in settling a family

Page 1

law case.

2.3   Husband also knows that during the ADR session, he stated that he had

never filed Federal or State income tax returns, based upon his father's

theory that payment of such taxes was voluntary. So, therefore, in arriving

at a written settlement, Wife had to protect herself and the children in a way

that would permit her to seek future modifications based upon future

changes in circumstances.

2.4   While it is accurate to claim wife did not sign his post-ADR proposed

separation agreement, it is also accurate to say he cannot demonstrate he

sought terms which were either fair or reasonable.

2.5   Again, on January 26, 2006, before the ADR meeting, Wife prepared and

sent Husband a detailed separation agreement which purported to settle all

pending litigation between the parties (Exhibit 1)[1]. Wife had no response to

her first proposal. On February 3, 2006 she revised the prior draft and sent

a new draft for husband's consideration (Exhibit 2).

2.6   On February 16, 2006 the parties appeared before Magistrate Sorokin for

mediation. Wife had to leave a full hour or so before the end of the session,

in order to pick up the parties' children at their various schools.

---

[1]Exhibit 1 and 2 are only the e-mail cover letter - not the actual 27 page draft agreement.

2.7    After a full day of mediating, a proposed resolution of the issues that were

discussed during the day was read into the record. The USDC (MA) then

entered an order dismissing the within action.

2.8    On February 22, 2006, Wife sent Husband a revised draft Agreement

(Exhibit 3), expressing the matters resolved in mediation, but also dealing

with the myriad of other necessary matters resulting from the MA Probate

Court and other litigation.

2.9    On February 24, 2006, Husband advised he did not agree with the terms in

Wife's proposal. But, he did not say what provisions he objected to.

2.10    Wife's counsel proposed a meeting with Husband and his counsel to work

out differences. Wife was then at home with sick children, but would be

available by telephone. Husband and his counsel refused to make time for

that meeting.

2.6    About a month later, on March 14, 2006 Husband finally responded to

Wife's proposed draft agreement. In sending that draft, Husband's counsel,

Attorney King, claimed she was doing so even though Husband had not yet

commented on the various provisions. In sum, she was sending the proposal

without Husband's approval and agreement.

2.7    Wife's counsel started to read Husband's draft and compared it to Wife's

last proposal, making hand written notes of some of the changes (Exhibit 4).

2.8     One example should suffice. Husband was then under court order to pay $600 a week child support. Husband was also paying the mortgage on the parties' Bet Shemesh, Israel house. Previously, Husband had let the first mortgage on that house go into default; and was then making payments to prevent foreclosure, so that the house could be sold without loss of the equity. Husband proposed Wife forego child support payments until the Bet Shemesh house be sold, at which time he would then make up the arrears. As this opposition is drafted, that house is under agreement, with the closing to occur near the end of May 2006. Husband could have no rational belief such a provision would be acceptable to Wife; and even if she had agreed, there is no reasonable expectation that such a provision would have been approved by the probate court judge.[2]

2.9     Husband's March 14th proposed agreement (Ex. 4, p. 12, ¶4c) *would have permitted him to not make child support payments so that he could pay the mortgage on the Bet Shemesh house.*

---

[2]Under MA divorce law, a judge must read and approve of the provisions in every proposed separation or marital settlement agreement. In the experience of Wife's counsel, no judge would have approved the Husband's proposed terms; and, indeed, it was a plain waste of time for Husband and his counsel to have proposed such terms and insisted they be agreed upon. **No such provision had been agreed to during the ADR mediation.**

2.10   At the time Husband proposed these terms, he already had been lectured by
       the probate court judge that the children are Husband's "primary creditors"
       and he was to pay support as his first priority (Exhibit 5, Tr. of September
       28, 2005 hearing, pp. 61, lines 17-18).

2.11   From Wife's perspective, Husband's proposal that she not get child support,
       even a level far below their previous standard of living, was clear evidence
       of his bad faith and lack of fair dealing.

2.12   On March 23, 2006 Husband retained successor (present) counsel.

2.13   On April 4, 2006, Wife filed her Complaint that Husband be held in civil
       and criminal contempt of the probate court orders since he had failed to pay
       child support since March 3, 2006 (Exhibit 6). Husband filed his Answer
       the morning of hearing on the contempt (Exhibit 7). Just prior to that
       hearing, Husband paid all of the arrears, a total of $3,788.94.

2.14   After the contempt hearing, the probate court (Kopelman, J.) issued its
       judgment finding Husband failed to pay six weeks of child support for six
       weeks (Exhibit 8), had paid the arrears in full and was ordered to pay $565
       in Wife's legal fees by April 28, 2006.[3]

2.15   In sum, even though there was no agreement or court order permitting

---

[3]As this opposition is being filed with this court, Husband still yet to pay these legal fees.

Husband to not pay child support, Husband took the law into his own hands. The evidence in Wife's hands, being copies of Husband's checking account, demonstrating he had the funds to, but chose not to pay his child support obligation.

2.16  That, when faced with criminal and civil contempt, Husband made payment of all arrears demonstrates he had the ability to get the money to pay both child support and the Bet Shemesh mortgage. All this from a father who claims he loves his children. What is wrong with the picture he is painting?

2.17  Wife's counsel sent copies of Wife's and Husband's prior proposals to Husband's current counsel. Wife's counsel sought to engage in settlement with Husband's current counsel. It was only on Friday, May 7, 2006, that Husband's counsel finally agreed to a meeting to be held on May 10, 2006.

2.18  In the meantime, Wife had no choice but to proceed with discovery in the Probate Court action. She needed to get his testimony, under oath, about a number of things, among them his income, his income tax returns, his cash flow and, as well, his conduct with another woman ( a factor relevant to the trial of an action under MA. General Laws, c. 208, §34).

2.19  Husband sought to evade and avoid his deposition, even though the date and time for his deposition had been set and ordered by the probate court

(Roberts, J.)  (Exhibit 9).

2.20  Husband's new counsel had been told of the date for Husband's court-
        ordered deposition and of Wife's unwillingness to agree to any continuance,
        particularly a lengthy continuance as proposed by new counsel.

2.21  New counsel entered their appearance knowing of the said court order.  Yet,
        they did not appear.  Instead that morning the went to the probate court
        seeking a continuance (Exhibit 10).

2.22  Wife objected to the continuance, filing a written response (Exhibit 11).

2.23  The court (Boorstein, J.) ordered Husband to immediately appear and begin
        his deposition, for no less than three hours and to promptly pay $500 in
        sanctions toward payment of Wife's counsel fees (Exhibit 12).

2.24  The Husband's deposition did get underway that day.  By way of summary,
        in that deposition. Husband took the "Fifth Amendment" some 45+ times.
        (Exhibit 13).

2.25  Wife moved for an order to compel Husband to testify and/or for sanctions
        (Exhibit 14), supported by her memorandum (Exhibit 15).

2.26  After the hearing, the court (Boorstein, J.) entered her order (Exhibit 16)
        requiring Husband to produce documents at least 15 days before his May
        30, 2006 deposition; and to testify about his income, income taxes and his

conduct with a certain woman or he could, again, take the Fifth

Amendment; and if so, he would then not be permitted to personally testify

at trial about several crucial mattes.

2.27   In between the hearing on Wife's motion to compel and for sanctions and

Judge Boorstein's April 24, 2006 order, Husband filed the present Motion

to Re-open this USDC (MA) "Hague" case.

2.28   By way of further relevant background, and to further demonstrate

Husband's bad faith and nefarious litigation tactics, during a probate court

hearing on September 28, 2005, Husband represented to that court

(Kopelman, J.) that he planned on staying in Massachusetts and obtaining

housing close to Wife and the parties' children (Exhibit 17).

2.29   In furtherance of that representation, the probate court, ordered Wife to pay

$15,000 to Husband out of the sale of proceeds of the former marital home

in Sharon, MA, so that Husband would have funds to obtain said housing in

Massachusetts.

2.30   Furthermore, the documents on file with this court disclose that the parties

went to Israel with their children in September 2004 on round-trip air

tickets, showing a return to Massachusetts in October 2004. Their house

was left as is - with fish in their tropical fish tank, nothing packed beyond

clothing for a vacation, etc. While in Israel, Husband took Wife's and the children's passports from Wife; and refused to return the passports to her. Then, he unilaterally went to the religious court and obtained an "Ekuv" - which can be described as an order preventing Wife from removing herself and the children from Israel, until their domestic tranquility was repaired or resolved. Wife, who is not a Hebrew speaker and who had no access to funds needed to hire private counsel, had to find a legal aid lawyer who, in turn, finally got the Ekuv "lifted." Wife was able to borrow $8,000 from the then-buyer of the former Sharon home (as an advance against the purchase price) to provide her with air tickets back to the USA.

2.31   In sum, Husband held the Wife and the children as prisoners in Israel, against their will.

2.32   In the meantime, he had the contents of their former marital home packed into a large container which he then had shipped to Israel.

2.33   As a result of further probate court orders, as this is written, that container is or should be on its way back to Massachusetts (Exhibit 16). The order essentially requires Husband to pay the expense of liberating the container from the Israeli shipping company, by paying the balance due for storing that container all these months.

2.34   In the meantime, Wife and the 7 children have been living a bare bones

existence in a rented house in Sharon without the children's prior furniture,

furnishing, personal belongings, etc.

## 3.0 Argument.

3.1   All of this by a father who claims he loves his children. What is wrong with

the picture he is painting?

3.2   Husband's present motion seeks to lay failed settlement negotiations at

Wife's door. But, as this is written, Husband has refused to either testify or

sign an affidavit specifying his cash flow before and after August 2004.

Yet, in this vacuum of information, Husband sees nothing wrong trying to

force Wife to agree to no alimony and some child support.

3.3   It is bad faith for Husband to now try to reopen this case to try to force the

children back to Israel after he told the probate court he was staying in

Massachusetts to be near his children and that he needed and got $15,000 to

help him get housing in Massachusetts.

3.4   If Husband had no ulterior motives, one would have expected that just as

soon as he got new counsel, he would move to re-open the Hague case.

Instead, he waited until he was about to be adjudicated in contempt of the

probate court and ordered to testify about his income and his conduct with

another woman or face sanctions.

3.5    It may be said, Husband's motion to re-open is suspect. One may fairly

conclude he is more motivated by bad faith and unfair dealing than anything

else. He seeks to re-open as a tactical matter. He wants to try to force her to

litigate with him in this court, as well as in the probate court, as part of his

effort to litigate her to death. And, he wants to have as much bargaining

power as he can before his deposition resumes on May 30, 2006.

3.6    And, in any event, he seeks to delay, stall and prevent the probate court

from holding a hearing on the merits of custody and visitation by keeping

this open this Hague Convention case. As we all know, so long as this case

is open, the probate court cannot make final orders on custody and

visitation.

3.7    No doubt, Husband will, if successful here, argue in the probate court that

he ought not to have to testify about his income, etc. because those topics

are not relevant until after a decision by the USDC (MA) on the Hague case.

Of course, Husband's argument ignores Wife's right to alimony.

3.8    Furthermore, setting aside, for a moment, the above facts and circumstances,

at this stage of this case, on this motion to reopen, common sense requires

Husband to demonstrate his underlying claim has a strong likelihood of

success on the merits. Husband has not done so. His complaint is but
notice pleading. His affidavits, if admissible over Wife's objections, do not
support his contention that Wife left Massachusetts intending to move
herself and the children permanently to Israel. The affidavits on file show
these parties were separated for some 13 months before September 2004 and
that they were trying to reconcile their marriage while vacationing for a
month in Israel. Unfortunately for the Wife and children, this turned out to
be a vacation from Hades, which, among other things cost each school age
child a lost year of education.

3.9   But, even if Husband demonstrated his case had a likelihood of success on
the merits, at this time, given his conduct, equity should Estopp Husband
from proceeding.

3.10   Husband's conduct prevents him from sustaining his burden of proving a
"good cause shown" sufficient to justify reopening this case.

## 4.0   Conclusion.

4.1   Based upon the forgoing and argument at the hearing, the court should deny
Husband's motion to re-open this case for each of the following reasons:

(A)   Husband is acting in bad faith and unfair dealing;

(B)   Husband has not demonstrated the required "good cause shown"

sufficient to justify reopening the case; and

(C)    Equity estoppes Husband from seeking to reopen this case.

May 9, 2006                                     Respectfully submitted,
                                               **Barbara Kausits** by her attorneys,
                                               **NISSENBAUM LAW OFFICES**

                                               By: _Wendy J. Overbaugh_
                                               Gerald L. Nissenbaum, BBO #372400
                                               Wendy J. Overbaugh, BBO #657457
                                               160 Federal Street - 24th Floor
                                               Boston, MA 02110
                                               (617) 330-9090;       fax at: 6090


**Certificate of Service**

I hereby certify that a copy of the foregoing was served on counsel for the Plaintiff by e-mail to their respective addresses of record.

May 9, 2006                          _Wendy J. Overbaugh_

N:\wpwin\Kausits v. Antelman\Federal Ct - Hague Petition\5 8 06 respond reopen gln.wpd

Page 13

## Jerry Nissenbaum

**From:** "Jerry Nissenbaum" <jerry@nissenbaumlaw com>
**To:** "Carol J. King" <carol@wallacelawoffice com>
**Cc:** "Barbara Kausits" <tiptheworld@yahoo com>
**Sent:** Thursday, January 26, 2006 5:53 PM
**Attach:** 01 26 05 Agreement.wpd; 01.26.05 Agreement doc
**Subject:** Draft Agreement for your respective review and comment

Carol,
As promised, attached is a proposed Draft Agreement.

There are a number of provisions in there that we did not cover.

For example, with 7 kids, I think the judge would order Perry to buy a $3 or $4 million dollar term life insurance policy. I proposed he buy $2 million with a fixed premium, to his age 70. The cost would be nominal; and the protection quite precious and necessary.

I also proposed that Barbara now get HMO family health and dental insurance plans. If she does it now, Perry can be covered as well.

But, Perry has to pay for it - or his employer. I am aghast that he has not already provided for this coverage. Right now Barbara is on Mass Health, which is a plan that covers low income and indigent people. I think she will not continue to qualify for this coverage.

I have not incorporated all of Perry's ideas about alternating weeks in the summer, etc. because, frankly, as he knows better than we do, he never spent that much time with the children. My experience is a judge will do what the parties were doing, period.

That said, any changes can be made to the schedule by agreement of the parties. My sense is that, as time goes on, if Perry exercises all the visitation now provided, he will have no problem getting Barbara to agree to let him have more time with some or all of the kids.

As for keeping the children in Orthodox Religious School, this year their tuition was paid or will be paid by Barbara from the new sale proceeds of the Sharon house.

I propose that next year's tuition be paid to Barbara in escrow from the proceeds of the sale of the house in Israel. In this way the kids know where they will be in

school for the academic year 2006-2007.

After that , unless the money is on the table, the kids will have to be transferred to public school, where they will remain.

If Perry does not agree to hold money aside for the year 2006-2007, then the kids will go to public school starting next September.

I do apologize for taking so long to get you this draft. But, it took me far more than I contemplated as I needed to address a number of unique issues which do not come up in most cases.

Please look this over. I have no pride in authorship, in the sense that if something is not clearly and plainly stated, I want to make it clearer.

I will work openly with you on the various provisions in an effort to come to agreement.

If we can agree on most, but not all provisions, we can agree to ask Kopelman for a status conference and get his "view" on what we are in dispute over. Since he will decide the case if we do not agree, after hearing what he says, we should be able to agree, even if one of clients does not like it.

if we cannot agree on custody or visitation, the we'll have to ask the court to appoint a Guardian ad Litem - but who will have the money to throw toward that expense?

So, please look this over; talk with Perry and advise.

I will be available Friday morning, if you have any questions, etc. to ask me why the heck I did this or that.

I will be away this weekend - we're off to NYC to go to the Metropolitan Opera on Sat. evening to see Rigaletto! I'll be back Sunday evening and in the office on Monday morning.

Another thing, assuming for the moment that Tivian is an asset that Perry had before the marriage, is there any doubt that it is still a marital asset which has to be valued? So, please ask Perry to get me that information as well. thanks.

Last, Barbara and I have NOT talked about the content of this agreement. So, Perry should not assume she has approved or disapproved of each term. But, I

wanted to get this to you so that we both could start to work to narrow whatever gaps there may be.

Jerry

## Jerry Nissenbaum

**From:**     "Jerry Nissenbaum" <jerry@nissenbaumlaw com>
**To:**       "Carol J. King" <carol@wallacelawoffice com>
**Sent:**     Friday, February 03, 2006 3:02 PM
**Attach:**   02 03.06 Agreement wpd; 02 03.06 Agreement.doc
**Subject:**  Slightly revised verson of prior draft

Attached is a slightly revised version of the draft agreement I sent you late on January 26th.

For your ease in identifying the changes, using the old draft pagination, changes have been made on pages
1, 2, 15, 16, 17, 19, 29, 33, 37-38.
Also the changes appear in italics.

(I used italics to insure that the so-called red-line would not get lost in saving from WordPerfect, which is what we use to generate documents, to Word, which we are told you use.)

During my conference with Barbara, I learned a great deal more about Perry's conduct, which, for the moment only, I will not characterize.

Suffice to say she reports numerous instances of threats by him on numerous things, particularly on-going threats to kidnap the children to Israel, that she will never again see the children and other of like ilk.   Further, her experience, after traveling to Israel the last time, with Perry taking the children's passports upon arrival there and then keeping the passports from her - which, from her point of view, left her kidnapped in Israel and Perry's prisoner in Israel - has had a profound effect.  Indeed, she is reluctant to agree that Perry have any right to remove the children from the USA!

However, I have her advised that the probate court is likely to permit Perry to vacation with the children, but, if so, under approximately these circumstances.  It may also be that the probate court would require Perry to post a cash bond or letter of credit - but I have not included such a provision in this draft.  The court may not now grant Perry that right, but he could come back to court on a complaint for modification, thus generating more litigation expense, etc. which one would think Perry would want to avoid, in terms of his own pocket book.

I prepared the new draft, notwithstanding that it has now been more than a week since I sent you the prior draft; and I have heard nothing back.

While it may be claimed I am wrong to do so, in my read between the lines, my sense of it is that, right now, Perry is not truly interested in any settlement; and want to see what happens in the Federal Court. Sadly, this does not surprise me, as my sense is Perry thinks he is re-inventing the wheel. And, yet, from my point of view, this is an often - presented Opera in which the lines and ending never change. Perhaps, Perry should look at the script from Rigaletto and consider that, notwithstanding what he things are his good intentions, as did the court jester, his present course may well leave his children much like "Gilda."

In the meantime, unlike our past President Gerald Ford, this Gerald can both walk and chew gum.

Finally, I would like to get back either your comments on the proposed joint scheduling order which I sent on 1/31/06; or your o.k. to sign your assent.

My memory is Young gave us two weeks to file it; and our time is up on Monday. If, by noon on Monday, I do not hear back from you, I'll file my own proposal.

Have a great weekend.

J.

## Wendy Overbaugh

| | |
|---|---|
| **From:** | "Wendy Overbaugh" <wendy@nissenbaumlaw.com> |
| **To:** | "Carol J. King" <carol@wallacelawoffice.com>; "Barbara Kausits" <tiptheworld@yahoo.com>; "Jerry Nissenbaum" <jerry@nissenbaumlaw.com> |
| **Sent:** | Wednesday, February 22, 2006 1:12 PM |
| **Attach:** | 02.22.06.Agreement.wpd; 02.22.06.Agreement.doc; POA.Perry.doc; POA.Perry.wpd; Summary.Husband.Claims.doc; Summary.Husband.Claims.wpd |
| **Subject:** | Revised agreement and attachments |

Carol -

Attached in word and wordperfect are the most current revised drafts of the agreement, a Power of Attorney and a Statement of Claims for your review and comment.

Wendy

_____

Wendy J. Overbaugh
Associate
Nissenbaum Law Offices
(617) 330-9090

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

NORFOLK, DIVISION                              No. 04D-0759

**BARBARA KAUSITS**
**a/k/a BARBARA ANTELMAN,**
             Plaintiff,

v.

**PERRY ANTELMAN,**
             Defendant.

# SEPARATION AGREEMENT
## February ___, 2006

## I.    PARTIES.

The parties to this Agreement are:

a.    Barbara Kausits, a/k/a Barbara Antelman, born November 27, 1962, of 11 Grove Street, Sharon, Norfolk County, Massachusetts 02067 (Wife / Mother); and

b.    Perry Antelman, born May 20, 1955, of _____Sharon, Norfolk County, Massachusetts 02067 (Husband / Father) (collectively, parties).

## II.    BACKGROUND.

The parties were married at Jerusalem, Israel, on August 13, 1991. Seven children was born of their marriage, each birth occurring in Rhode Island, USA. Their names and dates of birth are:
1.    Natiya Rivka Antelman, born August 11, 1992, now age 13;
2.    Nediv-lev Ahron Antelman, born March 5, 1994, now age 11;

---

Antelman Agreement                                          _____ Husband
No. 04D-0759-DV1              Page 1              _____ Wife

3.    Nihera Hadassah Antelman, born November 19, 1995, now age 10;
4.    Naveh Avraham Antelman, born November 23, 1997, now age 8;
5.    Nuchal Naftali Antelman, born June 23, 2000, now age 5;
6.    Asael Hoshea Antelman, born September 14, 2002, now age 3; and
7.    Yashar Ben Tzion Antelman, born September 14, 2005, now age 5+
months.

After marriage the parties lived together as husband and wife in this
Commonwealth and last lived together at 70 Ashcroft Road, Sharon, Norfolk
County, MA 02067 on or about August 24, 2004.

An irretrievable breakdown in the marriage relationship has occurred,
continues and there is no reasonable likelihood they will ever again resume marital
relations.

## III.    PURPOSE.

The purpose of this Agreement is to settle all matters which should be
resolved in light of the above referenced background.

## V.    AGREEMENTS.

**The parties agree:**

**SEPARATE STATUS.**

1.    Each may continue to live separate from the other, as if sole and unmarried.

2.    a.    Neither shall contract nor incur any debt, charge or liability in the
other's name or for which the other may become liable.

    b.    Each warrants and represents to the other that he or she has not and
will not incur any debt or made any commitment for which the other or his or her

Antelman Agreement
No. 04D-0759-DV1                    Page 2                    _____ Husband
                                                             _____ Wife

estate may be liable; nor used the other's name in order to have credit extended to him or her.

    c.    Except as may be expressly stated elsewhere in this Agreement, all liabilities listed on each party's Rule 401 Financial Statement shall remain that party's own responsibility.

### WAIVER OF ESTATE CLAIM.

3.    Except to enforce the terms of this Agreement, or a judgment of divorce, or as otherwise specified in this Agreement, each:

    a.    waives all rights to the last will made by the other, including dower and curtsey and waives, as well, all rights to take a statutory forced share of the other's estate;

    b.    waives and relinquishes all interests which either may now or hereafter acquire in or to any real or personal property of the other;

    c.    waives and relinquishes all interests which either may now or hereafter acquire in or to any interest in the other's life insurance, pensions, annuities and any other retirement funds, whether named as a beneficiary or otherwise except as set forth in Exhibit B;

    d.    shall renounce and refuse to accept any interest in any of the above described assets and renounce, as well, any interest received from the other's estate, or on account of the other's death, unless specifically provided for in a will executed after the date of this Agreement, except that sufficient assets shall be retained to pay for taxes (including, penalties and interest), if any, which are assessed as a result of the renouncement.

4.    a.    Hereafter, each shall have the right to dispose of his or her property by will, or otherwise, in such manner as each may, in his or her uncontrolled discretion, deem proper.

Antelman Agreement
No. 04D-0759-DV1                  Page 3               _____ Husband
                                                    _____ Wife

b.    Any power of attorney or health care proxy previously given from one party to the other is hereby revoked.

### RELEASES.

5.    Except to enforce the terms of this Agreement and / or the Judgment of Divorce:

a.    each hereby releases and forever discharges the other from all claims and obligations which either has ever had, now has or may have against the other up to the date of this Agreement, including but not limited to torts and claims against the property of the other, it being the parties' intention that, after signing this Agreement, there shall exist between them only such rights and obligations which are specifically provided for in this Agreement; and

b.    each acknowledges that each has received good and adequate consideration for the above releases from the party being released.

### ENTIRE AGREEMENT.

6.    Neither has made, nor relied upon any promise, warranty or representation, except those expressly made in this Agreement. Nothing which is claimed to have been said or agreed by one party to the other, at any time, place or under any other set of circumstances shall be used to vary the terms of this Agreement.

7.    Each accepts the terms of this Agreement in full satisfaction and discharge of all claims, past, present and future, which arise out of the marital relationship, including alimony and a division of property.

### EXHIBITS.

8.    The parties are bound by and will perform the terms set out in **Exhibits A through H** attached hereto, and incorporated herein by reference.

### MODIFICATION.

Antelman Agreement
No. 04D-0759-DV1                          Page 4                          _____ Husband
                                                                          _____ Wife

9.     The terms of this Agreement shall not be altered or modified except by a written agreement signed and acknowledged by both parties and submitted to the Norfolk Probate Court or by order of the court upon the filing of appropriate pleadings, followed by proof required by law to obtain a modification.

### SURVIVAL OF AGREEMENT AFTER DIVORCE.

10.    a.    (1)    At any hearing on the Wife's complaint for divorce, a duplicate original of this Agreement may be submitted to the court and incorporated into the Judgment of Divorce.

(2)    Notwithstanding such incorporation, this Agreement shall <u>NOT</u> be merged into the Judgment, but shall survive and have independent legal significance; and be forever binding, **except however, all issues pertaining to the parties' minor children and alimony for Wife shall be merged into and become a part of the judgment, modifiable in accordance with the law of this Commonwealth.**

b.    The purpose of this provision is to:

(1)    protect  each against any attempt by the other to vary the articulated and plain meaning of the terms of this Agreement after entry of a Judgment of Divorce; and

(2)    to enable the parties to enforce the terms of this Agreement either as a Judgment of Divorce or as a binding contract in any court with jurisdiction over the property of or over the other party.

### STRICT PERFORMANCE.

11.    The failure of a party to insist, in any instance, upon the strict performance of any term, shall not be construed as a waiver. Rather such term shall nevertheless continue in full force and effect.

### VALIDITY / SEVERABILITY.

Antelman Agreement
No. 04D-0759-DV1                        Page 5                        _____ Husband
                                                                      _____ Wife

12.   In the event any part of this Agreement is held invalid, such holding shall not invalidate the entire Agreement. Instead the remaining provisions shall continue to reflect fairly the intent and understanding of the parties and be in full force and effect.

### DEATH.

13.   This Agreement shall be binding upon the parties' respective estate, legal representatives, heirs and assigns; and, as well, upon the parties even if one or both of them die before entry of a Judgment of Divorce, Absolute.

### GOVERNING LAW.

14.   This Agreement is to be construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts, which are now in force and effect.

### VOLUNTARY EXECUTION.

15.   a.   Wife has had independent legal advice from Attorneys Gerald L. Nissenbaum and Wendy J. Overbaugh, 160 Federal Street, Boston, Massachusetts, 02110. Husband has had independent legal advice from Attorney Carol J. King, Wallace Law Office, P.C., One Post Office Square, Sharon, Massachusetts 02067. Neither has relied upon any legal representation made by counsel for the other, nor has either interpreted any statement made by the other's counsel as legal advice intended for other than the benefit of that lawyer's client.

b.   Each:

(1)   has read this Agreement and fully understands the background, facts and circumstances;

(2)   has been fully and fairly informed of all of his or her legal rights and liabilities;

(3)   believes this Agreement to be fair, just and reasonable under the circumstances; and

Antelman Agreement
No. 04D-0759-DV1                    Page 6                    _____ Husband
                                                             _____ Wife

(4)    signs this Agreement freely and voluntarily and without any coercion or undue influence by the other.

**FULL DISCLOSURE.**

16.    Each has:

a.    fully described and disclosed his or her assets, income and liabilities to the other to the best of his or her knowledge and ability, as set out on the financial statements on the form provided by the court and upon which each relies; and

b.    carefully considered the current assets and income, financial resources, liabilities and expenses of the other and of themselves.

17.    Each:

a.    has had the opportunity to fully discover the position and circumstances of the other and waives any further discovery and evaluations;

b.    understands the position and circumstances of the other;

c.    has read this Agreement, line by line;

d.    is satisfied with and understands the terms, provisions and conditions of this Agreement; and

e.    solemnly intends to be bound by the terms of this Agreement, come "hell or high water."

**GOOD FAITH AND FAIR DEALING.**

18.    Each will comply with the terms of this Agreement in good faith and with fair dealing.

Antelman Agreement
No. 04D-0759-DV1                    Page 7                    _____ Husband
                                                             _____ Wife

19.   a.   Each will, without delay or charge to the other, sign, acknowledge and deliver such documents and other items as are reasonably necessary to effect the terms of this Agreement.

b.   Except as stated otherwise, to the extent reasonably possible, all transfers required by this Agreement shall be effectuated within 30 days from the date of this Agreement, with reasonably satisfactory written evidence given by the transferor to the transferee.

20.   Unless the context otherwise provides, whenever a number of days is specified for the performance of an act, the time for starting the counting shall begin with the date of this Agreement.

21.   Except where one may have specific written authorization, neither party may sign the other's name to any document for any reason.

22.   Whenever, per the terms of this Agreement, a party's agreement is required, it shall not unreasonably be withheld or delayed.

**INDEMNIFICATION.**

23.   a.   Husband shall indemnify and save Wife harmless from and against all liabilities, claims, losses, damages and expenses, tax or other deficiency, penalty, interest charge, assessment, tax lien or expense, including reasonable accountant's and attorney's fees, costs or disbursements arising from claims made by any taxing authority in the USA or Israel.

b.   Each shall indemnify and save the other party harmless from and against all liabilities, claims, losses, damages and expenses, tax or other deficiency, penalty, interest charge, assessment, tax lien or expense, including reasonable accountant's and attorney's fees, costs or disbursements arising his or her breach of their respective promises, warranties and representations in this Agreement.

c.   In the event a third party makes or commences any claim against an indemnified party, the indemnified party shall promptly give notice of the claim to

Antelman Agreement
No. 04D-0759-DV1                     Page 8                     _____ Husband
                                                               _____ Wife

the indemnifying party; and the indemnifying party shall have the opportunity, in good faith and at his or her own expense, to defend any such claim.

**COUNTERPARTS.**

24. This Agreement is executed in counterparts, each of which is deemed to be an original.

**SIGNED AS A SEALED INSTRUMENT** this _____<sup>th</sup> day of February, 2006

| _____ | _____ |
| Barbara Kausits, a/k/a Antelman | Perry Antelman |

## COMMONWEALTH OF MASSACHUSETTS

_____ County                                           February___, 2006

Then, personally appeared    **BARBARA KAUSITS, A/K/A ANTELMAN** and proved to me through satisfactory evidence of identification which was _____, to be the person whose name is signed on the preceding and/or attached document and acknowledged to me that she signed it voluntarily for its stated purpose,

Before me,

                        _____
                        _____, Notary Public
                        My commission expires:


## COMMONWEALTH OF MASSACHUSETTS

_____, County                                     February___, 2006

Then, personally appeared    **PERRY ANTELMAN** and proved to me through satisfactory evidence of identification which was _____, to be the person whose name is signed on the preceding and/or attached document and acknowledged to me that he signed it voluntarily for its stated purpose,

Before me,

                        _____
                        _____, Notary Public
                        My commission expires: _____


Antelman Agreement                    Page 10                    _____ Husband
No. 04D-0759-DV1                                                 _____ Wife

# EXHIBIT A - ALIMONY

## HUSBAND'S WAIVER OF ALIMONY.

1.    Husband hereby waives any and all right he may have to any past or present or future alimony or support from Wife.

## ALIMONY TO WIFE.

2.    a.    Husband shall pay alimony to Wife, in the sum of $10 per month, which he shall pay at the same time and in the same manner as his payments of child support to Wife.

b.    Husband's obligation for alimony to Wife shall end upon the happening of the earliest of the following:

(1)    Death of either party;

(2)    Remarriage of Wife, whether said marriage ends by death, divorce or annulment; or

(3)    Order of a court of competent jurisdiction.

c.    Wife is obligated to promptly advise Husband of her remarriage, if any.

## MODIFICATION / CONTEMPT.

3.    a.    Wife may seek modifications of alimony and / or child support and on each such occasion the issue shall be treated as a matter of first impression before the court, so that Wife shall not be required to demonstrate or prove a material change in circumstances.

b.    If Husband seeks downward modification of alimony and /or child support he must prove, by a preponderance of the evidence, he has suffered a substantial and adverse change in circumstances.

    c.    Husband's remarriage and/or his obligation, if any, to pay alimony or support to a subsequent Wife or to pay child support to children other than children of the parties, shall not be a:

          (1)    justification for a reduction in Husband's obligation for alimony or child support;

          (2)    defense to Wife's request for increased alimony or child support; nor

          (3)    part of Husband's defense to any complaint for contempt commenced by Wife.

    d.    It may be that in the future, Wife is able to or does obtain part or full time employment or can or does have other sources of cash flow (hereafter, collectively, **"Wife's future cash flow."**) Nevertheless, evidence of Wife's future cash flow shall not be admitted into evidence for any reason in any future complaint for modification or contempt.

4.    By way of explanation, the above terms are intended to address, among other things:

    a.    The present and uncertain future prospects for Husband's various business enterprises and his possible future receipt of income, capital gains or other cash flow;

    b.    The fact that Wife is not now able to support herself because she is the primary caretaker of the parties' seven children;

    c.    The fact that the alimony and child support provided for in this Agreement (i) does not provide Wife with enough money to fully support herself and the parties' seven children, and (ii) are based solely on Husband's oral claims and explanation about both the amount of his cash flow and how and why that cash flow comes to him (hereafter, collectively, **Husband's Claims**.)

5.    In order to resolve the case at this time, Wife agrees to not now seek discovery in regard to either Husband's Claims, including possible sources of his income or cash flow to and for Husband's benefit. However, in addition to all discovery she is entitled to at the time of or in connection with all future complaints for contempt or modification, Wife specifically excludes herefrom her above waivers of discovery and reserves her right, to seek the discovery she could have. but for this Agreement, did not seek at this time. In other words, Wife's future discovery includes her right to go back beyond the date of this Agreement and to go behind the Judgment of Divorce.

6.    The parties have contemporaneously signed a several copies of a Notarized separate document entitled "Summary of Husband's Claims and Explanation" (**Summary**) which, while incorporated, shall not be physically attached to this Agreement. The Summary may be used by Wife in all future complaints for modification and / or contempt. In connection with said future complaints, Wife may show the document to her counsel, experts and the court. If Wife offers the Summary as an Exhibit, Husband is NOT permitted to object to the Summary being marked as an Exhibit, in evidence, nor offer evidence to rebut.

6.    Husband and Wife agree that Wife may and hereby specifically reserves her right claim and prove, in any future complaint for modification of alimony or child support that Husband has a greater ability to pay alimony and child support than he may now or then claim, including proof that he can earn more money by engaging in some other type of employment, such that the Judge may impute income to him, which income should, in turn, be considered in determining whether the amount of child support and alimony which Husband should pay. This clause is included in this agreement so as to make clear to any future court considering this matter that the parties are aware of ***Kelley v. Kelley***, 64 Mass. App. Ct. 733 (2005) and do not want Wife to be foreclosed from making the above arguments at any future point(s) in time.

<div align="center">(End of Exhibit A)</div>

Antelman Agreement
No. 04D-0759-DV1                    Page 13                    _____ Husband
                                                               _____ Wife

## EXHIBIT B - DIVISION OF PROPERTY

The parties agree that all of their assets have been considered.

**REAL ESTATE.**

**Sharon, MA.**

1.    The parties sold their marital home located at 70 Ashcroft Road, Sharon, MA (**Marital Home**.)  Wife received approximately $150,000 in net proceeds from the sale (Proceeds), which proceeds have been in Wife's control.

2.    The Proceeds had to be or will be used by Wife to pay, among other things:

        a.    For the 2005-2006 academic year, the parties' school age children are attending pre-school, kindergarten and grade schools, all of which are private Orthodox religious schools (**Religious Schools**) at an out of pocket expense of $_____ to date, plus anticipated expense of $_____.

        b.    To supplement what Wife needs to support herself and the children, over and above the child support and alimony payments, which are not sufficient to meet their expenses.

        c.    To pay $8,000 as a deposit toward her half-share of the costs in connection with a certain container, discussed below in this Exhibit B, under "Personal Property."

        d.    To pay her legal counsel and related expenses.

3.    The current balance of the Proceeds, after deducting the anticipated expenses needed to complete the 2005-2006 academic school year is approximately $_____.

**Bet Shemesh, Israel.**

4.    a.    The parties own a house in Bet Shemesh, Israel (**House**). Husband is currently trying and shall use his best efforts to sell the House to an-arms length buyer for the current fair market value, from which the Husband represents the proceeds should be approximately $100,000.

    b.    The parties shall cooperate in facilitating the sale of the House.

        (1)    To this end, if not yet accomplished, the parties shall sign all papers needed to dissolve all Israeli Rabbinical Court obligations to post bonds.

        (2)    Wife has signed a Power of Attorney appointing her Israeli attorney, Advocate Pnina Shapira. Wife represents Shapira advises that the form of the Power of Attorney has been used by Shapira in the past and accepted by title examiners and others in Israel as sufficient to empower Shapira to act on Wife's behalf in connection with signing purchase and sale agreement, deeds and otherwise complete the sale of real estate and related matters. Shapira also advises she has sent a copy of the Power of Attorney to Advocate Larry Dub, who is acting on behalf of the parties in an effort to sell the House.

        (3)    To the extent any other papers are required, each party shall promptly sign them.

    c.    Husband represents that the mortgage on the House is in arrears; and that to prevent the bank holding said mortgage from commencing foreclosure proceedings, Husband paid about $5,100 at the end of January 2006 and agreed to pay another $5,100 at the end of February and March 2006 to get the mortgage current. Husband agrees to make the said payments and future mortgage payments to prevent the house from being foreclosed.

    d.    Husband shall promptly provide (by fax or as an e-mail PDF attachment) Wife's Massachusetts counsel, Attorney Gerald L. Nissenbaum (e-mail: jerry@nissenbaumlaw.com; fax: ++ 617 / 330.6909) with copies of all documents mentioned above and documents related to the House and the hoped-

Antelman Agreement
No. 04D-0759-DV1            Page 15        _____ Husband
                                                _____ Wife

for sale, including, without limitation, document regarding the said arrears, threat to foreclose, payments Husband has and will make to keep the house from being foreclosed, offers to buy, purchase and sale agreement, closing statement, each to be sent as the documents are generated or can be provided to Husband. By signing this Agreement, Husband hereby authorizes and instructs his Israeli counsel, presently Adv. Shilo and the real estate attorney Adv. Dub (hereafter, collectively, **Shilo**), to directly provide Nissenbaum with copies of documents, status reports and related information.

e.   The net money from a sale or  foreclosure of the House (House Proceeds) shall first be paid directly to Shilo and used by him to pay the following, in the order stated:

(1)   To pay any money due in order to complete the payment of charges and expenses concerning the Container, including storage charges in Israel, ship's and customs brokers, shipping the Container to Wife's Sharon rented home and, after Wife removes her property therefrom, the cost of the owner picking up and removing the Container (hereafter, collectively, **"Container Costs."**)

(2)   To pay Wife one-half (½) of the Container Costs which she paid, so that, at the end, each party will have paid one-half the said Container Costs.

(3)   To pay Shilo their then outstanding balances due for work related only to the preservation and then the sale of the House.

(4)   To pay Wife the equalizing payment required by the Marital Balance Sheet.

(5)   To pay one-half (½) of any balance to Wife; and

(6)   To pay the other one-half of the balance to Wife up to $_____ which is the parties' estimate of the amount which is needed to pay for the expected costs of the children's

Religious Schools for the academic year 2006-2007. As used in this agreement said costs include, *without limitation*, application fees, testing fees, tuition, books, laboratory and other fees normally charged by each school, food at school, uniforms, transportation to and from School, tutoring, an allowance for children to use while at school, sports equipment and uniforms, musical instruments, and the expenses associated with any other extracurricular and religious activities.

f.    In order to assure Husband's compliance herewith, by signing this agreement, Husband authorizes and irrevocably instructs Shilo:

(1)    To take such action as is needed for him to receive and directly take into his possession at the closing or to receive from the closing attorney (Dub) or agent a certified or bank check for the House Proceeds;

(2)    To make payments from the House Proceeds as required in Exhibit B, ¶ 4.e.;

(3)    To pay any remaining balance to Husband.

g.    (1)    In the event the House Proceeds are not sufficient to meet the payment obligations set forth in Exhibit B, ¶4.e.(1)-(4) and (5), Husband shall in any event, within 30 days after the closing on the House, make the said payments to Wife.

(2)    If Wife does not receive funds per Exhibit B, ¶4.e.(6), the children will, absent payment from Husband's parents or others, as discussed below, attend secular or public school.

h.    Wife shall hold the money paid to her per Exhibit B, ¶4.e.(6) in a separate account; and will give Husband quarterly accountings, including copies of checks, bank statements and, to the extent she has them, invoices, paid bills, etc.

Antelman Agreement
No. 04D-0759-DV1                  Page 17                  _____ Husband
                                                          _____ Wife

**BANK ACCOUNTS.**

5.    The parties have no joint bank accounts at this time.  The parties individual bank accounts or assets, which are reflected on the following marital balance sheet; and which shall remain their individual property.

**RETIREMENT ACCOUNTS.**

6.    The parties have no retirement accounts.

**LIFE INSURANCE.**

7.    a.    Neither party has life insurance at this time.  In or within 30 days, Husband shall apply for a fixed term (no cash value) life insurance policy in the sum of $2 million dollars ($2MM) naming Wife as primary beneficiary (**Policy**).  Husband shall provide Wife with a copy of his application to one or more insurance companies for one or more policies which total $2MM.  The fixed term shall run from date of issuance of the Policy to Husband's 70th birthday.

b.    In or within 90 days, Husband shall provide Wife with a copy of the issued policy and face sheet.  Time is of the essence for the Husband's obligation to apply for and obtain this life insurance.

c.    Husband shall cooperate with the insurance company by promptly making himself available for any requested medical examination.

d.    Husband shall, at his sole expense, pay the full annual premium on the Policy, in advance on or before each anniversary date.

e.    Husband shall require the life insurance company to automatically provide Wife with copies of all bills and notices regarding said policy.  By signing this agreement, Husband authorizes Wife to directly contact the life insurance company and authorizes and directs said company to provide all documents and information about Husband's life insurance policies directly to Wife.

f.    Within 10 days of Husband paying the initial and each installment of or annual premium on the Policy, Husband shall provide Wife with proof of his payment.

g.    Husband shall maintain the Policy until the earliest of:

(1)    his attaining age 70;

(2)    his no longer having an alimony or child support obligation (including no longer having an obligation to pay for any child's school or college); or

(3)    the death of Wife, but in the latter event, any such policy shall then be continued in place and be paid to a person to be designated by Wife in or in accordance with this Agreement or designated in her last Will and Testament (and in default, to be designated by a court of competent jurisdiction.)

h.    In furtherance of the Exhibit B, 7 g (3), Wife initially designates herself as primary beneficiary and her sister, Tamar Kausits, now of 87 Clover Hill Circle, Tyngsboro, MA 01879; telephone # 978-569-5023 as alternate beneficiary.

i.    Wife has the right to substitute another person for Tamar Kausits and, as well, to also name a successor who will serve in place of Tamar Kausits. Husband shall, on his initial application and thereafter name Wife as primary beneficiary and Tamar Kausits as secondary or alternative beneficiary, until and if, as and when, Wife changes to another alternate beneficiary. The Husband shall not change the beneficiaries on the Policy unless he has written instructions from Wife so to do.

j.    In the event Policy proceeds are paid to Tamar Kausits she shall hold the funds in trust for the benefit of the parties' children, as described elsewhere in this agreement.

Antelman Agreement
No. 04D-0759-DV1                  Page 19              _____ Husband
                                                       _____ Wife

k.     If Wife receives Policy proceeds, she may use them to support herself and, in her sole and unfettered discretion, to support one or more of the children, as she deems meet and appropriate.

l.     If the alternative beneficiary receives the Policy proceeds, that person shall hold the funds in trust for the benefit of the children, with payments to be on an as-needed (a so-called, spray and sprinkle) basis for each child, in various amounts as the trustee, in his or her sole discretion decides, until all children have become emancipated. The trustee may also use funds, in his or her sole discretion, to help support (i) a spouse or significant other of a child; and (ii) a child born of a child of the parties. At the time of emancipation of all children, the remaining funds, if any, shall be equally divided among the children, by right of representation. If, at that time, money would be paid to a grandchild who is not emancipated, those funds may be paid outright to the grandchild's parent, or to one or more uncles or aunts, to be held in trust and used for that grandchild to further the purpose of this paragraph. The alternative beneficiary may charge reasonable compensation for his or her work. The Wife may, in her discretion, prepare a revocable or irrevocable life insurance trust to receive the proceeds of the Policy.

m.     In the event Husband fails to make timely payments on the premiums for said Policy, Wife may, at her option, make the payments to keep the Policy current and, thereafter, seek reimbursement from Husband or, if necessary, the court.

n.     In the event of Husband's death at a time when said Policy is not in force, Husband's obligation to pay $2MM shall be an obligation of his estate.

**PERSONAL PROPERTY.**

**Cars.**

8.     Each party drives and shall retain as his (1998 Chevrolet Venture) or her (1999 Suburban truck) sole property the car now in his or her possession, free of all claims by the other party.

**Heirlooms.** *Jewelry*

9.    The parties and each child shall each retain, to the extent applicable, as his or her sole property, any gifts of a personal nature given to each by a parent, grandparent or other relative, as an heirloom, without said value being included in the marital estate. By way of example, Wife was gifted a set of ivory necklace, bracelet and earrings by her grandmother; various children had dolls given to them. The value of the heirlooms shall not be included in the value of the marital estate.

**Contents of Container.**

10.    a.    The parties' Marital Home was in Sharon, MA, held in Wife's sole name. Husband represents that while Wife and children were unable to leave Israel because of an EKUV he obtained from the Israeli Rabbinical Court, Husband did not pay the mortgage; and the house was going to be foreclosed. Under those circumstances, Wife agreed to and the Marital Home was sold. Husband sold some of the furniture and furnishings and elected to have the remaining contents of the Marital Home packed into a container (herein described as "**Container**") which he had shipped to Israel (Container.)

b.    The Massachusetts Probate Court issued an order, incorporated, herein, requiring the parties to jointly pay storage and other charges necessary to have the Container shipped back to Massachusetts, with each party paying one-half (½) these costs.

c.    In order to facilitate the return of the Container to her rented home in Sharon, MA, Wife advanced $8,000 of the costs. Wife may, in her sole discretion, elect to advance the full balance of the costs to have the Container shipped back to her Sharon, Massachusetts home. In any event, Husband shall repay Wife one-half the costs either from the net proceeds from the sale of the House or from Husband, per other provisions of this Agreement.

d.    Upon the Container arriving in Sharon, MA it shall be delivered to the yard or driveway of the home in which the Wife and children are now living.

Antelman Agreement
No. 04D-0759-DV1                                        Page 21                                        Husband
                                                                                                        Wife

e.    In or within seven days of the arrival of the Container, the parties shall open it together and unload it themselves or with the help of others. Husband, Wife and children, as the case may be, shall take possession of their heirloom items.  Thereafter, the Wife shall have first pick of an item, Husband second, and they shall alternate picks until one party has selected items which, in terms of value are approximately one-half the total value of the amount which the items would sell for at a used furniture auction.  At the point where one party has selected items totaling one-half the said value, the other party shall be entitled to all remaining items.

f.    For purposes of this Agreement, one item would consist of such things as a complete set of dishes, a complete set of glasses, an entire bedroom set, including bed, bureaus, etc. or an entire dining room set including table, chairs and sideboard.  If the parties are unable to agree on the value, it shall be set by an appraisal done by Angelo Scala or his son, of Scala Antiques of Georgetown, MA, both of whom have extensive experience in appraisal and sale of household and antique items.

g.    Photographs which may be desired by both parties shall be color photocopied or copied onto a computer disc by Wife, with the expense being equally shared by the parties; and then about one-half the copies plus one-half of the originals shall be divided to each party, so that each of them has a full set of photographs consisting of half originals and half copies.

h.    After the Container is emptied, it shall be removed, the cost of which shall be shared equally by the parties.

**Husband's Stock in Closely Held Companies.**

11.    Husband owns stock in three closely held companies which are stated on his court-filed Rule 401 Financial Statement and/or reflected on the Marital Balance Sheet, set forth below.

**Marital Balance Sheet.**

12.    Subject to other provisions of this Agreement, the following Marital Balance Sheet reflects the parties' agreed value of and items of property subject to distribution; and indicates which party is to receive that item.

13.    The values used for Marantech, LLC, Aidance Skincare and Tivian Industries have been proffered by Husband. Husband warrants and represents he has used his utmost good faith and fair dealing in establishing these values; and has done so cognizant of his fiduciary duty to Wife. Based upon Husband's specific representation and in order to effectuate settlement now, without the need to pay a business appraiser/CPA/ expert to establish values, Wife relies upon both Husband's values for these assets and his warranty and representation, as set forth in this paragraph.

| Asset | Value | Wife | Husband |
|---|---|---|---|
| Balance of Proceeds from sale of 70 Marital Home, Sharon, MA | $_____ | x | |
| Proceeds from sale of House in Israel (Est.) | $100,000[1] | | x |
| Chevy Venture | | | x |
| Suburban Truck | | x | |
| Marantech, LLC Stock | $30,000 | | x |
| Aidance Skincare Membership Units | $60,000 | | x |
| Tivian Industries Stock | $40,000 | | x |
| BioVest | | | x |

[1] Pursuant to other provisions in this Agreement, this represents the approximate expected net House Proceeds, from which money will be paid, pursuant to Exhibit B, ¶4.e.

Antelman Agreement
No. 04D-0759-DV1

Page 23

_____ Husband
_____ Wife

| H's _____ Bank, Account ending in xxxx | | | x |
|---|---|---|---|
| W's _____ Bank, Account ending in xxxx | | x | |
| Sub-total | | | |
| Equalizing Cash Payment | | | |
| Total | | | |

11.    All property hereafter acquired by either party, all income and earnings of each and all appreciation of all property shall constitute and be the sole and separate property of the person by whom the said property is acquired or earned.

<center>(End of Exhibit B)</center>

## EXHIBIT C
## HEALTH INSURANCE AND UNINSURED MEDICAL EXPENSES

1.      Presently Husband has dental insurance for the family through his employer. He shall maintain said policy for the benefit of Wife and the parties' minor children.

2.      Presently, Wife has Mass Health insurance for herself and the children. Said insurance is going to expire on March 6, 2006.

3.      a.      Husband shall immediately obtain an HMO health insurance policy with Blue Cross / Blue Shield (e.g. HMO Blue) or any other major health insurance provider, with the lowest available co-pays, for the benefit of himself, Wife and the parties' minor children (hereafter, collectively, **Health Insurance**.) Husband intends to provide the Health Insurance through one of the companies to which he consults or in which he has an ownership interest.

        b.      If, Husband cannot get one of the companies to provide him with Health Insurance, he shall immediately try to arrange for a company to add Wife to the books as an employee with Wife's compensation being a family health insurance plan.

        c.      If Husband cannot immediately arrange for Heath Insurance, Wife may obtain family Health Insurance directly from Blue Cross / Blue Shield or other provider or obtain the health insurance through an organization to which she is or may become a member.  Husband shall immediately repay Wife for all costs associated with her obtaining Health Insurance, including membership fees, if any, in the Small Business Association or any other such organization that provides group Health Insurance plans; and, as well, immediately repay Wife any premium on said Health Insurance.  Thereafter, on or before the fist of each following month, Husband shall pay Wife, in advance, the premium due on said Health Insurance.  Time is of the essence in making this and all other monthly payments by Husband.

Antelman Agreement                                          _____ Husband
No. 04D-0759-DV1              Page 25                        _____ Wife

d.   Whether the policy is ultimately in Husband or Wife's name, Husband shall make certain that the Health Insurance remains in full force and effect.

4.   a.   In the event the Health Insurance is in Wife's name and Wife remarries, Husband shall no longer be covered under the Wife's Health Insurance.

b.   If, after her marriage, Wife can then be covered by her then-husband's Health Insurance, she shall also attempt to have the children covered under that plan. If there is an additional cost of including the children under Wife's then-husband's Health Insurance, Husband shall pay that extra cost in advance each month.

c.   If Wife obtains employment and can obtain employer-provided Health Insurance for herself and the children, she shall do so, if the cost to her would be less than the costs being paid for her then-existing Health Insurance. If there is a cost to Wife for her share of any employer provided Health Insurance covering both Wife and the then un-emancipated children, Wife shall, in the first, instance, pay her employee's share of the cost. Promptly thereafter, Husband shall pay Wife that cost; and thereafter, he shall pay the cost in advance, each month.

5.   Husband understands and accepts that under current law, Wife obtains new Health Insurance after the divorce is final, or if he remarries, he will no longer be covered under Wife's Health Insurance.

6.   a.   If, before the final divorce judgment is final, Husband obtains employer-provided Health Insurance which would cover the Wife and Children, then they shall be enrolled with him and he shall ensure that the premium is paid by his employer. If there is any co-payment due from Husband, he shall pay the same.

b.   If Husband, after the final divorce judgment, obtains employer-provided Health Insurance, it will cover just him and the minor children. In such an event, Husband shall also pay Wife the cost of her obtaining a Health Insurance for herself.

Antelman Agreement
No. 04D-0759-DV1                     Page 26                     _____ Husband
                                                                 _____ Wife

c.    In the event Husband obtains employer-provided Health Insurance for the children, a so-called children's Medical QDRO will be presented to the court for approval, after which it shall be filed with the administrator of the Husband's Health Insurance plan.

d.    If Husband's employer-provided policy does not cover Wife - either because he obtains the policy after the divorce is final or because he has remarried - Wife will then obtain her individual Health Insurance.    Husband shall be obligated to pay Wife for the cost of her Health Insurance in the same method and manner as described above for payment of the Wife's family plan Health Insurance.    The reason for this provision is that Wife is not likely to obtain her own or employer-provided Health Insurance or to have money to pay for her own Health Insurance because her primary obligation and job right now is doing her best to raise seven children.

7.    In the event Husband does not provide or pay for Health Insurance, and Wife obtains and /or pays for Health Insurance in his stead, thereafter, Husband must immediately repay Wife in full for her out of pocket payments and, as well, thereafter pay said premiums each month in advance.    Husband's failure to timely pay any Health or other insurance premium or to repay Wife, if she pays the premiums, is a material and substantial breach.

8.    The parties acknowledge that if there are health care related expenses which would have been covered by insurance, but there was no Health Insurance in place at that time due to a breach by a party, the party who failed to obtain and maintain the Heath Insurance (Breaching party) shall be solely responsible for paying the full amount due for the uninsured expenses. If the non-Breaching party pays these expenses, the Breaching party shall promptly reimburse the non-Breaching party.

9.    Husband shall pay the children's uninsured medical and dental care expenses, including orthodontia, psychiatric care and prescription medication.

10.    If Wife incurs an uninsured expense for the children, she shall, on no more than a monthly basis, submit a copy of the bill(s) or, if paid, the paid receipt(s) or a copy of a check(s) in payment thereof, to the Husband.    Within 7 days of

receipt, the Husband shall pay any unpaid bill or, as the case may be, pay Wife for her out of pocket expenses. Husband's failure to pay these uninsured medical bills or reimbursements to Wife, if she pays those expenses, is a material and substantial breach.

11.    Hereafter, each party shall be solely responsible for his or her own uninsured medical and other health care expenses.

<div align="center">(End of Exhibit C)</div>

## EXHIBIT D – CHILD RELATED PROVISIONS

### LEGAL AND PHYSICAL CUSTODY AND VISITATION (PARENTING TIME.)

1.   a.   The parties shall have shared or joint legal custody of their seven children, with Wife having care and control at all times when the children are not going to be with Husband at the times set forth below.

b.   The parties shall respectfully discuss and jointly decide all major matters related to their children's health, religious and secular education and welfare including, but not limited to, such things as elective medical treatment and activities which require financial contribution from the other party.

c.   As to emergency decisions, the parent whom the child is with, shall make decisions and/or give consent for treatment. However, that parent shall notify the other parent as soon as possible and, to the extent possible, give the other parent an opportunity to participate in decision making / consent.

2.   a.   The Wife shall have physical custody of the parties' minor children at all times when the children are not in Husband's physical custody as specified below in this Exhibit D.

b.   Wife and the parties' children currently reside in Sharon, MA and have no immediate plans to move. Husband currently resides in an apartment in Sharon, MA and has no immediate plans to move.

c.   If, within the next twelve months, either party decides to relocate outside of Sharon, MA, he or she shall so notify the other party giving no less than two months notice. Thereafter, the other party can decide whether to move or, if the move is greater than 30 miles away from Sharon, decide whether the matter needs to be brought to the court's attention for a modification of the parenting schedule.

d.   After a year from the date of this Agreement, Wife may relocate with the children to any place within Massachusetts.

Antelman Agreement
No. 04D-0759-DV1                    Page 29                    _____ Husband
                                                              _____ Wife

e. If, at any time, Husband relocates outside of Massachusetts or spends so much time outside Massachusetts so as to constitute an effective removal, Wife may move to any other place.

3. Husband shall have physical custody of the parties' older six children as follows:

a. Alternate weekends commencing Friday at the conclusion of school when Husband shall pick the children up from their respective schools / day care(s) and extending to Sunday evening at 5:00 P.M.

b. In the event the children's school is closed on Monday for either a secular or religious holiday following the Father's alternate weekend, his weekend visitation shall automatically extend through said Monday at 5:00 P.M.

4. a. As for the seventh and youngest child, Yashar, now about 5 months old, until such time as Yashar is three, Father shall see him on the weekends he has the other children, from 9 A.M. to 5 P.M. on Saturday and Sunday, extending to Monday if there is a so-called Monday holiday following Husband's weekend with the children.

b. Husband shall be obligated to pick up Yashar from and return him to Wife's home.

5. Husband is also be obligated to return the children at the end of his visitation to Wife's home. As Yashar gets older, he can start to participate in overnight visitation on a trial basis and then, hopefully, work his way into participating in the overnight visitation with his siblings.

6. In the event any of the children are ill, have homework or do not want to go on the visitation during a time in which they would otherwise be with Husband, at the option of Wife and child, that particular child(ren) may remain home. If, for example, the child is ill on Friday but is feeling better by Saturday afternoon and is healthy enough to join his/her siblings at Husband's home, Wife shall then make the child available for pick up by Husband or, at her option, bring that child(ren) to join the other children at Husband's home.

Antelman Agreement
No. 04D-0759-DV1                    Page 30                    _____ Husband
                                                              _____ Wife

7.     The parties agree to be flexible toward and mindful of their children's needs, particularly because of the wide range of their ages. They understand and accept that from time to time, a child may not go on visitation with Husband for a wide variety of reasons, such as, but not limited to: (i) a child (ren) is ill; (ii) Husband has planned activities which are age appropriate for some, but not all of the children; (iii) a child (ren) has particular homework or a project(s) due which they find too difficult to complete at or they feel they are too distracted at Husband's home; (iv) a child(ren) has a particular activity or sport in which he or she is involved; (v) a child wants to attend a friend's birthday or other party; (vi) and so on and so forth. In such event, the Wife will try to be available to care for the child(ren) not going with Husband.

8.     Husband's current employment requires him to travel to and from Israel, and elsewhere, on a frequent basis, sometimes taking him away for a month or more at a time. Husband shall give Wife as much advance notice of his travel as he is given, so that she can make necessary arrangements as a result of his missing his custodial time with the children. If the Wife had already made travel or other plans to be away during time the children would have been with Husband, then she may have to hire a babysitter or make arrangements to take the children with her; or she may have to cancel travel plans and lose deposits. In any such event, Husband shall reimburse Wife the costs of child care, travel and related expenses and lost deposits.

### SCHOOLS.

9.     Presently six of the seven children, and eventually all of the children will be attending school, from pre-school through high school (hereafter, collectively, School.) Presently, Wife serves as homemaker, caretaker, chief cook and bottle washer, etc. and also as primary chauffeur to get the children back and forth to their respective various Orthodox Jewish Religious Lubacvitch school, or Litvish (yeshiva) private Schools, where boys and girls study together (Religious Schools.) This necessarily takes much time and gives Wife no opportunity to have any kind of employment.

10.     The parties want their children to attend only Religious Schools. However, the School Expenses (see Exhibit B) is well beyond the Wife's means. For the

Antelman Agreement
No. 04D-0759-DV1                    Page 31                    _____ Husband
                                                               _____ Wife

2005-2006 school year, Wife used a portion of the net proceeds from the sale of the Marital Home to fund Religious School attendance for the children. For the 2006-2007 school year, Husband will fund the expenses of the children attending Religious School from his share of the Net Proceeds of the Home. (See Exhibit B.)

11.    After 2006-2007 academic year, unless Husband or other members of his family agree, in a notarized and binding written agreement to fund the children's attendance in Religious School through grade 12, the Wife has the right to place the children in public school, where they may, at her election remain through the 12th grade. In any event, Husband shall not look to Wife to share any part of the School Expenses for sending the children to Religious School.

12.    In the event one or more of the children are able to obtain scholarships or tuition grants, that will serve to reduce the Husband's obligation for those items. Husband shall have the obligation for applying for any such scholarships or grants. Both parties shall cooperate in seeking scholarships and grants for Religious School and College for the children by timely completing and returning financial aid and other forms, providing copies of tax returns or affidavits which will suffice to excuse providing said returns; and the like.

13.    Wife hopes to find some kind of employment as soon as possible, although it may well be years before she can do so. In any event, starting with the school year 2006-2007 she will no longer be required to drive the children to and from school, as School Expenses include such travel.

### HOLIDAYS AND VACATIONS IN USA.

14.    In the event the children are enrolled in public school the parties shall alternate years in which the children spend their Religious and Secular holidays with each parent, as follows:

Antelman Agreement
No. 04D-0759-DV1                    Page 32                    _____ Husband
                                                              _____ Wife

a.   Beginning in 2006 and in all even years thereafter, Wife shall have the children for:

- Rosh Hashana;[2]
- Christmas break from the close of school until 9 A.M. on the morning of the mid-way point in the break when they shall go to Husband's home until 5 P.M. on the day before they are to return to school, at which time they will return to Wife's home; and
- February school vacation, starting on the Friday at the close of school for 8 days to 5 P.M. on the second Sunday, being the day before they return to school.  (In the odd years when Husband has this vacation with children, he shall return the children to Wife's home by 5 P.M. on the second Sunday.)

b.   Beginning in 2006 and on all even years thereafter, Husband shall have the children for:

- Yom Kippur;
- Thanksgiving break from the close of school on Wednesday until 5 P.M. on the day before they are to return to school, at which time they will return to Wife's home;
- Christmas break from 9 AM on the morning of the mid-way point in the break until 5 P.M. on the day before they are to return to school, at which time they will return to Wife's home; and
- April school vacation week starting on the Friday at the close of school for 8 days to 5 P.M. on the second Sunday, being the day before they return to school, at which time they will return to Wife's home; and
- 4th of July (only during years in which it does not fall on a weekend in which event the holiday shall begin at 9 A.M. on the morning of the 4th of July and shall extend to 9 A.M. the

---

[2] For purposes of this Agreement, Jewish holidays begin 2 hours before sundown on the prior evening; and last until sundown on the day of the holiday.

morning of July 5th. When the 4th of July falls on a weekend or a Monday, whichever parent would ordinarily have the children for that weekend, shall have the children.)

c.    The parties shall swap schedules in odd years.

15.    In the event the children attend Religious Schools and have additional holidays, the additional holiday schedule shall rotate as follows:

a.    In even years Wife shall have the children for:
   * Last 2 days of Succot;
   * First 2 days of Pesach; and
   * Shavuot.

b.    In even years, Husband shall have the children for:
   * First 2 days of Succot;
   * Purim; and
   * Last 2 days of Pesach.

c.    The parties shall swap this schedule in odd years.

16.    In addition to the school vacation weeks referenced above, each of the parties shall be entitled to have the children for a two (2) consecutive week vacation period during the summer. Parties shall exchange summer vacation request schedules no later than March 15th each year. If the children attend day or overnight camp, have lessons or schools, the parties shall choose vacation time which would not interfere with the children's other activities.

**CHILDREN'S PASSPORTS.**

17.    The Wife shall have sole control and possession of all of the children's passports, both USA and Israeli. Husband is specifically restrained from applying for replacement or other passports for the children. Except however, if the Husband is traveling outside the USA, pursuant to other provisions of this Agreement and a child's passport is lost or stolen, he may seek a replacement passport for the sole purpose of continuing his travel and return to the USA; and,

if these circumstances apply, at the end of the trip, he shall give the children's replacement or renewal passports to Wife.

### TRAVEL WITH CHILDREN.

18. When a party travels with the children, he or she shall provide the other party with a detailed itinerary including: date of departure and return, air plane or other confirmation details and confirmation numbers, where s/he is going to be going, the days s/he will be there, contact and other telephone numbers for him/her, the children and the place s/he will be; and only if that party makes specific advance arrangements for the other party to speak at least once per day, except on the Sabbath, with the children. Each party shall insure that the other party has cell phone numbers and the number for the cell phones of any of the children who have a cell phone; and that all of these cell phones are taken on the trip, kept powered and kept on.

### HUSBAND'S TRAVEL WITH CHILDREN OUTSIDE U.S.A.

19. a. The Husband may travel with the children outside the USA, but only if, as and when, he enters into a new written agreement / memorandum signed by him and Wife which contains all of the information stated in the next-prior paragraph (**Travel Agreement**.) At that point, Wife shall provide Husband with the children's passports together with a Notarized statement that Husband is permitted to remove the children from the USA to the agreed-upon destination upon the terms set forth in what will then be the attached Travel Agreement.

b. After the parties have signed the Travel Agreement, or at such other time as the Court may order, Wife will then provide Husband the children's U.S.A. passports, for his use solely for the specified travel, together with a Notarized statement that Husband is permitted to remove the children from the U.S.A. to the agreed upon destination.

20. a. At no time for any reason, no matter what claimed emergency or other reason, may either party seek any order from the courts in Israel or elsewhere to prevent either party or the children from leaving Israel or any other

Antelman Agreement
No. 04D-0759-DV1                          Page 35          _____ Husband
                                                           _____ Wife

place they have travel to. If a party seeks such an order, he or she shall pay the other party's Expenses as defined below.

b.      More specifically, each party waives all rights to initiate legal or other proceedings under Israeli law or the law of any other country except for the law of Massachusetts and then, only in the Norfolk Probate Court, Canton, MA, U.S.A. (or if the children have been moved by Wife from Norfolk County, MA, then in a subsequent U.S.A. court that has subject matter jurisdiction under the UCCJA, UCCJEA and PKPA), on their own behalf or on behalf of the minor child(ren) against the other party for issues arising out of and/or relating to the children and any other issue contained in this Agreement.

c.      For purposes of this Agreement, expenses include the party's air and other travel, hotel, food and in-country travel including rental cars, cabs, legal fees and related costs in the U.S.A. and elsewhere, detective and other fees to search out and find the other party, certified copies and / or translation(s) of documents, and, generally, all other expenses reasonably perceived to be needed to effect a return of the children to Massachusetts or to whatever state in the U.S.A. Wife and children may have been living in at the time they left on the trip or wherever Wife resides at the time of the return.

### OTHER RELEVANT MATTERS.

21.   The birthdays of the parents and children will not change the visitation schedule. Rather, the parent or child will celebrate their respective birthday during the next scheduled time with that parent.

22.   Presuming the parties both continue to reside in Massachusetts, the parties shall adjust their rotating schedule such that the children are always with Wife on Mother's Day Weekend and always with Husband on Father's Day Weekend.

23.   a.      At all times when the children are with either parent, they shall be permitted to telephone, e-mail, instant message or otherwise communicate with the other parent, free from restrictions by the parent who the child is with.

Antelman Agreement                        _____ Husband
No. 04D-0759-DV1              Page 36       _____Wife

b.   In order to facilitate the children's ability to speak with Wife while they are in Husband's custody, Husband will forthwith have a so-called land line telephone installed in his home; and if a child has a cell phone, he will make sure it is powered up and on.

c.   The parties recognize that the children are entitled to privacy during their conversations with the other parent and to that end will not eavesdrop, prevent a child from having a private conversation, etc.

d.   When a child is called by a parent, the parent with whom the child is at that time shall make his or her best efforts to get the child to the telephone.   If a child has, in fact, gone to bed, then there is no need to wake the child.   However, the child shall be informed the next morning of the call from the parent and, as well, encouraged to call the other parent back.

24.   Telephone calls to the children by a parent shall be no more than two per day, unless there is a specific reason for a further call.

### COLLEGE EDUCATION.

25.   The parties hope that their children will attend college.   Accordingly, the parties shall discuss, investigate and agree on the appropriate college or university for the children when the time comes, taking into consideration each child's wishes.

26.   Because of the parties' present precarious financial situation, they are not able to make a commitment to help the children with undergraduate college expenses (College Expenses.)

27.   The term College Expenses includes, without limitation, preparatory courses for the SAT or other entrance examinations, application fees, travel to see various colleges, tuition, room, board (on or off campus, plus telephone and utilities), books, lab, necessary equipment and other associated fees, plus a

reasonable number of trips to and from college each year to the extent they are financially able at the time the children go to college.

28. The children shall each first apply for financial aid, scholarships and student loans, which, if received, shall be used as the first source of payment for College Expenses.

29. In the future, if the parties are not able to agree on which of them, if either, shall have to pay for all or a part of a child(ren)'s College Expenses, either party shall file an action in a court of competent jurisdiction. At that time they shall be obligated to jointly move - and do hereby authorize the other to assent to a motion for a speedy trial. At that time the court shall consider the parties' respective then-present obligations, income, assets and expenses.

### CHILD SUPPORT.

30. a. Husband shall pay to the Wife the sum of $2,580 per month on the first of March 2006, in advance, and the first of each subsequent month for support of their children, until further order of the court. Husband shall ensure that his payments are received by Wife on or before 10:00 A.M. on or before the first of each month. Between the date of this agreement and commencement of the monthly payments, Husband shall continue to make payments in accordance with the probate court's temporary order.

b. Husband's payments shall be made by his direct deposit or wire transfer into Wife's checking account. Wife shall, at the time of signing this agreement provide Husband with her checking account number, bank name and swift code. Wife may, no more often than once per year, change the account into which Husband is required to make his payments, providing Husband with sufficient advance notice so that his payments will not be delayed.

c. To the extent Husband is paying both alimony and child support he shall pay both amounts in full at the same time and in the same manner.

Antelman Agreement
No. 04D-0759-DV1                    Page 38                    _____ Husband
                                                              _____ Wife

31.   a.   Because of Husband's present uncertain income and future prospects, he is obligated to keep Wife advised of his job status, increases or decreases in income, including bonuses, travel paid by his employer and other perks.

b.   Annually, no later than May 15th, commencing on or before May 15, 2006, Husband shall provide Wife with copies of all income tax returns which should have been or were filed by him for the prior calendar year.

c.   If the tax returns are not provided, Husband must, instead, provide his accountant with access to all of Husband's books and records; and the Husband shall ensure that his accountant, by said May 15th each year, directly provides the wife with the accountant's Affidavit setting forth all of Husband's gross income, cash flow, capital gains from all sources, investments, expenses, plus all employer-paid perks.

d.   At her election, Wife may demand to see and, if so, Husband and/or his accountant shall provide her with underlying documents which support any part of the Husband's tax returns or accountant's Affidavit.

32.   a.   The $2,580 per month ($600 per week) is far from what is necessary to properly support their children.

b.   Therefore, at any time, or from time to time, Wife may file a complaint for modification of child support in which she shall NOT have to prove a material change in circumstances or an emergency in order to obtain either a temporary order of increased support, pending a trial or in order to obtain an increase in support at trial. Husband waives any requirement which the judge, in issuing a temporary order in the Wife's complaint for modification of child support, has to make findings.   These provisions are in addition to provisions regarding modification contained elsewhere in this Agreement.

33.   a.   The Husband shall pay 70% and the Wife 30% of the children's various fees for extra curricular activities (such as sports, lessons)  in which the children may wish to participate.

b.      Before a child is enrolled in any such activity, the parties shall communicate with each other in an attempt to agree on which activities the children will participate, taking into consideration the schedules of the other children and availability of the parents to get the children to and from the activities.

c.      Agreement of a party to the children's participation in activities shall not be unreasonably withheld.  If a child is enrolled in an activity, the parent with whom that child may be on that day shall use his or her best efforts to get the child to the activity, particularly if it is a team sport in which team mates may be "counting" on the child to be present and participate.

### US DISTRICT COURT (MA).

34.    The parties shall stipulate to a dismissal of the USDC (MA) action No. 05-11786-WGY, with prejudice and without costs.

### REVIEW OF HUSBAND'S TIME WITH CHILDREN.

35.    The physical custodial arrangement / parenting plan shall, at a party's written request made no earlier than one year from approval of this Agreement by the court,  be reviewed.   Initially the parties shall try to agree on a revised schedule.  If they are unable to so agree, they shall enter mediation with Attorney Karen Tosh of Boston, MA.  If Tosh is not available, then mediation shall be with former probate court judge Charles Bowser, and if he is not available, then with former probate court judge Eileen Shavel.  The Husband shall be responsible for paying the mediator in advance.  If, after mediation, the parties have not agreed to a new schedule, either party may then file a complaint for modification in court.

(End of Exhibit D)

## EXHIBIT  E – LIABILITIES

The parties have a number of debts.

The bulk of the debt in Wife's name has been charged off by the creditors. To the extent said debts have been charged off, Wife will not pay those debts. Currently there are 4 debts in Wife's name which are in collections:

1.    BankOne credit card in the amount of $5,184;
2.    Telecom USA utilities in the amount of $257;
3.    Telecom USA utilities in the amount of $385; and
4.    Attleboro Medical Associates in the amount of $172.

Wife shall be responsible for the above four debts which she shall pay. Or, if she is unable to pay, Wife may elect to file for bankruptcy.

If, as and when Husband wants to ensure payment to the above named creditors or any other creditor who Husband believes may be owed a debt by Wife, he may, at his election, make arrangements with said creditors to transfer Wife's debt into his own name. In doing so, Husband will become the sole obligor of said debts and will forever indemnify and hold Wife harmless for these debts.

Husband shall be obligated to pay all debts standing in his name including any debts owed to his father, landlords in Israel, friends, relatives or anyone else Husband believes money is owed to. Husband will forever indemnify and hold Wife harmless for all debts in his name including those owed to his father, landlords in Israel, friends, relatives and anyone else whom Husband may owe money.

(End of Exhibit E)

## EXHIBIT F - LEGAL FEES AND COSTS

### FEES IN CONNECTION WITH THE DIVORCE.

1.      Each shall be responsible for the payment of his or her own legal fees and costs in connection with this divorce.

### FEES IN THE EVENT OF A BREACH.

2.      In the event that a court finds a party responsible for a breach of any term of this Agreement, the party claiming a breach may also seek an order from that court to have his or her reasonable attorney's fees and costs paid by the breaching party.

3.      A breach is defined as a party violating a term of the agreement or attempting to change, set aside or avoid the clear meaning of any part thereof. However, this is not meant to exclude a Rule 60(b) motion if properly presented.

4.      If, after breaching the Agreement, the breaching party fulfills his or her obligations, the breaching party shall still be responsible for paying the non-breaching party's legal fees and expenses. And, if need be, filing a complaint for contempt or going forward to collect such fees shall be deemed proper.

(End of Exhibit F)

Antelman Agreement
No. 04D-0759-DV1                    Page 42                    _____ Husband
                                                              _____ Wife

## EXHIBIT G

## TAX CONSIDERATIONS AND CONSEQUENCES

### TAX CONSEQUENCES OF TRANSFERS OF PROPERTY.

1.     a.     Sections 1041 (a) and (b) of the U.S. Internal Revenue Code of 1986, as amended, are applicable to all transfers of property required by this Agreement so that no gain or loss will be recognized by either party upon their relinquishment of said property; and the transferee will have a carryover basis in each transferred asset, receiving the transferor's interest and adjusted cost basis.

       b.     Each shall provide the other with any requested information necessary for complete and accurate tax reporting about the adjusted basis of said property.

2.     To the extent that the stated "income tax" treatment of a transfer is not accepted by the IRS and if a party has to pay the IRS or Mass DOR additional income taxes, interest and penalties as a result thereof, he or she shall be reimbursed by the other party.

### INCOME TAXES.

3.     a.     Each party shall hold the other harmless and indemnified from any claim, deficiency, demand, penalty or interest and associated legal and accounting fees in connection with their joint income tax returns to the extent such is attributable to his or her failure to report income or to excess deductions.

       b.     In the event either party receives any notice, demand or other communication from the IRS, Massachusetts DOR or U.S. Attorney regarding their joint income tax returns, he or she shall promptly provide a copy to the other.

4.     Wife shall file an individual income tax return for 2005 to report the capital gain on the sale of the former marital home. Wife shall claim all seven children as exemptions on her individual tax return. It is expected that Wife will owe no tax

as a result of filing this return. However, if for some reason, Wife owes a tax, the parties shall split said obligation equally.

### DEPENDENCY.

5.    Beginning in 2006, if Husband provides proof to Wife on or before April 1st of each year that he has filed U.S. Federal and State Income tax returns, then in that year, Husband shall have the right to claim Nadev, Navi and Asael as a dependents on those tax returns. In the event Husband does not provide that proof in a timely fashion, then Wife shall have the right to claim Nadev, Navi, and Asael as her dependents.

6.    In any event, Wife shall have the right to claim Natiya, Nihera, Nuchal, and Yashar on her Federal and State income tax returns.

7.    However, in the event Wife will not benefit from claiming all her dependants in any particular year, Husband may claim the children as his dependants if he is filing a tax return that year.

8.    In the event, Husband is permitted to claim any or all of the children as his dependent, Wife shall sign the necessary forms giving Husband permission to claim those children as dependents on his tax returns.

9.    In the event, Husband files Federal and State income tax returns, but will not benefit from claiming Nadev, Navi and Asael as dependents, he is entitled to claim, he shall so advise Wife who, then may claim those children as dependents.

(End of Exhibit G)

Antelman Agreement
No. 04D-0759-DV1                    Page 44                    _____ Husband
                                                              _____ Wife

# EXHIBIT H - RELIGIOUS MATTERS TO BE ENFORCED AS A CIVIL CONTRACT and MIRROR IMAGE ORDER.

1.    The parties shall raise their children as Orthodox Jews in the tradition which accepts children going to Lubacvitch schools or Litvish (yeshiva), e.g. where boys and girls are not in the same classes. If however, the children attend public schools, they shall not be educated in classes where boys and girls are separated.

2.    a.    In or within 60 days of the entry of the Judgment of Divorce Nisi in the parties' civil divorce, the Husband shall willingly give and the Wife shall willingly accept a Jewish Divorce (Get) to be issued by an Orthodox Rabbinical Court (Bet Din) in Boston or vicinity.

    b.    The parties jointly, or if necessary the Husband, shall petition the Bet Din and arrange to have the divorce promptly brought before the Bet Din; and they shall equally pay the costs associated therewith.

3.    Although on the surface the provisions of this Exhibit H are religious in nature, they are entered into as a binding civil contract which can be enforced by a civil or probate court as a civil or criminal contempt of court; and violation hereof are deemed to be material breaches.

4.    a.    In order that each party have assurances that, if the children are brought to Israel on visitation, that they will be returned to the Wife's home, the parties shall:

        (1)    Sign a separate agreement containing the custody and visitation provisions of this agreement; and

        (2)    Have the separate agreement translated into Hebrew.

    b.    The separate agreement shall be executed in a form acceptable to the civil courts in Israel.

c.     The parties shall jointly petition the Israeli civil court (Bet Mishpat Li'inyanei Mishpacha) to enter the Hebrew language Agreement as a court order enforceable by the Israeli court. The Israeli court order shall be a mirror image of the order of the parties' Agreement and the Massachusetts court judgement regarding custody and visitation, including, without limitation, provision regarding their pledge to not seek an order preventing a party or the children from leaving Israel.

d.     By entering into the mirror image order in Israel, the parties do not, thereby, subject themselves to personal jurisdiction in Israel, except to the extent necessary to obtain emergency enforcement of the mirror image Agreement and mirror image judgment.

e.     The Husband shall pay the costs of a translation service and associated Israeli court fees and for each party's respective Israeli lawyers.

f.     Notwithstanding any other provision of this Agreement, until such time as the mirror image order is entered by the Bet Mishpat Li'inyanei Mishpacha, the Husband shall not be permitted to remove the children from the USA to any other country; and, if he does so, he shall be adjudged as having kidnaped the children in violation of Massachusetts and USA criminal law.

g.     Notwithstanding the entry of the mirror image order, the parties agree that neither of them shall request any court in Israel to modify any provision of custody, visitation, support or alimony.   So long as the Wife and the child(ren) live in Massachusetts, it is Massachusetts that shall have exclusive jurisdiction over and exclusive rights to modify custody, visitation, support or alimony.

(End of Exhibit H)
(End of Exhibits and end of Agreement)

N:\wpwin\Kausits v. Antelman\Probate Court Pleadings\Drafts\02 22 06 Agreement.wpd

Antelman Agreement                                                      _____ Husband
No. 04D-0759-DV1                    Page 46                       _____ Wife

*[handwritten: King draft 3/14/06 9:27 PM]*

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

NORFOLK, DIVISION                                    No. 04D-0759

**BARBARA KAUSITS**
**a/k/a BARBARA ANTELMAN**,
                    Plaintiff,

v.

**PERRY ANTELMAN**,
                    Defendant

## AGREEMENT

### I.    PARTIES

AGREEMENT made this _____ day of March, 2006, by and between Barbara Kausits, of 11 Grove Street, Sharon, Norfolk County, Massachusetts (hereinafter "Wife"), and Perry Antelman, of _____, Sharon, Norfolk County, Massachusetts (hereinafter "Husband").

The term "parties," as used in this agreement, refers to the husband and the wife.

Any other persons affected by this agreement are specifically defined and identified in appropriate context.

### II.    CHILDREN BORN DURING THE MARRIAGE

Seven children were born of the parties' marriage, each birth occurring in Rhode Island, USA. Their names and dates of birth are:

1.    Natiya Rivka Antelman, born August 11, 1992, now age 13;
2.    Nediv-lev Ahron Antelman, born March 5, 1994, now age 11;
3.    Nihera Hadassah Antelman, born November 19, 1995, now age 10;
4.    Naveh Avraham Antelman, born November 23, 1997, now age 8;
5.    Nuchal Naftali Antelman, born June 23, 2000, now age 5;
6.    Asael Hoshea Antelman, born September 14, 2002, now age 3; and
7.    Yashar Ben Tzion Antelman, born September 14, 2005, now age 5+ months.

Antelman Agreement                                    _____ Husband
No. 04D-0759-DV1                    Page 1            _____ Wife

All references to "children" in this agreement refer to the unemancipated minor children of the parties unless a contrary intent is expressly stated.

## III.    BACKGROUND

The parties were married at Jerusalem, Israel, on August 13, 1991.

An irretrievable breakdown in the marriage relationship exists, and the irreconcilable differences between them has caused them to live separate and apart from each other.

Because of the irretrievable breakdown of their marriage the parties intend by this agreement to make a full, final and complete settlement of all matters relating to the obligations, rights, liabilities, duties and interests of each of them arising from and related to their marriage.

Because of the irretrievable breakdown of their marriage the parties further intend by this agreement to make a full, final and complete provision for the care, custody, education, support and maintenance of their minor children, whose welfare is of paramount concern to both the husband and wife.

## III.    PURPOSE

After marriage, the parties lived together as husband and wife in this Commonwealth and last lived together in Neve Daniel, Israel on or about July 25, 2005. The wife has filed a Complaint for Divorce (being Probate and Family Court Docket No. 04D-0759) in the Norfolk Division. The parties have each had independent legal advice from counsel of his or her own selection; each fully understands the facts and has been fully informed of his or her legal rights and liabilities; and each signs this Agreement freely and voluntarily.

This Agreement is made in order to settle and determine:
(a) the property rights of each of the parties;
(b) whether and to what extent all or any part of the estate of the Husband or Wife should be assigned to the other in consideration of the provisions of Massachusetts General Laws, Chapter 208, Section 34;
(c) all other rights and obligations arising from the marital relationship;
(d) all other matters which should be settled in view of the existing divorce complaints.

NOW, THEREFORE, in consideration of the mutual promises, agreements and covenants hereinafter contained, the parties mutually agree as follows:

Antelman Agreement                                              _____ Husband
No. 04D-0759-DV1                        Page 2                   _____ Wife

## V.    SEPARATE STATUS

1.    Each may continue to live separate from the other, as if sole and unmarried.

2.    a.    Neither shall contract nor incur any debt, charge or liability in the other's name or for which the other may become liable.

b.    Each warrants and represents to the other that he or she has not and will not incur any debt or made any commitment for which the other or his or her estate may be liable; nor used the other's name in order to have credit extended to him or her.

c.    Except as may be expressly stated elsewhere in this Agreement, all liabilities listed on each party's Rule 401 Financial Statement shall remain that party's own responsibility.

### WAIVER OF ESTATE CLAIM

3.    Except to enforce the terms of this Agreement, or a judgment of divorce, or as otherwise specified in this Agreement, each:

a.    waives all rights to the last will made by the other, including dower and curtsey and waives, as well, all rights to take a statutory forced share of the other's estate;

b.    waives and relinquishes all interests which either may now or hereafter acquire in or to any real or personal property of the other;

c.    waives and relinquishes all interests which either may now or hereafter acquire in or to any interest in the other's life insurance, pensions, annuities and any other retirement funds, whether named as a beneficiary or otherwise except as set forth in Exhibit B;

d.    shall renounce and refuse to accept any interest in any of the above described assets and renounce, as well, any interest received from the other's estate, or on account of the other's death, unless specifically provided for in a will executed after the date of this Agreement, except that sufficient assets shall be retained to pay for taxes (including, penalties and interest), if any, which are assessed as a result of the renouncement.

4.    a.    Hereafter, each shall have the right to dispose of his or her property by will, or otherwise, in such manner as each may, in his or her uncontrolled discretion, deem proper.

b.    Any power of attorney or health care proxy previously given from one party to the other is hereby revoked.

### RELEASES

Antelman Agreement
No. 04D-0759-DV1                      Page 3                      _____ Husband
                                                                  _____ Wife

5.    Except to enforce the terms of this Agreement and / or the Judgment of Divorce:

a.    each hereby releases and forever discharges the other from all claims and obligations which either has ever had, now has or may have against the other up to the date of this Agreement, including but not limited to torts and claims against the property of the other, it being the parties' intention that, after signing this Agreement, there shall exist between them only such rights and obligations which are specifically provided for in this Agreement; and

b.    each acknowledges that each has received good and adequate consideration for the above releases from the party being released.

### ENTIRE AGREEMENT

6.    Neither has made, nor relied upon any promise, warranty or representation, except those expressly made in this Agreement. Nothing which is claimed to have been said or agreed by one party to the other, at any time, place or under any other set of circumstances shall be used to vary the terms of this Agreement.

7.    Each accepts the terms of this Agreement in full satisfaction and discharge of all claims, past, present and future, which arise out of the marital relationship, including alimony and a division of property.

### EXHIBITS

8    The parties are bound by and will perform the terms set out in **Exhibits A through H** attached hereto, and incorporated herein by reference.

### MODIFICATION

9.    The terms of this Agreement shall not be altered or modified except by a written agreement signed and acknowledged by both parties and submitted to the Norfolk Probate Court or by order of the court upon the filing of appropriate pleadings, followed by proof required by law to obtain a modification.

### SURVIVAL OF AGREEMENT AFTER DIVORCE

10.    a.    (1)    At any hearing on the Wife's complaint for divorce, a duplicate original of this Agreement may be submitted to the court and incorporated into the Judgment of Divorce.

(2)    Notwithstanding such incorporation, this Agreement shall <u>NOT</u> be merged into the Judgment, but shall survive and have independent legal significance; and be forever

Antelman Agreement
No. 04D-0759-DV1                    Page 4                    _____ Husband
                                                             _____ Wife

binding, **except however, all issues pertaining to the parties' minor children, insurance, and alimony for Wife shall be merged into and become a part of the judgment, modifiable in accordance with the law of this Commonwealth.**

      b.      The purpose of this provision is to:

           (1)     protect each against any attempt by the other to vary the articulated and plain meaning of the terms of this Agreement after entry of a Judgment of Divorce; and

           (2)     to enable the parties to enforce the terms of this Agreement either as a Judgment of Divorce or as a binding contract in any court with jurisdiction over the property of or over the other party.

### STRICT PERFORMANCE

11.     The failure of a party to insist, in any instance, upon the strict performance of any term, shall not be construed as a waiver. Rather such term shall nevertheless continue in full force and effect.

### VALIDITY / SEVERABILITY

12.     In the event any part of this Agreement is held invalid, such holding shall not invalidate the entire Agreement. Instead the remaining provisions shall continue to reflect fairly the intent and understanding of the parties and be in full force and effect.

### DEATH

13.     This Agreement shall be binding upon the parties' respective estate, legal representatives, heirs and assigns; and, as well, upon the parties even if one or both of them die before entry of a Judgment of Divorce, Absolute.

### GOVERNING LAW

14.     This Agreement is to be construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts, which are now in force and effect.

### VOLUNTARY EXECUTION

15.    a     Wife has had independent legal advice from Attorneys Gerald L. Nissenbaum and Wendy J. Overbaugh, 160 Federal Street, Boston, Massachusetts, 02110. Husband has had independent legal advice from Attorney Carol J. King, Wallace Law Office, P.C., One Post Office Square, Sharon, Massachusetts 02067. Neither has relied upon any legal representation

Antelman Agreement                                    _____ Husband
No. 04D-0759-DV1                  Page 5               _____ Wife

made by counsel for the other, nor has either interpreted any statement made by the other's counsel as legal advice intended for other than the benefit of that lawyer's client.

      b.    Each:

          (1)    has read this Agreement and fully understands the background, facts and circumstances;

          (2)    has been fully and fairly informed of all of his or her legal rights and liabilities;

          (3)    believes this Agreement to be fair, just and reasonable under the circumstances; and

          (4)    signs this Agreement freely and voluntarily and without any coercion or undue influence by the other.

### FULL DISCLOSURE

16    Each has:

      a.    fully described and disclosed his or her assets, income and liabilities to the other to the best of his or her knowledge and ability, as set out on the financial statements on the form provided by the court and upon which each relies; and

      b.    carefully considered the current assets and income, financial resources, liabilities and expenses of the other and of themselves.

17.    Each:

      a.    has had the opportunity to fully discover the position and circumstances of the other and waives any further discovery and evaluations;

      b.    understands the position and circumstances of the other;

      c.    has read this Agreement, line by line;

      d.    is satisfied with and understands the terms, provisions and conditions of this Agreement; and

      e.    solemnly intends to be bound by the terms of this Agreement.

### GOOD FAITH AND FAIR DEALING

18    Each will comply with the terms of this Agreement in good faith and with fair dealing.

19    a.    Each will, without delay or charge to the other, sign, acknowledge and deliver such documents and other items as are reasonably necessary to effect the terms of this Agreement.

b.    Except as stated otherwise, to the extent reasonably possible, all transfers required by this Agreement shall be effectuated within 30 days from the date of this Agreement, with reasonably satisfactory written evidence given by the transferor to the transferee.

20    Unless the context otherwise provides, whenever a number of days is specified for the performance of an act, the time for starting the counting shall begin with the date of this Agreement.

21.    Except where one may have specific written authorization, neither party may sign the other's name to any document for any reason.

22.    Whenever, per the terms of this Agreement, a party's agreement is required, it shall not unreasonably be withheld or delayed.

**INDEMNIFICATION**

23.    a.    Husband shall indemnify and save Wife harmless from and against all liabilities, claims, losses, damages and expenses, tax or other deficiency, penalty, interest charge, assessment, tax lien or expense, including reasonable accountant's and attorney's fees, costs or disbursements arising from claims made by any taxing authority in the USA or Israel, unless the Wife reports or has reported any information, directly or indirectly, to any taxing authority giving rise to an investigation or claim.

b.    Each shall indemnify and save the other party harmless from and against all liabilities, claims, losses, damages and expenses, tax or other deficiency, penalty, interest charge, assessment, tax lien or expense, including reasonable accountant's and attorney's fees, costs or disbursements arising his or her breach of their respective promises, warranties and representations in this Agreement.

c.    In the event a third party makes or commences any claim against an indemnified party, the indemnified party shall promptly give notice of the claim to the indemnifying party; and the indemnifying party shall have the opportunity, in good faith and at his or her own expense, to defend any such claim.

**COUNTERPARTS**

24.    This Agreement is executed in counterparts, each of which is deemed to be an original.

Antelman Agreement                                            _____ Husband
No. 04D-0759-DV1                    Page 7              _____ Wife

**SIGNED AS A SEALED INSTRUMENT** at _____, Massachusetts, this _____ th day of March, 2006

_____          _____
Barbara Kausits, a/k/a Antelman          Perry Antelman

# COMMONWEALTH OF MASSACHUSETTS

_____ County                                       March___, 2006

Then, personally appeared **BARBARA KAUSITS, A/K/A ANTELMAN** and proved to me through satisfactory evidence of identification which was _____,  to be the person whose name is signed on the preceding and/or attached document and acknowledged to me that she signed it voluntarily for its stated purpose,

Before me,

                                    _____
                                    _____, Notary Public
                                    My commission expires:


## COMMONWEALTH OF MASSACHUSETTS

_____, County                                  March___, 2006

Then, personally appeared **PERRY ANTELMAN** and proved to me through satisfactory evidence of identification which was _____, to be the person whose name is signed on the preceding and/or attached document and acknowledged to me that he signed it voluntarily for its stated purpose,

Before me,

                                    _____
                                    _____, Notary Public
                                    My commission expires: _____


Antelman Agreement                      Page 9                    _____ Husband
No. 04D-0759-DV1                                                   _____ Wife

## EXHIBIT A - ALIMONY

### HUSBAND'S WAIVER OF ALIMONY

1.    Husband hereby waives any and all right he may have to any past or present or future alimony or support from Wife.

### ALIMONY TO WIFE

2.    The issue of alimony to the Wife shall remain open.

(End of Exhibit A)

*delete protections for W. re H's present lack of disclosure; providing no Basis to raise his H's ability to earn (deemed income)*

_____ Husband
_____ Wife

## EXHIBIT B - DIVISION OF PROPERTY

The parties agree that all of their assets have been considered.

**REAL ESTATE**

**Sharon, MA**

201 is right

1.    The parties sold their marital home located at 70 Ashcroft Road, Sharon, MA (**Marital Home**.) Wife received approximately $~~201,000~~ in net proceeds from the sale (Proceeds), which proceeds have been in Wife's control   ~~156,000~~

2.    The Proceeds had to be or will be used by Wife to pay, among other things:

    a.    For the 2005-2006 academic year, the parties' school age children are attending pre-school, kindergarten and grade schools, all of which are private Orthodox religious schools (**Religious Schools**) at an out of pocket expense of $_____ to date, plus anticipated expense of $_____.

    b.    To supplement what Wife needs to support herself and the children, over and above the child support and alimony payments, which are not sufficient to meet their expenses.

    c.    To pay $8,000 as a deposit toward her half-share of the costs in connection with a certain container, discussed below in this Exhibit B, under "Personal Property."

    d.    To pay her legal counsel and related expenses.

3.    The current balance of the Proceeds, after deducting the anticipated expenses needed to complete the 2005-2006 academic school year is approximately $_____.

**Bet Shemesh, Israel**

4.    a.    The parties own a house in Bet Shemesh, Israel (**House**). Husband is currently trying and shall use his best efforts to sell the House to an-arms length buyer for the current fair market value, from which the Husband represents the proceeds should be approximately $100,000.

    b.    The parties shall cooperate in facilitating the sale of the House.

        (1)    To this end, if not yet accomplished, the parties shall sign all papers needed to dissolve all Israeli Rabbinical Court obligations to post bonds.

Antelman Agreement                                          _____ Husband
No. 04D-0759-DV1                      Page 11                _____Wife

(2)    Wife has signed a Power of Attorney appointing her Israeli attorney, Advocate Pnina Shapira. Wife represents Shapira advises that the form of the Power of Attorney has been used by Shapira in the past and accepted by title examiners and others in Israel as sufficient to empower Shapira to act on Wife's behalf in connection with signing purchase and sale agreement, deeds and otherwise complete the sale of real estate and related matters. Shapira also advises she has sent a copy of the Power of Attorney to Advocate Larry Dub, who is acting on behalf of the parties in an effort to sell the House. Wife agrees to promptly sign all Powers of Attorney requested by any party involved in the sale of the house. *added*

(3)    To the extent any other papers are required, each party shall promptly sign them.

    c.    Husband represents that the mortgage on the House is in arrears; and that to prevent the bank holding said mortgage from commencing foreclosure proceedings, Husband paid about $5,300 at the end of January 2006 and agreed to pay another $5,300 at the end of February and March 2006 to get the mortgage current. Husband agrees to make the said payments and future mortgage payments to prevent the house from being foreclosed. These payments are nearly equal to Husband's monthly income. In order for the Husband to meet this obligation, he may be unable to remain current in child support payments. Should Husband be unable to remain current in his child support payments, he agrees to bring the child support current immediately upon receipt of the proceeds from the sale of the house.

*deleted d. — documents re house Children must come first ; d. distribution of proceeds ; h. authorization to Shilo ; h. & for private school*

**BANK ACCOUNTS**

5.    The parties have no joint bank accounts at this time. The parties' individual bank accounts or assets, which are reflected on the following marital balance sheet, shall remain their individual property.

**RETIREMENT ACCOUNTS**

6.    The parties have no retirement accounts.

**LIFE INSURANCE**

*b. delete c. time is of essence d. cooperation to pay premiums & obligation to try payment +h/w notices prof*

7.    Each party shall purchase a life insurance policy in the face amount of $500,000.00 listing the other as beneficiary. In or within 90 days, each shall provide the other with a copy of the issued policy and face sheet. Each party shall maintain the policy until the earliest of the date the youngest child becomes emancipated or the death of the other party.

*change from H @ $2m to each @ $500M*

Antelman Agreement
No. 04D-0759-DV1          Page 12

_____ Husband
_____ Wife

*40 23 63 when youngest is out of college*

### PERSONAL PROPERTY

### Cars

8.    Each party drives and shall retain as his (1998 Chevrolet Venture) or her (1999 Suburban truck) sole property the car now in his or her possession, free of all claims by the other party

### Heirlooms & Jewelry

9.    The parties and each child shall each retain, to the extent applicable, as his or her sole property, any gifts of a personal nature given to each by a parent, grandparent or other relative, as an heirloom, without said value being included in the marital estate. By way of example, Wife was gifted a set of ivory necklace, bracelet and earrings by her grandmother; various children had dolls given to them. The value of the heirlooms shall not be included in the value of the marital estate.

b. *deleted* W's Jewelry

### Contents of Container

10.    a    The contents of the parties' home in Sharon MA were shipped to Israel in a container.

b.    The Massachusetts Probate Court issued an order, incorporated, herein, requiring the parties to jointly pay storage and other charges necessary to have the Container shipped back to Massachusetts, with each party paying one-half (½) these costs. Husband shall execute the Power of Attorney attached to this agreement giving Pnina Shapira authority to negotiate with the Container company for the payoff and return of the Container to Massachusetts.

c.    The Container will be shipped to a facility or storage unit chosen by the Container Company. Wife advanced $8,000 of the costs in order to facilitate the return of the Container. ~~Wife shall advance the full balance of the costs to have the Container shipped back to her~~ Sharon, Massachusetts home. Husband shall repay Wife one-half (½) the costs per order of the Norfolk Probate Court. Reimbursement shall be due upon receipt of the net proceeds from the sale of the Bet Shemesh house. For purposes of this payment Container costs include, without limitation, storage costs in Israel and elsewhere, insurance, transport back to Massachusetts and unloading the Container.

d.    Upon the Container arriving in Sharon, MA it shall be delivered to the facility chosen by the Container Company. It has been represented that the Container Company will unload the contents of the container and remove the Container. The contents will be stored in the facility until the parties dispose of the contents.

_____ Husband
_____ Wife

e.    In or within seven days of the arrival of the Container, Husband, Wife and children, as the case may be, shall take possession of their heirloom items. Thereafter, the Wife shall have first pick of an item, Husband second, and they shall alternate picks until all items have been selected.

f.    For purposes of this Agreement, one item would consist of such things as a complete set of dishes, a complete set of glasses, an entire bedroom set, including bed, bureaus, etc. or an entire dining room set including table, chairs and sideboard.

g.    Photographs which may be desired by both parties shall be color photocopied or copied onto a computer disc by Wife, with the expense being equally shared by the parties; and then about one-half the copies plus one-half of the originals shall be divided to each party, so that each of them has a full set of photographs consisting of half originals and half copies.

## Husband's Stock in Closely Held Companies

11.    Husband owns stock in three closely held companies which are stated on his court-filed Rule 401 Financial Statement and/or reflected on the Marital Balance Sheet, set forth below.

## Marital Balance Sheet

12.    Subject to other provisions of this Agreement, the following Marital Balance Sheet reflects the parties' agreed value of and items of property subject to distribution; and indicates which party is to receive that item.

13.    The values used for Marantech, LLC, Aidance Skincare and Tivian Industries have been proffered by Husband. Husband warrants and represents he has used his utmost good faith and fair dealing in establishing these values; and has done so cognizant of his fiduciary duty to Wife. Based upon Husband's specific representation and in order to effectuate settlement now, without the need to pay a business appraiser/CPA/ expert to establish values, Wife relies upon both Husband's values for these assets and his warranty and representation, as set forth in this paragraph.

| Asset | Value | Wife | Husband |
|---|---|---|---|
| Proceeds from sale of 70 Marital Home, Sharon, MA | $201,539.04 | x | |

| | | | |
|---|---|---|---|
| Proceeds from sale of House in Israel (Est.) | $100,000[1] | | x |
| Chevy Venture | | | x |
| Suburban Truck | | x | |
| Marantech, LLC Stock | $30,000 | ½ | ½ |
| Aidance Skincare Membership Units | $60,000 | ½ | ½ |
| Tivian Industries Stock | $40,000 | | x |
| BioVest | | | x |
| H's _____ Bank, Account ending in xxxx | | | x |
| W's _____ Bank, Account ending in xxxx | | x | |
| W's Jewelry | | x | |
| Sub-total | | | |
| Equalizing Cash Payment | | | |
| Total | | | |

*why does H get 100%* (handwritten)

11.    All property hereafter acquired by either party, all income and earnings of each and all appreciation of all property shall constitute and be the sole and separate property of the person by whom the said property is acquired or earned.

(End of Exhibit B)

*No mention of Aidance Medical Diagnostics* (handwritten)

---

[1] Pursuant to other provisions in this Agreement, this represents the approximate expected net House Proceeds.

**EXHIBIT C**
**HEALTH INSURANCE AND UNINSURED MEDICAL EXPENSES**

1.      Presently Husband has dental insurance for the family. He shall maintain said policy for the benefit of Wife and the parties' minor children as long as it is available to him at a reasonable cost.

2      a.      Husband shall obtain a health insurance policy with Blue Cross / Blue Shield (e.g. HMO Blue) or any other major health insurance provider, as soon as possible, for the benefit of himself, Wife and the parties' minor children (hereafter, collectively, **Health Insurance**.) Husband intends to provide the Health Insurance through one of the companies to which he consults or in which he has an ownership interest.

        b.      If, Husband cannot get one of the companies to provide him with Health Insurance, he shall immediately try to arrange for a company to add Wife to the books as an employee with Wife's compensation being a family health insurance plan. He shall attempt to arrange employment for the Wife that will allow her to work at home.

        c      If Husband cannot arrange for Health Insurance, by May 31, 2006, Wife may obtain family Health Insurance directly from Blue Cross / Blue Shield or other provider or obtain the health insurance through an organization to which she is or may become a member. Husband shall repay Wife as soon as reasonably possible for all costs associated with her obtaining Health Insurance, including membership fees, if any, in the Small Business Association or any other such organization that provides group Health Insurance plans; and, as well, repay Wife any premium on said Health Insurance. Thereafter, on or before the first of each following month, Husband shall pay Wife, in advance, the premium due on said Health Insurance. Time is of the essence in making this and all other monthly payments by Husband. *& remain to H obligated to keep in good standing*

4      a      In the event the Health Insurance is in Wife's name and Wife remarries, Husband shall no longer be covered under the Wife's Health Insurance.

        b.      If, after her marriage, Wife can then be covered by her then - husband's Health Insurance, she shall also attempt to have the children covered under that plan. If there is an additional cost of including the children under Wife's then-husband's Health Insurance, Husband shall pay that extra cost in advance each month.

        c      If Wife obtains employment and can obtain employer - provided Health Insurance for herself and the children, she shall do so, if the cost to her would be less than the costs being paid for her then-existing Health Insurance.

5.      Husband understands and accepts that under current law, if Wife obtains new Health Insurance after the divorce is final, or if he remarries, he will no longer be covered under Wife's Health Insurance.

Antelman Agreement                                        _____ Husband
No. 04D-0759-DV1                    Page 16              _____Wife

6.   a.   If, before the final divorce judgment is final, Husband obtains employer-provided Health Insurance which would cover the Wife and Children, then they shall be enrolled with him and he shall ensure that the premium is paid by his employer. If there is any co-payment due from Husband, he shall pay the same.

b.   If Husband, after the final divorce judgment, obtains employer-provided Health Insurance, it will cover just him and the minor children. In such an event, Husband shall also pay Wife the cost of her obtaining a Health Insurance for herself. This cost will be deemed alimony for the Wife.

c.   If Husband's employer-provided policy does not cover Wife - either because he obtains the policy after the divorce is final or because he has remarried - Wife will then obtain her individual Health Insurance. Husband shall pay Wife for the cost of her Health Insurance in the same method and manner as described above for payment of the Wife's family plan Health Insurance. This cost will be deemed alimony for the Wife.

7.   In the event Husband does not provide or pay for Health Insurance, and Wife obtains and /or pays for Health Insurance in his stead, thereafter, Husband must repay Wife in full for her out of pocket payments and, as well, thereafter pay said premiums each month in advance.

8.   If either party incurs an uninsured expense for the children, he or she shall, on no more than a monthly basis, submit a copy of the bill(s) or, if paid, the paid receipt(s) or a copy of a check(s) in payment thereof, to the other party. Within 7 days of receipt, the party shall pay his or her half of any unpaid bill or, reimburse the other party for his or her out of pocket expenses.

11.   Hereafter, each party shall be solely responsible for his or her own uninsured medical and other health care expenses.

<center>(End of Exhibit C)</center>

Antelman Agreement
No. 04D-0759-DV1                    Page 17                    _____ Husband
                                                               _____Wife

## EXHIBIT D – CHILD RELATED PROVISIONS

### LEGAL AND PHYSICAL CUSTODY AND VISITATION (PARENTING TIME)

1.     a.     The parties shall have shared or joint legal custody of their seven children, with Wife having physical custody at all times when the children are with her, and the Husband having physical custody at all times when the children are with him.

       b.     The parties shall respectfully discuss and jointly decide all major matters related to their children's: health, religious and secular education and welfare including, but not limited to, such things as elective medical, dental, and mental health treatment; participation in inherently dangerous and unusual activities; college education; and camp and extended school vacations.  Each party shall have the right of direct access, without further permission of the other party, concerning the children: to review medical and dental records; consult with individuals or institutions who provide educational, medical, psychological, or dental services and review records thereof; consult with those providing instructional or supervisory service; and activities which require financial contribution from the other party.

       c.     As to emergency decisions, the parent whom the child is with, shall make decisions and/or give consent for treatment.  However, that parent shall notify the other parent as soon as possible and, to the extent possible, give the other parent an opportunity to participate in decision making / consent.

2.     a.     The Wife shall have physical custody of the parties' minor children at all times when the children are not in Husband's physical custody as specified below in this Exhibit D. The Husband shall have physical custody of the parties' minor children at all times when the children are not in the Wife's physical custody as specified below in this Exhibit D.

       b.     Wife and the parties' children currently reside in Sharon, MA and have no immediate plans to move.  Husband currently resides in an apartment in Sharon, MA and has no immediate plans to move.

       c     If, either party decides to relocate outside of Sharon, MA, he or she shall so notify the other party giving no less than two months notice.  Thereafter, the other party can decide whether to move or, if the move is greater than 30 miles away from Sharon, decide whether the matter needs to be brought to the court's attention for a modification of the parenting schedule or hearing on the proposed relocation.

3.     Husband shall have physical custody of the parties' older six children as follows:

       a.     Alternate weekends commencing Friday at the conclusion of school when Husband shall pick the children up from their respective schools / day care(s) and extending to

          _____ Husband
          _____ Wife

Monday morning, when Husband shall take the children to their respective schools/day care, or Wife's home.

      b.     In the event the children's school is closed on Monday for either a secular or religious holiday following the Father's weekend, his weekend visitation shall automatically extend through Tuesday morning, when Husband shall take the children to their respective schools/day care, or Wife's home.

4.     a.     As for the seventh and youngest child, Yashar, now about 5 months old, until such time as Yashar is three, Father shall see him on the weekends he has the other children, from 9 A.M. to 5 P.M. on Saturday and Sunday, extending to Monday if there is a so-called Monday holiday following Husband's weekend with the children.

      b.     Husband shall be obligated to pick up Yashar from and return him to Wife's home.

5.     As Yashar gets older, he can start to participate in overnight visitation on a trial basis and then, hopefully, work his way into participating in the overnight visitation with his siblings.

7.     The parties agree to be flexible toward and mindful of their children's needs, particularly because of the wide range of their ages.

8.     Husband's current employment requires him to travel to and from Israel, and elsewhere, approximately three times per year, taking him away for about two weeks at a time. Husband shall give Wife as much advance notice of his travel as he is given, so that she can make necessary arrangements as a result of his missing his custodial time with the children. If the Wife plans to be away, she will give the Husband as much advance notice as she is given, so that he can make necessary arrangements as a result of her missing custodial time with the children.

     SCHOOLS

9.     The parties' agree that the children shall be enrolled in secular schools beginning with the 2006 – 2007 school year.

     HOLIDAYS AND VACATIONS IN USA

14.     In the event the children are enrolled in public school the parties shall alternate years in which the children spend their Religious and Secular holidays with each parent, as follows:

      a.     Beginning in 2006 and in all even years thereafter, Wife shall have the children for:

Antelman Agreement                              _____ Husband
No. 04D-0759-DV1          Page 19             _____ Wife

- Rosh Hashana;[2]
- Christmas break from the close of school until 9 A.M. on the morning of the mid-way point in the break when they shall go to Husband's home until 5 P.M. on the day before they are to return to school, at which time they will return to Wife's home; and
- February school vacation, starting on the Friday at the close of school for 8 days to 5 P.M. on the second Sunday, being the day before they return to school. (In the odd years when Husband has this vacation with children, he shall return the children to Wife's home by 5 P.M. on the second Sunday.)

b.    Beginning in 2006 and on all even years thereafter, Husband shall have the children for:

- Yom Kippur;
- Thanksgiving break from the close of school on Wednesday until 5 P.M. on the day before they are to return to school, at which time they will return to Wife's home;
- Christmas break from 9 AM on the morning of the mid-way point in the break until 5 P.M. on the day before they are to return to school, at which time they will return to Wife's home; and
- April school vacation week starting on the Friday at the close of school for 8 days to 5 P.M. on the second Sunday, being the day before they return to school, at which time they will return to Wife's home; and
- 4th of July (only during years in which it does not fall on a weekend in which event the holiday shall begin at 9 A.M. on the morning of the 4th of July and shall extend to 9 A.M. the morning of July 5th. When the 4th of July falls on a weekend or a Monday, whichever parent would ordinarily have the children for that weekend, shall have the children.)

c.    The parties shall swap schedules in odd years.

15    In the event the children attend Religious Schools and have additional holidays, the additional holiday schedule shall rotate as follows:

a    In even years Wife shall have the children for:
- Last 2 days of Succot;
- First 2 days of Pesach; and

---

[2] For purposes of this Agreement, Jewish holidays begin 2 hours before sundown on the prior evening; and last until sundown on the day of the holiday.

Antelman Agreement                                              _____ Husband
No. 04D-0759-DV1              Page 20                           _____ Wife

- • Shavuot.

b.    In even years, Husband shall have the children for:
- • First 2 days of Succot;
- • Purim; and
- • Last 2 days of Pesach.

c.    The parties shall swap this schedule in odd years.

16.    In addition to the school vacation weeks referenced above, each of the parties shall be entitled to have the children for a two (2) consecutive week vacation period during the summer. Parties shall exchange summer vacation request schedules no later than April 15th each year.   If the children attend day or overnight camp, have lessons or schools, the parties shall make every effort to choose vacation time which would not interfere with the children's other activities.

## TRAVEL WITH CHILDREN

17.    When a party travels with the children, he or she shall provide the other party with a detailed itinerary including: date of departure and return, air plane or other confirmation details and confirmation numbers, where s/he is going to be going, the days s/he will be there, contact and other telephone numbers for him/her, the children and the place s/he will be; and only if that party makes specific advance arrangements for the other party to speak at least once per day, except on the Sabbath, with the children.   Each party shall insure that the other party has cell phone numbers and the number for the cell phones of any of the children who have a cell phone; and that all of these cell phones are taken on the trip, kept powered and kept on.

## TRAVEL WITH CHILDREN OUTSIDE U.S.A.

19.    a.    Either party may travel with the children outside the USA, if and when, he or she provides all of the information stated in the next-prior paragraph (**Travel Agreement**.)   At that point, the non-traveling party shall provide the other with the children's passports together with a Notarized statement that the party is permitted to remove the children from the USA to the agreed-upon destination upon the terms set forth in what will then be the attached Travel Agreement.

## OTHER RELEVANT MATTERS

21.    The birthdays of the parents and children will not change the visitation schedule. Rather, the parent or child will celebrate their respective birthday during the next scheduled time with that parent.

Antelman Agreement                                              _____ Husband
No. 04D-0759-DV1                    Page 21                     _____ Wife

22.    Presuming the parties both continue to reside in Massachusetts, the parties shall adjust their rotating schedule such that the children are always with Wife on Mother's Day Weekend and always with Husband on Father's Day Weekend.

23.    a.    At all times when the children are with either parent, they shall be permitted to telephone, e-mail, instant message or otherwise communicate with the other parent, free from restrictions by the parent who the child is with.

       b.    In order to facilitate the children's ability to speak with Wife while they are in Husband's custody, Husband will forthwith have a so-called land line telephone installed in his home; and if a child has a cell phone, he will make sure it is powered up and on.

       c    The parties recognize that the children are entitled to privacy during their conversations with the other parent and to that end will not eavesdrop, prevent a child from having a private conversation, etc.

       d.    When a child is called by a parent, the parent with whom the child is at that time shall make his or her best efforts to get the child to the telephone.   If a child has, in fact, gone to bed, then there is no need to wake the child.  However, the child shall be informed the next morning of the call from the parent and, as well, encouraged to call the other parent back.

24.    Telephone calls to the children by a parent shall be no more than two per day, unless there is a specific reason for a further call.

### COLLEGE EDUCATION

25.    The parties hope that their children will attend college.   Accordingly, the parties shall discuss, investigate and agree on the appropriate college or university for the children when the time comes, taking into consideration each child's wishes.

26.    Because of the parties' present precarious financial situation, they are not able to make a commitment to help the children with undergraduate college expenses (College Expenses.)

27.    The term College Expenses includes, without limitation, preparatory courses for the SAT or other entrance examinations, application fees, travel to see various colleges, tuition, room, board (on or off campus, plus telephone and utilities), books, lab, necessary equipment and other associated fees, plus a reasonable number of trips to and from college each year to the extent they are financially able at the time the children go to college.

_____ Husband
_____ Wife

28.    The children shall each first apply for financial aid, scholarships and student loans, which, if received, shall be used as the first source of payment for College Expenses.

29.    In the future, if the parties are not able to agree on which of them, if either, shall have to pay for all or a part of a child(ren)'s College Expenses, either party shall file an action in a court of competent jurisdiction. At that time they shall be obligated to jointly move - and do hereby authorize the other to assent to a motion for a speedy trial. At that time the court shall consider the parties' respective then-present obligations, income, assets and expenses.

### CHILD SUPPORT

30.    a.    Husband shall pay to the Wife the sum of $2,580 per month for support of their children, until further order of the court, through the Department of Revenue. d.

    c.    To the extent Husband is paying both alimony and child support he shall pay both amounts in full at the same time and in the same manner.

31.    a.    Because of both parties' present uncertain income and future prospects, each is obligated to keep the other advised of his or her job status, increases or decreases in income, including bonuses, travel paid by his employer and other perks.

32.    a.    The parties shall equally share the costs of the children's various fees for extra curricular activities (such as sports, lessons) in which the children may wish to participate.

    b.    Before a child is enrolled in any such activity, the parties shall communicate with each other in an attempt to agree on which activities the children will participate, taking into consideration the schedules of the other children, the costs, and availability of the parents to get the children to and from the activities.

    c.    Agreement of a party to the children's participation in activities shall not be unreasonably withheld. If a child is enrolled in an activity, the parent with whom that child may be on that day shall use his or her best efforts to get the child to the activity, particularly if it is a team sport in which team mates may be "counting" on the child to be present and participate.

### US DISTRICT COURT (MA)

34.    The parties shall stipulate to a dismissal of the USDC (MA) action No. 05-11786-WGY, with prejudice and without costs.

### REVIEW OF HUSBAND'S TIME WITH CHILDREN.

Antelman Agreement                    _____ Husband
No. 04D-0759-DV1            Page 23            _____ Wife

35.    The physical custodial arrangement / parenting plan shall, at a party's  written request made no earlier than one year from approval of this Agreement by the court,  be reviewed. Initially the parties shall try to agree on a revised schedule.  If they are unable to so agree, they shall enter mediation with a mediator of their choice.  If the parties cannot agree on a mediator, they shall mediate with Attorney Karen Tosh of Boston, MA.  If Tosh is not available, then mediation shall be with Bryna Bettigole of Pawtucket, Rhode Island.  If she is not available, then with former probate court judge Charles Bowser, and if he is not available, then with former probate court judge Eileen Shavel.  The parties shall share equally in the costs of mediation.  If, after mediation, the parties have not agreed to a new schedule, either party may then file a complaint for modification in court.

(End of Exhibit D)

## EXHIBIT E – LIABILITIES

The parties have a number of joint debts. They have agreed to share equally in the payment of the joint debts.

The bulk of the debt in Wife's name has been charged off by the creditors. To the extent said debts have been charged off, Wife will not pay those debts. Currently there are 4 debts in Wife's name which are in collections:

1.  BankOne credit card in the amount of $5,184;
2.  Telecom USA utilities in the amount of $257;
3.  Telecom USA utilities in the amount of $385; and
4.  Attleboro Medical Associates in the amount of $172.

Wife shall be responsible for the above four debts which she shall pay. Or, if she is unable to pay, Wife may elect to file for bankruptcy. Wife shall forever indemnify and hold husband harmless for all debts in her name.

If, as and when Husband wants to ensure payment to the above named creditors or any other creditor who Husband believes may be owed a debt by Wife, he may, at his election, make arrangements with said creditors to transfer Wife's debt into his own name. In doing so, Husband will become the sole obligor of said debts and will forever indemnify and hold Wife harmless for these debts.

Husband shall be obligated to pay all debts standing in his name alone, including any debts owed to his father, landlords in Israel, friends, relatives or anyone else Husband believes money is owed to. Husband will forever indemnify and hold Wife harmless for all debts in his name including those owed to his father, landlords in Israel, friends, relatives and anyone else whom Husband may owe money.

<div align="center">(End of Exhibit E)</div>

## EXHIBIT F - LEGAL FEES AND COSTS

### FEES IN CONNECTION WITH THE DIVORCE

1    Each shall be responsible for the payment of his or her own legal fees and costs in connection with this divorce

### FEES IN THE EVENT OF A BREACH

2.    In the event that a court finds a party responsible for a breach of any term of this Agreement, the party claiming a breach may also seek an order from that court to have his or her reasonable attorney's fees and costs paid by the breaching party.

3.    A breach is defined as a party violating a term of the agreement or attempting to change, set aside or avoid the clear meaning of any part thereof. However, this is not meant to exclude a Rule 60(b) motion if properly presented

4.    If, after breaching the Agreement, the breaching party fulfills his or her obligations, the breaching party shall still be responsible for paying the non-breaching party's legal fees and expenses. And, if need be, filing a complaint for contempt or going forward to collect such fees shall be deemed proper

(End of Exhibit F)

## EXHIBIT G

## TAX CONSIDERATIONS AND CONSEQUENCES

### TAX CONSEQUENCES OF TRANSFERS OF PROPERTY

1.    a.    Sections 1041 (a) and (b) of the U.S. Internal Revenue Code of 1986, as amended, are applicable to all transfers of property required by this Agreement so that no gain or loss will be recognized by either party upon their relinquishment of said property; and the transferee will have a carryover basis in each transferred asset, receiving the transferor's interest and adjusted cost basis

      b.    Each shall provide the other with any requested information necessary for complete and accurate tax reporting about the adjusted basis of said property.

2.    To the extent that the stated "income tax" treatment of a transfer is not accepted by the IRS and if a party has to pay the IRS or Mass DOR additional income taxes, interest and penalties as a result thereof, he or she shall be reimbursed by the other party.

### INCOME TAXES

3.    a.    Each party shall hold the other harmless and indemnified from any claim, deficiency, demand, penalty or interest and associated legal and accounting fees in connection with their joint income tax returns to the extent such is attributable to his or her failure to report income or to excess deductions.

      b.    In the event either party receives any notice, demand or other communication from the IRS, Massachusetts DOR or U.S. Attorney regarding their joint income tax returns, he or she shall promptly provide a copy to the other.

4.    Wife shall file an individual income tax return for 2005 to report the capital gain on the sale of the former marital home.  Wife shall claim all seven children as exemptions on her individual tax return.  It is expected that Wife will owe no tax as a result of filing this return. However, if for some reason, Wife owes a tax, the parties shall split said obligation equally

### DEPENDENCY

5.    Beginning in 2006, if Husband provides proof to Wife on or before April 1st of each year that he has filed U.S. Federal and State Income tax returns, then in that year, Husband shall have the right to claim Nadev, Navi and Asael as dependents on those tax returns.  In the event Husband does not provide that proof in a timely fashion, then Wife shall have the right to claim Nadev, Navi, and Asael as her dependents

_____ Husband
_____ Wife

6.    In any event, Wife shall have the right to claim Natiya, Nihera, Nuchal, and Yashar on her Federal and State income tax returns.

7    However, in the event Wife will not benefit from claiming all her dependants in any particular year, Husband may claim the children as his dependants if he is filing a tax return that year

8.    In the event, Husband is permitted to claim any or all of the children as his dependent, Wife shall sign the necessary forms giving Husband permission to claim those children as dependents on his tax returns.

9.    In the event, Husband files Federal and State income tax returns, but will not benefit from claiming Nadev, Navi and Asael as dependents, he is entitled to claim, he shall so advise Wife who, then may claim those children as dependents

(End of Exhibit G)

_____ Husband
_____ Wife

## EXHIBIT H - RELIGIOUS MATTERS TO BE ENFORCED AS A CIVIL CONTRACT and MIRROR IMAGE ORDER.

1.    The parties shall raise their children as Orthodox Jews in the tradition which accepts children going to Lubacvitch schools or Litvish (yeshiva), e.g. where boys and girls are not in the same classes. If however, the children attend public schools, they shall not be educated in classes where boys and girls are separated.

2.    a.    In or within 60 days of the entry of the Judgment of Divorce Nisi in the parties' civil divorce, the Husband shall willingly give and the Wife shall willingly accept a Jewish Divorce (Get) to be issued by an Orthodox Rabbinical Court (Bet Din) in Boston or vicinity.

       b.    The parties jointly, or if necessary the Husband, shall petition the Bet Din and arrange to have the divorce promptly brought before the Bet Din; and they shall equally pay the costs associated therewith.

3.    Although on the surface the provisions of this Exhibit H are religious in nature, they are entered into as a binding civil contract which can be enforced by a civil or probate court as a civil or criminal contempt of court; and violation hereof are deemed to be material breaches.

4.    a.    In order that each party have assurances that, if the children are brought to Israel on visitation, that they will be returned to the Wife's home, the parties shall:

              (1)    Sign a separate agreement containing the custody and visitation provisions of this agreement; and

              (2)    Have the separate agreement translated into Hebrew.

       b.    The separate agreement shall be executed in a form acceptable to the civil courts in Israel.

       c.    The parties shall jointly petition the Israeli civil court (Bet Mishpat Li'inyanei Mishpacha) to enter the Hebrew language Agreement as a court order enforceable by the Israeli court. The Israeli court order shall be a mirror image of the order of the parties' Agreement and the Massachusetts court judgment regarding custody and visitation.

       d.    By entering into the mirror image order in Israel, the parties do not, thereby, subject themselves to personal jurisdiction in Israel, except to the extent necessary to obtain emergency enforcement of the mirror image Agreement and mirror image judgment.

       e.    The parties shall divide the costs of a translation service and associated Israeli court fees equally. Each party shall pay his or her respective Israeli lawyers.

_____ Husband
_____ Wife

    f.      Notwithstanding any other provision of this Agreement, until such time as the mirror image order is entered by the Bet Mishpat Li'inyanei Mishpacha, neither party shall be permitted to remove the children from the USA to any other country.

    g.      Notwithstanding the entry of the mirror image order, the parties agree that neither of them shall request any court in Israel to modify any provision of custody, visitation, support or alimony. So long as the Wife and the child(ren) live in Massachusetts, it is Massachusetts that shall have exclusive jurisdiction over and exclusive rights to modify custody, visitation, support or alimony.

<p style="text-align:center">(End of Exhibit H)<br>(End of Exhibits and end of Agreement)</p>

N:\wpwin\Kausits v. Antelman\Probate Court Pleadings\Drafts\02.22.06.Agreement.wpd

_____ Husband
_____ Wife



RECEIVED

MAR - 9 2006

# Kausits
## vs.
## Antelman

# Kausits vs. Antelman, 9/28/2005

9/28/2005

Volume 1
pp 1-87

**Jones Reporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 1

```
 1                                    Volume:    I

 2                                     Pages:    1-87

 3                                  Exhibits:    None

 4

 5                COMMONWEALTH OF MASSACHUSETTS

 6    NORFOLK, ss           PROBATE AND FAMILY COURT

 7                       DOCKET NO. 04D-759

 8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ x

 9    BARBARA KAUSITS,

10                    Plaintiff,

11        v.

12    PERRY ANTELMAN,

13                    Defendant.

14    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ x

15

16    BEFORE:    Judge David H. Kopelman

17    DATE:      September 28, 2005

18    LOCATION:  Norfolk County Probate and Family Court

19               35 Shawmut Road

20               Canton, Massachusetts  02021

21

22

23

24
```

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   HENRY KATZ, ESQ.
 4   14 Crest Road
 5   Sharon, Massachusetts  02067
 6        Appearing for Barbara Kausits
 7
 8   CAROL J. KING, ESQ.
 9   WALLACE LAW OFFICE
10   One Post Office Square
11   Sharon, Massachusetts  02067
12        Appearing for Perry Antelman
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2   WITNESS    DIRECT  CROSS  REDIRECT  RECROSS
 3   --
 4
 5
 6
 7   _____  x
 8
 9           E X H I B I T S
10   NO.                     PAGE
11   --
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              P R O C E E D I N G S
 2
 3        THE COURT:  Okay.  Kausits and
 4   Antelman.  Parties and counsel, right up front.
 5        MR. KATZ:  Up front, Your Honor?
 6        THE COURT:  Right up front.  Okay.
 7   This is the case of Barbara Kausits, K-A-U-S-I-T-S,
 8   S-I-T-S, and Perry Antelman, Docket Number 04D-
 9   0759.  Counsel identify themselves for the record.
10        MS. KING:  Carol King representing -
11        THE COURT:  Sorry, Carol what is it?
12   King?
13        MS. KING:  King, K-I-N-G.
14        THE COURT:  All right.  And you're
15   representing husband?
16        MS. KING:  Perry Antelman.
17        THE COURT:  Okay.
18        MR. KATZ:  Henry Katz for the wife.
19        THE COURT:  All right.  And there's a
20   Motion to Dismiss?  Is that right?
21        MS. KING:  That's correct.
22        THE COURT:  And there's an affidavit.
23   Let me see what we've got here.  There's the Motion
24   to Dismiss.  What is this here?  Is this part of
```

Page 5

```
 1   the Motion to Dismiss?  What is this?
 2        MR. KATZ:  Is that my stuff?
 3        THE COURT:  Oh, that's opposition.  But
 4   what is this attached to it?  Where did it come
 5   from?
 6        MR. KATZ:  (inaudible)
 7        THE COURT:  Okay.  There's motion -
 8   there's -
 9        MR. KATZ:  That's not mine.
10        THE COURT:  Husband's Motion to
11   Dismiss, Plaintiff's Opposition to Motion to
12   Dismiss, Affidavit in Support of Plaintiff's
13   Opposition to Dismiss, Motion for Temporary
14   Support, Emergency Motion to Vacate Ex-Parte Orders
15   and Stay Court Proceedings, Notice of Wrongful
16   Removal and Retention.  All right.  As far as
17   wrongful removal and retention, did your client -
18   my understanding of the Hague Convention is, for
19   there to be a wrongful removal, you need a court
20   order granting your client custody of the children.
21   Is there such an order in existence?
22        MS. KING:  That's also not a correct
23   statement of the law.
24        THE COURT:  Well, you tell me what the
```

2 (Pages 2 to 5)

Kausits vs Antelman, 9/28/2005

Page 54

1    MR. ANTELMAN: - in fact, that was one
2  of the reasons why we also wanted to move to
3  Israel, because the cost of living there is around
4  a third of what it is here, and we were surviving
5  very nicely -
6    THE COURT: Well, by agreement, by
7  agreement, you guys can live wherever you choose to
8  live.
9    MR. ANTELMAN: Right.
10   THE COURT: But now the problem is -
11   MR. ANTELMAN: Right, I know.
12   THE COURT: - there's no agreement,
13  so -
14   MR. ANTELMAN: So it is -
15   THE COURT: I can't compel her to move
16  somewhere -
17   MR. ANTELMAN: I know that, I
18  understand. We've been through that. I understand
19  that.
20   THE COURT: Okay.
21   MR. KATZ: Is that on the record?
22   THE COURT: I mean, the cost of living
23  may be cheaper in Utah, but I can't -
24   MR. ANTELMAN: I understand that.

Page 55

1    THE COURT: - order her to go to Utah.
2    MR. ANTELMAN: I understand that. So -
3    MS. KING: Could I interrupt just -
4    THE COURT: Yeah, sure, go ahead.
5    MS. KING: I just want to make it clear
6  that -
7    MS. KING: - under your ex-parte
8    THE COURT: Yeah.
9    MS. KING: - under your ex-parte
10  orders -
11   THE COURT: Yeah.
12   MS. KING: - she was given (inaudible)
13  proceeds from the sale of the home, with the
14  ability to take those proceeds -
15   THE COURT: Right, but see, I entered
16  that ex-parte order, my memory is, I could be
17  confused, but my - because I often am, but my
18  memory is that I entered that ex-parte order
19  because the allegation was that he was in Israel,
20  was going to stay in Israel, was going to cut her
21  off and that all she had to live on was the
22  proceeds of the house and she wasn't going to eat
23  unless she was able to sell the house and retain
24  the proceeds.
25   MR. KATZ: Exactly right, and the

Page 56

1  only -
2    THE COURT: That's why -
3    MR. KATZ: The only thing that changed
4  is, he's now back from Israel, but he's still not
5  providing any support.
6    THE COURT: Well, he's going to have to
7  pay support, but on the other hand, she has -
8  doesn't she derive some income from the proceeds?
9  Doesn't she - don't the unexpended portion of the
10  proceeds from the sale of that house - where was
11  it? In Sharon, right?
12   MR. KATZ: Right.
13   THE COURT: Don't they generate some
14  income as well?
15   MR. KATZ: They generate some income,
16  but she has seven kids, they're in private schools,
17  (inaudible) -
18   THE COURT: Well -
19   MR. KATZ: There's a tremendous
20  amount -
21   THE COURT: Is there -
22   MR. KATZ: I don't think there's any
23  dispute -
24   THE COURT: Is there a tuition

Page 57

1  remission? Are they - what are they in, Solomon
2  Schechter, or -
3    MR. KATZ: They're not - they're not -
4    MR. ANTELMAN: One of them.
5    MR. KATZ: They're not admitting any -
6    THE COURT: (inaudible) kids graduated
7  Schechter. But they have a tuition remission type
8  of -
9    MR. KATZ: Not for her.
10   THE COURT: Well, I would think they
11  would, given the financial - they have
12  scholarships.
13   MR. KATZ: I think she's - well, I know
14  they have scholarships.
15   MS. KAUSITS: I applied for financial
16  aid.
17   THE COURT: (inaudible)
18   MR. KATZ: One of the schools says that
19  they're willing - one of the schools told me that
20  they're willing to negotiate, but they're owed
21  $20,000 (inaudible) before they let -
22   THE COURT: Well, I'm not a collection
23  agency for the schools.
24   MR. KATZ: Neither am I, but I think

15 (Pages 54 to 57)

Kausits vs. Antelman, 9/28/2005

Page 58

1  : that there's no dispute that the $1,300 - I mean,
2  nobody's saying it's unreasonable. That's what she
3  needs to live.
4         THE COURT: That may be reasonable, but
5  then he's got nothing to eat.
6         MR. KATZ: I'm not arguing, I under -
7         THE COURT: He's got to live, too.
8         MR. KATZ: I understand that.
9         THE COURT: Well, what do you suggest -
10  you're making fourteen - I'm rounding it off -
11         MR. ANTELMAN: Right, right.
12         THE COURT: - $1,400 a week. What do
13  you - and I understand that's your gross.
14         MR. ANTELMAN: Right.
15         THE COURT: But your net, according to
16  this, is $1,555. What do you suggest you give to
17  your -
18         MR. ANTELMAN: Right.
19         THE COURT: - seven kids to live on?
20         MR. ANTELMAN: I was -
21         THE COURT: It's not an alimony order,
22  it's just -
23         MR. ANTELMAN: Yeah, I understand
24  that -

Page 59

1         THE COURT: - child support only.
2         MR. ANTELMAN: - and I also know,
3  because all these years I supported - I mean, I was
4  the breadwinner of the house -
5         THE COURT: I'm not critical of you,
6  I'm not critical of your wife -
7         MR. ANTELMAN: - so what I suggest is
8  that, you know, if we are going to be staying here,
9  and I will basically go wherever my children are -
10         THE COURT: Which is the right thing to
11  do.
12         MR. ANTELMAN: Right.
13         THE COURT: Which is the right thing to
14  do.
15         MR. ANTELMAN: So I would recommend
16  that - in fact, what we had done, I mean, we
17  borrowed - continually borrowed money for years to
18  help us, to help ourselves, because our standard -
19         THE COURT: From who? From who?
20         MR. ANTELMAN: From friends, family.
21         THE COURT: Okay.
22         MR. ANTELMAN: Because our standard of
23  living was too high. But what I would recommend
24  is, we take from the proceeds of the house monies

Page 60

1  to help subsidize whatever is necessary -
2         THE COURT: Yeah, but you still can't
3  say that, "I'm going to pay zero."
4         MR. ANTELMAN: I'm not saying that -
5         THE COURT: Just use the house -
6         MR. ANTELMAN: No, no, no, no, no, no,
7  right. I understand that.
8         THE COURT: Whatever the order is,
9  she's going to need to use monies from the house to
10  subsidize
11  it -
12         MR. ANTELMAN: Right, I know that.
13         THE COURT: - if her expenses are
14  $1,300 -
15         MR. ANTELMAN: Right.
16         THE COURT: - no matter what the order
17  is, she's going to have to subsidize it.
18         MR. ANTELMAN: I know. And I have a
19  problem because, because she left the way she left,
20  I still have - we have obligations and liabilities
21  in Israel that I'm still paying on, and -
22         THE COURT: Let me just say this, I'll
23  just tell you this -
24         MR. ANTELMAN: Yes.

Page 61

1         THE COURT: - and I'm not unique in
2  this regard -
3         MR. ANTELMAN: Yes.
4         THE COURT: - the courts view your
5  children, and it's an odd way to phrase it, as your
6  primary creditors. I don't give a hoot -
7         MR. ANTELMAN: Right.
8         THE COURT: - about her Visa card, your
9  creditors in Israel -
10         MR. ANTELMAN: Right, right.
11         THE COURT: - your creditors on unpaid
12  school loans.
13         MR. ANTELMAN: Right.
14         THE COURT: Doesn't matter. They stand
15  in line.
16         MR. ANTELMAN: Right.
17         THE COURT: The first creditor, as far
18  as I'm concerned, are the kids.
19         MR. ANTELMAN: Yes.
20         THE COURT: They have to get - because
21  I'm a family court. I'm not a collection agency
22  for Visa or for -
23         MR. ANTELMAN: Okay, so if I stay up in
24  - if I - literally, if I stay up in this one room -

16 (Pages 58 to 61)

Kausits vs. Antelman, 9/28/2005

Page 62

1 THE COURT: If you say to your
2 creditors, "See you later, do what you want" -
3 MR. ANTELMAN: Right.
4 THE COURT: - and -
5 MR. ANTELMAN: So if I do that -
6 THE COURT: Yeah.
7 MR. ANTELMAN: - okay, and I don't take
8 an apartment here -
9 THE COURT: Okay.
10 MR. ANTELMAN: - and I stay up in an
11 attic, which is where I am now, until this is
12 resolved -
13 THE COURT: Whose attic are you in?
14 MR. ANTELMAN: Actually, in the
15 business I'm consulting for, they're letting me
16 stay in the attic.
17 THE COURT: Okay.
18 MR. ANTELMAN: Okay?
19 THE COURT: And what town is that in?
20 MR. ANTELMAN: Providence.
21 THE COURT: In Providence, okay.
22 MR. KATZ: That's your father's
23 business?
24 MR. ANTELMAN: No. Not at all.

Page 63

1 THE COURT: Okay, go ahead.
2 MR. ANTELMAN: And if I do that -
3 THE COURT: Yeah.
4 MR. ANTELMAN: - then I could pay
5 somewhere between $400 to $500 a week towards that,
6 and that is without, that is without an apartment
7 here. What's difficult for me is, when I've - I've
8 had the children every other weekend, and I have
9 them from Friday through Monday morning -
10 THE COURT: Yeah, I'm not going to
11 change that.
12 MR. ANTELMAN: Yeah.
13 THE COURT: Is that - that's in the
14 agreement?
15 MR. ANTELMAN: Yeah, yeah, yeah, that's
16 right. The thing is -
17 THE COURT: Well, that's a good thing
18 that you have your children.
19 MR. ANTELMAN: I love it -
20 THE COURT: Yeah, right.
21 MR. ANTELMAN: - (inaudible) made a
22 change in my life. I mean, I couldn't do that.
23 THE COURT: Right.
24 MR. ANTELMAN: The problem there is, is

Page 64

1 that to - I don't feel responsible to them, having
2 them in a small place. I would - I think it should
3 be right that I should have -
4 THE COURT: Why don't you sell - why
5 don't - I mean, just a suggestion -
6 MR. ANTELMAN: Right.
7 THE COURT: - before the creditors
8 attach the heck out of that Bet Shemesh residence -
9 MR. ANTELMAN: Well, they won't go
10 international, they won't go -
11 THE COURT: Well, why don't you sell it
12 and then -
13 MR. ANTELMAN: Right, we want to sell
14 it.
15 THE COURT: - and use that money to buy
16 a condo?
17 MS. KING: She - she's -
18 MR. DELUCA: Your Honor, if I may -
19 THE COURT: Yeah.
20 MR. DELUCA: - what we talked about -
21 THE COURT: I'm willing to unfreeze
22 that, so . . .
23 MR. DELUCA: What we talked about is
24 all along those lines. We talked about a support

Page 65

1 order by father. I recommended about forty percent
2 of his gross income, which I think is, like, $600
3 a week. Mother retained the use of the monies,
4 which currently, right now, is somewhere around
5 $140,000 -
6 THE COURT: To supplement the support -
7 MR. DELUCA: To supplement. There is
8 $60,000 being held in escrow from the proceeds,
9 Judge, that their creditors have a lien on it, and
10 -
11 THE COURT: Nothing I can do about
12 that.
13 MR. DELUCA: Well, I understand, but I
14 think we agreed to release those monies to the
15 creditors just to clean that up.
16 THE COURT: That's fine.
17 MR. DELUCA: So that'll leave $140,000
18 here that mother could use pursuant to your order,
19 which states she could use it for living expenses,
20 etcetera. Father be permitted to sell the property
21 in Israel.
22 THE COURT: I'm going to let him do
23 that in a heartbeat.
24 MR. DELUCA: And then once he sells

17 (Pages 62 to 65)

Kausits vs. Antelman, 9/28/2005

Page 66

1  that property in Israel, I think the parties will
2  be in a better position for him to get a suitable
3  housing here in the States, if he chooses to move
4  back to the States -
5          THE COURT:  Sounds reasonable to me.
6          MR. DELUCA:  - or whatever.  I think
7  trying to - and what I was trying to keep the
8  parties focused on, trying to look more than -
9          THE COURT:  The big picture.
10         MR. DELUCA:  Trying to look more than
11 two months down the road is impossible, Judge.  I
12 think we just need to look at right now.  And I
13 think right now, that's the solution that would
14 work.
15         THE COURT:  Well, I'll tell you what.
16 I'm prepared to do this.  I'm going to -
17 notwithstanding the automatic restraining order,
18 I'm going to - husband is given leave to promptly
19 sell real estate located in 36 - is it Tasha
20 (phonetic) Street?
21         MR. ANTELMAN:  Yes.
22         THE COURT:  Tasha Street in Bet
23 Shemesh.  Where is Bet Shemesh?
24         MR. ANTELMAN:  Right in between Tel

Page 67

1  Aviv and Jerusalem.
2          THE COURT:  Oh, midway, all right.
3          MR. ANTELMAN:  Right, right, midway.
4          THE COURT:  Bet Shemesh, Israel.
5          MR. KATZ:  The first grandchild is
6  awaiting birth over there.
7          THE COURT:  Is that right?  Well, this
8  case should get resolved.  This is crazy.
9          MR. KATZ:  Absolutely.
10         THE COURT:  They're going to - you're
11 going to spend - whatever monies you have, you're
12 going to spend on litigation?  You've got - the
13 money should be spent educating your seven kids,
14 for god's sake, not paying lawyers for -
15         MR. ANTELMAN:  Yeah, that's -
16         THE COURT:  - appeals and -
17         MR. ANTELMAN:  Education was free in
18 Israel.
19         THE COURT:  I understand, but look,
20 she's got a right to live where she's going to
21 live -
22         MR. ANTELMAN:  Yes, I know, yes.
23         THE COURT:  - that's the reality of it.
24 And to your credit, you said, "I'm going to come

Page 68

1  here and be with my children," to your credit.
2          MR. ANTELMAN:  Yes, yes.
3          THE COURT:  All right.  He's given
4  leave to utilize the net proceeds to assist him in
5  obtaining housing and pay -
6          MR. KATZ:  (inaudible) some controls on
7  that.
8          THE COURT:  - his expenses.  Well, she
9  must have an idea what it's worth.
10         MR. KATZ:  No, I understand.  It's
11 worth probably, I think -
12         MS. KING:  I'm sorry -
13         MR. KATZ:  I think it's worth about two
14 twenty.
15         MR. DELUCA:  I think we got the equity
16 at about a hundred -
17         THE COURT:  Well, you've got two twenty-
18 five -
19         MR. KATZ:  The equity is about a
20 hundred -
21         THE COURT:  - it's subject to a
22 mortgage of a hundred and twenty-one -
23         MR. KATZ:  The equity is about a
24 hundred and twenty.  I mean, the concern I have is

Page 69

1  that he'll use the money, based on an order like
2  that, and buy a house in Israel -
3          THE COURT:  No, no, no, I don't think -
4  it doesn't sound like he's going to buy a house in
5  Israel.  Doesn't sound like he's going to do that
6          MS. KING:  He's not.
7          THE COURT:  I'll put "to buy housing" -
8  I'll put "husband represents that he will be
9  residing in" - where, Rhode Island or
10 Massachusetts?
11         MR. ANTELMAN:  Or - yeah, prob - I'm
12 (inaudible).
13         THE COURT:  I'll put "Rhode Island or
14 Massachusetts."  Well, is it your plan to move to
15 Massachusetts, then?
16         MR. ANTELMAN:  I would.
17         THE COURT:  All right.
18         MR. ANTELMAN:  I (inaudible) -
19         THE COURT:  Okay, fine.  Well, that
20 covers that.  And then as far as the support order,
21 I suppose it should go to the Department of
22 Revenue, through the Department of Revenue, to make
23 sure it gets collected.  And - yeah, hang on for a
24 second, let me just get my . . . okay.  I take his

18 (Pages 66 to 69)

**Commonwealth of Massachusetts**
**The Trial Court**
**Norfolk Division    Probate and Family Court Department    Docket No. 04D-0759-DV1**

<u>**Complaint for Civil and Criminal  Contempt**</u>
**dated** April 3, 2006

<u>Barbara Kausits a/k/a Antelman</u> , Plaintiff
v.
<u>Perry W. Antelman</u> , Defendant

1)    Plaintiff, who resides at <u>11 Grove Street, Sharon, Middlesex County, Massachusetts</u> is the spouse of Defendant, Perry W. Antelman (hereafter Perry), who resides at <u>95 Main St. Sharon, Norkolk County, Massachusetts.</u>    North

2)    By Temporary Order's of the Court, <u>Judge Kopleman dated 09/28/05 (Exhibit 1)</u>; <u>Judge Kopleman 12/07/05</u> (Exhibit 2), and <u>Judge Boorstein dated 03/24/06 (Exhibit 3)</u> defendant was ordered:

- ☒    to pay child support in the sum of <u>$600.00 per week (Ex. 1)</u>;
- ☒    said child support to be made payable to the Commonwealth of Massachusetts Department of Revenue (DOR) by wage assignment. If wage assignment is not implemented, it is father's responsibility to pay said child support directly to DOR each and every Friday without excuse and without delay (Ex. 1);
- ☒    each party to share the costs in connection with the container of household goods, currently in Israel (Exhibit 2); and
- ☒    pay $500 forthwith to plaintiff's counsel as a sanction (Ex. 3); and
- ☒    said - orders - are still in force.

3)    Defendant has not obeyed that order - and:

- ☒    is in arrears of court-ordered child support payments, in sum the of $3,000 as of today;
- ☒    has violated the order on March 3rd, 10th, 17th, 24th, and 31st by not paying the $600, instead choosing to pay other obligations (Exhibit 4 - defendants' Day I deposition transcript pg. 116; ¶14 through 22);
- ☒    has not paid to Plaintiff the $4,000 for his share of the container costs; and
- ☒    to date has not paid the $500 to plaintiff's counsel.

4)    Wherefore, plaintiff requests that defendant be required to appear before this Court to show cause why said defendant should not be adjudged in contempt of Court and require the defendant to:

(a)    immediately pay the $3,000 arrears;
(b)    immediately pay the $4,000 in container costs;
(c)    immediately pay the $500 ordered in Ex. 3, plus Plaintiff's legal fees and costs for this complaint;
(d)    enter a finding of criminal contempt and sentence defendant to the House of Corrections for no less than 7 days; and
(e)    for any such additional relief that the court deems meet and just

4/4/06

Date:  April 4, 2006

Respectfully submitted,
**Barbara Kausits**, by her attorney

**NISSENBAUM LAW OFFICES**

By: _Wendy J Ovenbaug_
Gerald L. Nissenbaum, BBO # 372400
Wendy J. Overbaugh, BBO # 657457
160 Federal Street - 24th Floor
Boston, MA  02120
617.330.9090; fax at: 6909

CJ-D 103 (1/89)

**Commonwealth of Massachusetts**
**The Trial Court**
Norfolk Division    Probate and Family Court Department    Docket No. 04D-0759-DV1

## Complaint for Civil and Criminal Contempt
**dated April 3, 2006**

Barbara Kausits a/k/a Antelman , Plaintiff

v.

Perry W. Antelman  , Defendant

Attorney:  Gerald L. Nissenbaum, BBO # 372400
Wendy J. Overbaugh, BBO # 657457
160 Federal Street - 24th Floor
Boston, MA  02120
617.330.9090; fax at: 6909

Instructions for filling out this form:

1.    Give street address, city or town, and county in paragraph 1.

2.    Exact dates and specific details must be set out in paragraph 3.

3.    When this complaint is filled out the attorney is to submit a completed contempt summons to the Register for further processing.

4.    See M.G.L. Chapter 119A, Section 12, concerning wage assignments.

5.    If more space is required attach 81/2 x 11 white sheets of paper hand printed or typed thereon as needed.

Exhibit 27

# Commonwealth of Massachusetts
## The Trial Court
### Probate and Family Court Department

Norfolk Division                                      Docket No. 04D0759-DV1

Barbara Kausits, Plaintiff

v.

Perry W. Antelman, Defendant

## TEMPORARY ORDER

Pending a hearing on the merits or until further order of the Court, it is Ordered that:

1.  The husband's motion to dismiss the wife's complaint for divorce for lack of subject matter jurisdiction is hereby denied.

2.  The husband's motion to stay proceedings pending the Hague Convention litigation in the federal court is hereby denied, except as to the entry of any permanent judgment by this Court regarding custody and visitation.

3.  Notwithstanding paragraph two above, this Court reserves the right to enter temporary orders with respect to the wife's pending complaint for divorce.

4.  The wife shall continue to have sole physical custody of the seven minor children, ages 13, 11, 9, 7, 5, 3 and two weeks.

5.  The husband shall have reasonable rights of visitation with his seven minor children as set forth in a stipulation dated September 7, 2005. (This was the same stipulation regarding visitation which was filed in the Federal District Court.)

6.  Commencing Friday, September 30, 2005, and on each and every Friday thereafter, the husband shall pay $600 per week for support of his seven minor children.

7.  The aforesaid child support shall be made payable to the Commonwealth of Massachusetts and shall be sent to the Department of Revenue Child Support Enforcement Division, P.O. Box 55140, Boston, MA 02205-5140, by means of an implemented wage assignment.

Exhibit B-1

9/28/05

8.   If for any reason that the wage assignment is not implemented it shall be the father's responsibility to pay the aforesaid child support directly to the Department of Revenue each and every Friday without excuse and without delay.

9.   Notwithstanding the automatic restraining order, the husband is hereby given leave to promptly sell real estate located at 36 Tashur Street, Bet Shemesh, Israel.

10.  Thereafter, the husband shall have the right to utilize the net proceeds of the sale of the Israeli real estate to assist him in obtaining housing and to defray his living expenses. (The husband has represented to the Court that he intends to purchase a residence located in Massachusetts in order to be close to his seven minor children).

11.  The wife shall have the right to utilize the net proceeds arising from the sale of her Sharon real estate to defray her living expenses, after paying a total of $60,000 to various creditors who had placed liens upon said real estate prior to its sale.

12.  The parties and their counsel of record are again urged by this Court to utilize their assets, energies and talents in the direction of resolving their pending disputes, if not for their own sake, then for the sake of their seven children, rather than dissipating the aforesaid resources in endless and expensive litigation

_September 28, 2005_
Date

_Da ett Kope_
Justice

Exhibit B-2

Exhibit 2

Commonwealth of Massachusetts
The Trial Court
Probate and Family Court Department

Norfolk Division

Docket No. 04D0759-DV1

Barbara Kausits, Plaintiff

vs.

Perry Antelman, Defendant

ADDITIONAL TEMPORARY ORDER

Pending a hearing on the merits, or until further order of the Court, it is hereby Ordered that:

1. The wife shall forthwith pay to the husband the sum of $15,000 from the net proceeds realized by her from the sale of the Sharon real estate.

2. The aforesaid $15,000 shall be deemed an advance credit to the husband with respect to a G.L. chap. 208, sec. 34 division of assets.

3. The Department of Revenue is authorized and instructed to forthwith pay to the wife in full any and all child support held by it paid by the husband pursuant to an order of support entered by this Court on September 28, 2005.

4. The parties shall make immediate arrangements to ship their household goods, presently located in a container in Israel, from Israel to a mutually-agreed upon location in the Boston area.

5. Both parties shall promptly pay any and all charges incurred in connection with storage, shipping and transportation of the aforesaid household goods.

6. Promptly upon arrival in the Boston area, the personal property shall be divided between the parties by permitting each party to alternately choose one item of personal property. One party shall be entitled to make the first choice, following which the second party shall be permitted to make the second and third choices. Thereafter, the parties shall alternate commencing with the first party.

7. The father shall continue to have the right to visit with the six minor children (excluding the seventh child, who is an infant) on alternate weekends commencing Friday at the conclusion of school and extending until Monday at the commencement of school.

12/7/05

8. In the event that the children's school is closed on Monday following the father's alternate weekend visitation for either a secular or religious holiday, his weekend visitation shall automatically extend until the following Tuesday at the commencement of school;

9. The father shall also have the right to visit with the six minor children each and every Wednesday, commencing upon the close of school and extending until the following Thursday morning at the commencement of their school.

10. It shall be the father's responsibility to pick up and return the six minor children from and to their respective schools or daycare.

_December 7, 2005_
Date

_____
Justice

12/7/2005

*Exhibit 3*

RECEIVED

MAR 28 2006

COMMONWEALTH OF MASSACHUSETTS
The Trial Court
Probate and Family Court Department

FILED
MAR 24 2006
NORFOLK PROBATE COURT

NORFOLK DIVISION

DOCKET # 04D-0759-DV1

BARBARA KAUSITS,
                                    PLAINTIFF

         v.

PERRY ANTELMAN,
                                    DEFENDANT

*...HEREBY... DENIED...*

JUDGE

PERRY ANTELMAN'S
**EMERGENCY MOTION TO CONTINUE DEPOSITION DATE**

Now comes the Defendant, Perry Antelman, and respectfully requests that this Court

continue his deposition currently scheduled for Friday, March 24, 2006 at 9:00 a.m. As reasons

therefore, the Defendant states as follows:

1.      The Defendant met with Attorney Laura Studen of Burns & Levinson LLP, on

Tuesday, March 21, 2006. At that time, it was agreed that Attorney Studen would represent Mr.

Antelman in the pending divorce action.

2.      On Wednesday, March 22, 2006, Attorney Studen faxed Attorney Nissenbaum a

letter indicating that she will be representing Mr. Antelman and that her Notice of Appearance

will be filed with the Court shortly and upon receipt of Attorney King's Notice of Withdrawal.

Attorney Studen also requested that the deposition be rescheduled, as she would be out of state

and could not attend the deposition of Mr. Antelman on March 24, 2006. (See letter attached as

Exhibit A.)

Perry Antelman

113

| | | |
|---|---|---|
| 4:3:16 | 1 | shareholders. |
| 4:33:17 | 2 | Q. Was there a meeting of the shareholders? |
| 4:33:20 | 3 | A. Sure. |
| 4:33:20 | 4 | Q. Where? |
| 4:33:22 | 5 | A. The majority of shareholders. |
| 4:33:23 | 6 | Q. Was it a meeting by mail or in person? |
| 4:33:30 | 7 | A. It had to be in person, and it was by phone. |
| 4:33:34 | 8 | Q. And who conducted this in-person meeting? |
| 4:33:40 | 9 | who was the chair of that meeting? |
| 4:33:43 | 10 | A. I don't know who the chair was, but I'm |
| 4:33:46 | 11 | familiar with people who were present. |
| 4:33:47 | 12 | Q. Who was that? |
| 4:33:48 | 13 | A. That would be -- |
| 4:33:49 | 14 | Q. Was David there? |
| 4:33:50 | 15 | A. No. |
| 4:33:51 | 16 | Q. All right. |
| 4:33:53 | 17 | A. Tom Gardner; Ted Barrows, B A R R O W S; Mike |
| 4:34:04 | 18 | Smith; Douglas Leonard. I know of those four people |
| 4:34:?? | 19 | that were at the meeting. |
| 4:34:?? | 20 | Q. Do any of these people live in Massachusetts? |
| 4:34:27 | 21 | A. I don't believe so. |
| 4:34:28 | 22 | Q. Rhode Island? |
| 4:34:29 | 23 | A. Yes |
| 4:4:29 | 24 | Q. All of them? |

JONES REPORTING COMPANY
617-451-8900

Perry Antelman

114

| | | |
|---|---|---|
| 4:4:30 | 1 | A. I believe so. |
| 4:34:31 | 2 | Q. Where in Rhode Island does Tom live? |
| 4:34:33 | 3 | A I don't know. |
| 4:34:35 | 4 | Q. Ted? |
| 4:34:36 | 5 | A. I don't know. |
| 4:34:37 | 6 | Q. Mike? |
| 4:34:38 | 7 | A I don't know. |
| 4:34:40 | 8 | Q. Doug Leonard? |
| 4:34:43 | 9 | A. Doug doesn't live in Rhode Island. He lives |
| 4:34:46 | 10 | in Connecticut. |
| 4:34:46 | 11 | Q. Do you know where in Connecticut? |
| 4:34:50 | 12 | A. Brookline, Connecticut. |
| 4:34:54 | 13 | Q. And why from your point of view did they want |
| 4:34:58 | 14 | you out? |
| 4:35:00 | 15 | A. Because they felt that the company -- the |
| 4:35:09 | 16 | company could be serviced with a better managing |
| 4:35:15 | 17 | director. |
| 4:35:15 | 18 | Q. who is the managing director now? |
| 4:35:18 | 19 | A. I don't know. |
| 4:35:19 | 20 | Q. who replaced you; do you know? |
| 4:35:22 | 21 | A. Sorry. Ted Barrows. |
| 4:35:27 | 22 | Q. Do you think he -- as far as you know, he is |
| 4:35:30 | 23 | the last person who served as the managing director? |
| 5:32 | 24 | A. Yes, as far as I know. |

JONES REPORTING COMPANY
617-451-8900

Perry Antelman

115

| | | |
|---|---|---|
| 5:37 | 1 | Q. B A R R O W? |
| 35:40 | 2 | A. Yes, with an S. |
| 35:41 | 3 | Q. Leonard -- |
| 35:4? | 4 | A. It's with an S, Barrows. |
| 35:4? | 5 | Q. And Leonard is L E O N A R D? |
| 36:19 | 6 | A. Yes. |
| 36:20 | 7 | Q. Do you know a fellow by the name of Lang? |
| 36:23 | 8 | A. Mm-hmm. |
| 36:24 | 9 | Q. Who is he? |
| 36:25 | 10 | A. Ronald Lang? |
| 36:27 | 11 | Q. Is that -- |
| 36:28 | 12 | A. I know a Ronald Lang. |
| 36:29 | 13 | Q. Is he an investor in one of the companies? |
| 36:31 | 14 | A. Yes. |
| 36:32 | 15 | Q. What company? |
| 36:34 | 16 | A. He is an investor in Marantech and an |
| 36:36 | 17 | investor in Medical Diagnostics, and he is an |
| 36:41 | 18 | investor in Aidance Skincare & and Topical |
| 36:48 | 19 | Solutions. |
| 36:49 | 20 | Q In other words, he is a believer? |
| 36:51 | 21 | A. Yes. |
| 36:55 | 22 | Q What about -- he lives in Sharon, Mass? |
| 36:59 | 23 | A. Yes. |
| 37:16 | 24 | Q. Malcolm Chase, who is Malcolm Chase? |

JONES REPORTING COMPANY

Perry Antelman

116

| | | |
|---|---|---|
| 4:7:21 | 1 | A. The wealthiest man in the State of Rhode |
| 4:37:24 | 2 | Island. |
| 4:37:25 | 3 | Q. Is he an investor in your companies, any of |
| 4:37:27 | 4 | these companies? |
| 4:37:28 | 5 | A. His trusts have investments in our companies. |
| 4:37:32 | 6 | Q. In all of them? |
| 4:37:38 | 7 | A. Yes, by virtue of either himself or through |
| 4:37:43 | 8 | Marantech's ownership in AMD. |
| 4:37:45 | 9 | Q. Okay. Who is Richard Sugarman? |
| 4:37:49 | 10 | A. An investor. |
| 4:37:51 | 11 | Q. Does he live in Rhode Island or |
| 4:37:53 | 12 | Massachusetts? |
| 4:37:53 | 13 | A. He lives in Rhode Island. |
| 4:38:27 | 14 | Q. Now, you are paying $5,300 a month for three |
| 4:38:32 | 15 | months to bring the mortgage and the house in |
| 4:38:36 | 16 | Betshemesh up to date? |
| 4:38:37 | 17 | A. I have done that for three months. |
| 4:38:38 | 18 | Q. You plan to do it again at the end of -- when |
| 4:38:41 | 19 | is the next payment due? |
| 4:38:43 | 20 | A. The end of this month. |
| 4:38:44 | 21 | Q. The end of March? |
| | 22 | A. Yes. |
| 4:38:59 | 23 | That's B E T S H E M E S H. |
| 9:07 | 24 | Q. Now, the sooner you make that payment, will |

JONES REPORTING COMPANY

COMMONWEALTH OF MASSACHUSETTS
The Trial Court
Probate and Family Court Department

Norfolk Division                                    Docket No.   04D0759DV1

CONTEMPT SUMMONS

BARBARA KAUSITS A/K/A ANTELMAN, Plaintiff

V.

PERRY W. ANTELMAN, Defendant

To the above named Defendant:

You are ordered to appear at a Probate and Family Court to be held at **CANTON**
in said County of **NORFOLK on APRIL 12TH 2006**
at 8:30 AM in the forenoon to show cause why you should not be held in civil and/or criminal
contempt, the penalty for which may be a jail sentence.

You are hereby summoned and required to serve upon **GERALD L. NISSENBAUM,
ESQUIRE** whose address is **NISSEMBAUM LAW OFFICES 160 FEDERAL STREET 24TH
FLOOR, BOSTON, MASSACHUSETTS 02110**
your answer, if any, to the complaint which is herewith served upon you, **FORTHWITH** after
service of this summons upon you, exclusive of the day of service. You are also required to file
your answer, if any, to the complaint in the office of the Register of this Court at **CANTON**
either before service upon plaintiff's attorney or within a reasonable time thereafter.

Failure to appear on this date may result in the issuance of an order for your arrest.

Witness **DAVID H. KOPELMAN**, Esquire, first Justice of said Court at **CANTON**

this 4TH day of APRIL, 2006 .

                                                    Register of Probate

## COMMONWEALTH OF MASSACHUSETTS
### The Trial Court
### Probate and Family Court Department

**NORFOLK DIVISION**                                  **DOCKET # 04D-0759-DV1**

---

**BARBARA KAUSITS,**

PLAINTIFF

v.

**PERRY ANTELMAN,**

DEFENDANT

---

### DEFENDANT, PERRY ANTELMAN'S, ANSWER TO
### PLAINTIFF, BARBARA KAUSITS' COMPLAINT FOR CONTEMPT
### DATED ARPIL 3, 2006

NOW comes the Defendant, Perry Antelman, and answers Plaintiff, Barbara Kausits' Complaint for Contempt dated April 3, 2006, by corresponding numbered paragraphs as follows:

1. Admitted.

2. The documents speaks for themselves, however, the Plaintiff incorrectly quotes the Court Order (Kopelman, J.) dated December 7, 2005. The order states "Both parties shall promptly pay any and all charges incurred in connection with storage, shipping and transportation of the aforesaid household goods."

3. Denied.

4. The Defendant denies that the Plaintiff is entitled to any relief.

## AFFIRMATIVE DEFENSES

The Defendant asserts the following affirmative defenses:

1.  The Defendant has to date, paid all his child support obligations, paid $500.00 to

    Attorney Nissenbaum and has arranged to pay $10,000 for the container, $2,000

    more than the Plaintiff has paid.

2.  The Plaintiff's claim is not advanced in good faith.

2.  The Plaintiff has unclean hands.

WHEREFORE, the Defendant requests that this Honorable Court dismiss the Plaintiff's

Complaint for Contempt and order her to pay the attorneys fees and costs incurred by the

Defendant.

                              Respectfully submitted

                              PERRY ANTELMAN
                              By his attorneys,

Dated:  April 12, 2006

                              Laura R. Studen, BBO #483690
                              Francine Gardikas, BBO #644557
                              BURNS & LEVINSON LLP
                              125 Summer Street
                              Boston, Massachusetts 02110
                              (617) 345-3000

2

Rec'd in CT

APR 1 9 2006

**Commonwealth of Massachusetts**
**The Trial Court**
**Probate and Family Court Department**

**Norfolk Division**                                    **Docket No.** 04D0759-DV1

Perry Antelman, Plaintiff

vs

Barbara Kausits, Defendant

**JUDGMENT OF CONTEMPT**
(Complaint filed April 4, 2006)

After hearing, it is Ordered and Adjudged that:

1.   The Court finds that the defendant had failed to pay his child support obligation in
     the amount of $600 per week for six consecutive weeks thereby creating an
     arrearage of $3,600.

2.   The Court further finds that on April 10, 2006, the defendant paid $3,788.94,
     thereby paying the aforesaid arrearages in full, plus interest and penalties

3.   Counsel fees in the amount of $500 and costs in the amount of $65 are hereby
     awarded to the plaintiff pursuant to the provision of G.L. chap. 208, sec. 38.

4.   The defendant shall pay the aforesaid costs and counsel fees in the total amount of
     $565 directly to Attorney Nissenbaum on or before April 28, 2006 by check or
     money order, but not in cash.

_April 12, 2006_
Date

_____
Justice

**Commonwealth of Massachusetts**
**The Trial Court**
**Probate and Family Court Department**

**Norfolk Division**                                    **Docket No. 04D0759-DV1**

Barbara Kausits, Plaintiff

vs.

Perry Antelman, Defendant

ORDER



After hearing on March 15, 2006, it is Ordered that:

1.    Defendant ("Husband") shall respond, pursuant to M.R.D.R.P. 34, to the First Request for Production of Documents by Plaintiff ("Wife") dated February 8, 2006 on or before April 4, 2006.

2.    Husband's deposition shall go forward on March 24, 2006 at 9:00 a.m. and if not concluded, shall be suspended no later than 12:30 p.m. that day.

3     Upon Wife's demand for an evidentiary hearing on Husband's Complaint for Contempt filed October 27, 2005, said hearing shall be held on August 28, 2006 at 9:00 a.m. in Canton. The Trial Department shall issue a confirmatory notice. Husband's Motion for Counsel Fees in the contempt action also shall be heard on that day.

_____March 15, 2006_____                        _Lisa A. Roberts_
Date                                                Justice Lisa A. Roberts

03-15-06

*10* ✓

MAR 24, 2006

## COMMONWEALTH OF MASSACHUSETTS
### The Trial Court
### Probate and Family Court Department

**NORFOLK DIVISION**                              **DOCKET # 04D-0759-DV1**

| |
|---|
| **BARBARA KAUSITS,** |
| PLAINTIFF |
| v. |
| **PERRY ANTELMAN,** |
| DEFENDANT |

## PERRY ANTELMAN'S
## EMERGENCY MOTION TO CONTINUE DEPOSITION DATE

Now comes the Defendant, Perry Antelman, and respectfully requests that this Court

continue his deposition currently scheduled for Friday, March 24, 2006 at 9:00 a.m. As reasons

therefore, the Defendant states as follows:

1.    The Defendant met with Attorney Laura Studen of Burns & Levinson LLP, on

Tuesday, March 21, 2006. At that time, it was agreed that Attorney Studen would represent Mr.

Antelman in the pending divorce action.

2.    On Wednesday, March 22, 2006, Attorney Studen faxed Attorney Nissenbaum a

letter indicating that she will be representing Mr. Antelman and that her Notice of Appearance

will be filed with the Court shortly and upon receipt of Attorney King's Notice of Withdrawal.

Attorney Studen also requested that the deposition be rescheduled, as she would be out of state

and could not attend the deposition of Mr. Antelman on March 24, 2006. (See letter attached as

Exhibit A.)

3/23/06

3.    On Wednesday, March 22,2006, Attorney Nissenbaum faxed a three page letter to Attorney Studen indicating that he would not reschedule the deposition, among other non-related topics. (See letter attached as Exhibit B.)

4.    Attorney Studen is not available and is out of state until Thursday, March 30, 2006. She desires to defend her client's deposition as well as be present at the deposition of Tami Kesselman, which has also been noticed for March 24, 2006.

5.    There is no emergency that requires that Mr. Antelman's be deposed on Friday, March 24, 2006. Presently there are no immediate pending Court hearings. Further, Attorney Studen requested, as a professional courtesy only, to reschedule the deposition. There is not attempt on the part of Mr. Antelman to avoid the Court order and delay the divorce process.

6.    Ms. Kausits will not be prejudiced by this brief continuance.


                              Respectfully submitted
                              PERRY ANTELMAN
                              By his attorneys,

Dated:  March 23, 2006

                              Laura R. Studen, BBO #483690
                              Francine Gardikas, BBO #644557
                              BURNS & LEVINSON LLP
                              125 Summer Street
                              Boston, Massachusetts 02110
                              (617) 345-3000

Exhibit A

# BURNS & LEVINSON LLP

LAURA R. STUDEN
617.345.3325
LSTUDEN@BURNSLEV.COM

125 SUMMER STREET  BOSTON, MA 02110
T 617.345.3000  F 617.345.3299
WWW.BURNSLEV.COM

March 22, 2006

*Via Facsimile and First Class Mail*
Gerald L. Nissenbaum, Esq.
Nissenbaum Law Offices
160 Federal Street, 24th Floor
Boston, MA 02110

           *Re:    Kaustis v. Antelman*

Dear Attorney Nissenbaum:

        Mr. Antelman has hired me and the law firm of Burns & Levinson LLP to represent him in his pending divorce action. I will forward my Notice of Appearance along with Attorney King's Notice of Withdrawal shortly.

        It is my understanding that your have scheduled Mr. Antelman's deposition for Friday, March 24, 2006. I am not available that date, as I will be out of state. Would you kindly contact me late next week to arrange for a mutually convenient date?

                                  Respectfully,

                                  *Laura Studen*

                                  Laura R. Studen

cc:    Mr. Perry Antelman

Exhibit B

Mar 22 2006  5:55PM                                              No.0091   P. 1/4

GERALD L. NISSENBAUM*
MADELINE M. CELLETTI
———
WENDY J. OVERBAUGH

**NISSENBAUM
LAW
OFFICES**

THE LANDMARK
160 FEDERAL STREET – 24TH FLOOR
BOSTON, MA 02110
TELEPHONE (617) 330-9090
FAX (617) 330-9009
e-mail: jerry@nissenbaumlaw.com
web: nissenbaumlaw.com
———
(BY APPOINTMENT ONLY)
26 WASHINGTON STREET
W. BOXFORD, MA 01885
TELEPHONE (978) 352-8530

March 22, 2006

**Fax (only): 781-793-0600**
Carol J. King, Esq.
Wallace Law Office, P.C.
One Post Office Square
Sharon, MA 02067

**Fax (only): 617-345-3299**

Re:  *Kausits v. Antelman*

Dear Attorneys King and Studen:

I have Attorney Studen's 4:35 p.m. fax March 22, 2006 letter advising that she has been hired by Mr. Antelman and that she is going to file her appearance shortly. Insofar as I am concerned, until an appearance if filed, Attorney Studen is NOT yet hired.

Further, Attorney Studen's letter states she is not available this Friday for a "deposition" that I have scheduled. **Clearly someone failed to advise her that Judge Roberts ordered Mr. Antelman to appear this Friday at 9 a.m. to begin his deposition.** No one, not Attorney Studen, not Attorney King and not Mr. Antelman can change that order. A copy of the order is enclose to Attorney Studen.

I do not agree and, frankly, counsel, Mr. Antelman should know I would not agree to any postponement in his now-court-ordered deposition. That Attorney Studen is not available is not of my doing. If she was not available, she had two choices, call me first, before taking the case to find out if I would agree to a continuance; or not get into the case right now. Again, I do not agree to a continuance.

Upon receipt of the fax letter, I called Attorney Studen and spoke with a person who I believe is her secretary. I was advised that Attorney Studen has just left on a brief vacation, to return late next week. I advised this person that there is a court order and I do not agree to a continuance.

*PAST PRESIDENT OF AMERICAN AND INTERNATIONAL ACADEMIES OF MATRIMONIAL LAWYERS
*ALSO ADMITTED IN NEW YORK

03/22/06  WED 17:40  [TX/RX NO

Mar 2 2 2006 5:36PM                                    No 0091    F    2/2

# NISSENBAUM
# LAW
# OFFICES

Carol J. King, Esq.                 March 22, 2006                    Page 2
Laura R. Studen, Esq.

I also advised and say again: if Mr. Antelman does not appear on this coming Friday at 9:00 a.m. to begin his deposition, I will promptly file a Complaint for Contempt and a motion for an early return day and have a lawyer from this office go to the court on Friday, to file the contempt and the motion for a short order of notice and get us in court on a contempt by the first of next week.

Since Mr. Antelman bitterly complained he cannot afford to pay $600 a week child support, cannot afford to pay health insurance, etc. Mr. Antelman will have some explaining to do to the judge about where he is getting the money to retain new counsel. Whatever the source, if he can raise money for counsel, he can raise money to pay the $4,000 he now owes Ms. Kautsis for his ½ share of the $8,000 she paid toward the costs of getting the container back to Sharon, MA. And, he can now pay for health insurance. He can pay more child support.

If he says his parents are paying, then the short answer is, he can get that money for child support, which should immediately result in an increase for the kids. Can Mr. Antelman think we do not recall the claim that his father and he are not on good terms so that he cannot get more money than what he has represented to the judge he now gets?

I like to give opposing counsel every courtesy. But, right now, Attorney Studen is not opposing counsel, as there is no appearance. And, I suspect there will be no appearance filed until her firm gets a substantial retainer -- as well she should in this case. If, as and when Attorney Studen appears, I will certainly talk with her, but not until then.

Further, opposing counsel ought not to presume they can come in at this point and appropriately ask opposing counsel for a continuance of a court ordered deposition. Hey, I had to go to court to force the guy to show up; and now he thinks he can avoid the court order? That is not the way the system works.

Until now, it is Attorney King and only Attorney King who is counsel of record. Both Attorney King and Mr. Antelman are aware of Judge Roberts' order.

If, as I suspect, Mr. Antelman did not make clear to Attorney Studen that he

Mar 22 2006 5:37PM                                                    No. 0091   P. 3/4

# NISSENBAUM
# LAW
# OFFICES

Carol J. King, Esq.                    March 22, 2006                    Page 3
Laura R. Studen, Esq.

was under court order to show up this Friday morning to start his deposition, then shame on him.    I will be here, again waiting with a stenographer, to start Mr. Antelman's deposition this Friday at 9:00 a.m.  It is expected Mr. Antelman will appear and testify, as the court order requires.

    Yours very truly,

    **NISSENBAUM LAW OFFICES**

    By: _Gerald L. Nissenbaum_

GLN:pb
Enclosure/pb
e-cc:  Ms. Barbara Kausits
N:\wpwin\Kausits v. Antelman\Correspondence\Husband's lawyer\Studen\3.22 06 wpd

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

NORFOLK, DIVISION                                   No  04D-0759

**BARBARA KAUSITS**
**a/k/a BARBARA ANTELMAN,**
        Plaintiff,

v.

**PERRY ANTELMAN,**
        Defendant

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION TO CONTINUE DEPOSITION
### and Request for Sanctions.

## 1.0      Preliminary Statement.

This opposition is divided into five parts.

1.1    First, is this preliminary statement.

1.2    In section 2.0 we describe the several really bad signals the court will send

to all lawyers and parties if it allows this motion; and discuss why the court

should order defendant to go immediately from the court house to

Nissenbaum Law Offices to be deposed for no less than 3.5 hours, as

previously ordered by the court.

1.3    In section 3.0 we provide a brief history of relevant facts.

1.4    In section 4.0 we discuss why the court should inquire of defendant, Perry

3\24\06

Antelman (Husband) how much his new lawyers have requested as a deposit, the terms on which he has hired them; and the source of funds from which he wants to pay them. In light of Husband's claims of sharply diminished income and lack of assets, his retention of new counsel is both curious and remarkable.

1.5    Last, in section 5.0, we demonstrate why the court must enter important sanctions.

## 2.0    Does the Court Really Want Lawyers to Follow the Rules?; and does it really want Parties to Obey Court Orders?

2.1    Should the court (i) deny the Husband's motion and (ii) impose sanctions?

2.2    That depends upon how the court answers the following questions:

    a.    Does the court really want lawyers to obey its Standing Orders and comply with the Rules of Procedure?

    b.    Does the court want the parties and counsel to respect the court and obey its orders as if they mean something?

    c.    Does the court want to stop lawyers from clogging the motion session

with arguments which should not have been made?

2.2 **What will happen if the court (i) allows the Husband's motion or (ii) declines to impose sanctions?**

2.3 That depends on if the court wants to send an announcement to Massachusetts Lawyers Weekly, stating, the court:

    a. empowers and encourages obdurate litigants who nefariously and unilaterally chose to:

        (1) not appear at properly noticed depositions;

        (2) not produce documents when required by the rules; and

        (3) change lawyers whenever they want to avoid going to a court-ordered deposition;

    b. encourages lawyers to not follow the requirements of the Standing Order on Motions for Reconsideration (Standing Order);

    c. encourages lawyers to go around the Standing Order by putting a title on their motion which sounds different even though the substance seeks to overturn relief granted in a prior court order;

    d. encourages successor counsel to clog the motion session by making the same argument which prior counsel made and lost;

    e. encourages lawyers to ignore their obligations to instruct clients not

to appear at court ordered depositions;

f.    encourages and empowers lawyers to file motions on the date and
      time when a court-ordered deposition is supposed to commence, in an
      effort to delay the deposition even if the emergency motion is lost;

g.    encourages lawyers to serve emergency motions without filing the
      required Affidavit and without a Motion to Waive Notice;

f.    opens and welcomes into the courtroom to all those who wish to force
      the other side to run up legal bills, so that even if the motion is lost,
      the other side still ends up the looser; ~~has~~ *and*

g.    has more compassion for those lawyers who ignore the law and look
      with disdain upon and seek to improperly manipulate the court, while
      rejecting lawyers who cherish the law, seek to enforce court rules and
      have their clients obey court orders.

## 3.0    Brief History.

In considering this section, **the court should be asking itself this question:**

> If the court lets the Husband and his
> lawyer get away with this, what
> signal does that send to the bar?
> What signal does that send to other
> parties who also want to avoid
> discovery?

3.1    On March 15, 2006, when the parties were last in court, plaintiff, Barbara

Kautsis (Wife) argued her motions to compel Husband to attend his

deposition and to produce documents.[1]

3.2    The Husband claims he has never filed income taxes, nor paid income taxes.

The parties' non-marital home assets were under his sole control; and Wife

has little to no idea what they are and what they may be worth.   Husband

has taken everything, including, we note, her "bag of jewelry," which he

continues to hold hostage. [2]

3.3    Wife needs discovery, among other reasons,  to investigate and document

---

[1]Husband simply did not file a response to, nor did he produce documents in response to Wife's written request that he Produce Documents. Later that day, his lawyer, Attorney King, sent a fax letter saying he was not going to show up the next day for his deposition. The Wife's motions followed.

[2]One of the requests was for husband to produce the jewelry for appraisal by Boston Appraisal Service, a division of DePrisco Jewelers. Boston, MA

Husband's claims that:

a.     ⬤ his cash flow is in the form of gifts from his parents, while also
       claiming he is not getting along with his parents, while also claiming
       he renders consulting services to one company which sends those
       hours to another company which pays him money, all of which has
       yet to be confirmed or documented;

b.     he has to frequently travel back and forth to Israel for business
       purposes;

c.     that there was a reorganization of a prior company into a new
       company, with changes in and a reduction of his ownership
       percentage; and, of course,

d.     there is a need to find out from Husband what his claims will be on
       all of the Section 34 factors.

3.4    Husband made several arguments to the court (Roberts, J.) about why he
       should not have to be deposed and why he should not have to produce
       documents.

3.5    After argument, the court stated it would order Husband to appear for the
       start of his deposition and order him to produce the documents.

3.6    The court asked counsel and the parties to try to agree on a date to start

Husband's deposition.

3.7    Then, Husband claimed he should not have to start his deposition for weeks or a month or more.

3.8    Because there is a June pre-trial ordered by the court, Wife needs to start discovery now because it is likely there will be a fair amount of follow-on discovery to be done.

3.9    Now, given Husband's recent claims of substantially reduced income and no source of funds to pay bills, his now-demonstrated ability to retain new counsel must be investigated. **Wife feels that any money Husband can raise by way of increased cash flow should first be directed toward paying more child support, given that the present order is woefully insufficient.**

3.10   After further argument the court (Roberts, J.) ordered Husband to appear to start his deposition on Friday, March 24, 2006 at 9:00 a.m.

3.11   In a last ditch effort to avoid the deposition, Husband then claimed he could not attend as he had to exercise visitation with his children.

3.12   When Wife informed the court that they children did not get out of school until 2:30 p.m., the court ordered Husband to appear for his deposition on March 24, 2006 at 9:00 for 3.5 hours, to recess at 12:30 p.m. and continue

on another day.

3.13  The court (Roberts, J.) followed its oral order with its written March 15, 2006 order.

3.14  Since then, Husband called Wife and threatened that he is going to hire more lawyers and spend more money to avoid his deposition and to fight wife for custody and on all other matters.

3.15  And, sure enough, here we are in court with Husband suddenly having the where-with-all to hire Burns & Levenson..

3.16  It may be Husband did not tell Attorney Studen that there was a court ordered deposition set for March 24, 2006.

3.17  Near the end of Wednesday, Studen faxed Wife's counsel, Gerald L. Nissenbaum, a letter in which she sought to unilaterally cancel the March 24th deposition. One would have thought a telephone call would be the courteous way to approach this. Or, it may be, knowing there was a court order, Studen logically understood, that her request would not be agreed.

3.18  Nissenbaum tried to call Studen and was told she had just left to take a week long vacation.

3.19  Nissenbaum wrote to Studen by fax that evening. He provided Studen with a copy of the applicable court order. He declined to agree to a continuance.

He noted neither Studen, nor her office had filed an appearance, that King was counsel of record and, in sum, Studen ought not to think she could unilaterally change the court's order.

3.20   About 2:35 p.m. yesterday, Thursday, Studen filed her appearance and that of her associate, Attorney Francine Gardikas. At that point they had knowledge of the court order requiring Husband's deposition to start at 9:00 a.m. on March 24, 2006. Studen takes the case subject to current orders.

3.21   Also, 4:45 p.m. yesterday afternoon, Gardikas and Studen filed Husband's so called Emergency motion for a continuance. And, they marked this motion for a hearing for March 24, 2006, at the time the court previously ordered Husband's deposition to commence!

3.20   Husband and his counsel surely know they are asking the court to reconsideration Judge Roberts' order. **But, Studen and Gardikas have utterly failed to follow the mandatory steps of the Standing Order on Motions for Reconsideration.** And they even failed to follow the steps required for filing an emergency motion.

3.21   From Wife's point of view, Husband and his present counsel think they can play a cute trick on the court by forcing Nissenbaum into court when he should be deposing Husband. They think, therefore, that even if they lose

the motion, there will be no deposition.

3.22  To us, this is reprehensible conduct. Only those who want to take undue advantage of others and the court do these things. If the court does not put a stop to it and make clear their conduct is not acceptable, the court will have lost control of the Husband, this case, while providing a road map for others who are similarly nefariously inclined.

## 4.0    The Court Should Inquire How Husband Suddenly Has the Where-With-All to Hire Burns & Levenson.

4.1    In September 2005, Husband claimed his cash flow had dropped to less than half because his parents, who have been the sole source of his cash flow, were angry with him. Therefore, he was ordered to pay just $600 for the support of Wife and seven children. This is not enough money to pay for their usual and ordinary needs. Wife has been supplementing this order with funds from the sale of the former marital home. But, those funds are essentially now fully depleted.

4.2    Wife paid $8,000 on account of the money needed to get the container /lift back from Israel to Sharon, MA. Wife made demand on Husband to pay her ½ that sum, as ordered by the court. He has refused to pay her.

4.3  Husband claims he has to pay $5,300 a month for January, February and March 2006 in order to pay up the mortgage on the house in Israel - a mortgage he intentionally let go into arrears. Husband has complained he does not have the money to pay. But, he also says he is paying.

4.4  Husband claims he has no other funds, but he just got back from a two-week trip to Israel, supposedly on business. Where did the money come from to pay those expenses?

4.5  Now Husband has the demonstrated ability to raise funds from some source to be able to hire Burns & Levenson.

4.6  The court should, here and now, ask Husband and his lawyers the terms on which the firm was hired, the amount of money paid, the amount of money to be paid as a further deposit, the terms of future payments and where the money came from. None of this is privileged.

4.7  The short answer is: If Husband had the ability to raise money to hire new counsel, he had the money to pay more child support.

4.8  In this case, Husband's ability to raise money is a marital asset. The court has jurisdiction over those assets and, as well power to issue orders to Husband to re-direct any cash he can raise toward the support of the children.

4.9    The court should now order all money paid to or any money which may be

paid to Burns & Levenson by Husband or on his behalf to be paid over to

the Wife as additional child support.


## 5.0    Sanctions Must Be Imposed In Order to Level the Playing Field, to Send a Proper Message to Husband, His Counsel and  to Others Similarly Inclined.

5.1    As a result of the tactics employed by Husband and his counsel,

Nissenbaum has had to be in court this Friday morning, when he should

have been at his office deposing Husband.

5.2    The court should now deny the Husband's motion and order him to go

immediately to Nissenbaum Law Offices, Boston, MA to commence his

deposition and continue until he has completed 3.5 hours of testimony.

Recesses and breaks  shall not be counted toward testimony time.

5.3    If, as a result of the above order, Husband is not able to pick the children up

from school, then Wife shall do so; and she shall take them to her home.  If,

Husband does not finish his deposition time in order that he can get to

Sharon, MA and pick up the children before sunset, then this weekend's

visitation will not start until Saturday after sunset; and he shall have no

make-up time.

5.4    By signing this motion, Nissenbaum represents that he has spent no less

than 5.0 hours in seeking to maintain the deposition time ordered by the

court, 3.0 of which was spent on considering and preparing the within

motion.  In addition, Nissenbaum will spend some 2.0 hours traveling to and

from the court and estimates another 1.0 at court, for a total of 8 hours.

Nissenbaum 's current hourly rate is $600 which is similar to other

matrimonial lawyers of similar education, training, experience and

reputation in the Boston area; a rate which is in the circumstances

reasonable and a rate known to Husband.

5.5    Studen and Gardikas (i) assisted their client in evading a court order, (ii)

knowingly filed a motion for reconsideration without complying with the

Standing Order, (iii) marked their motion for day and time which required

Nissenbaum to be in court when he was to be at his office deposing

Husband , (iv) could have no reasonable subjective or objective justification

for believing the court would allow the relief requested; and (v) could not

reasonably expect the court would condone such reprehensible tactics.

5.6    Based upon an evaluation of the conduct of Husband and his current

counsel, the court should find they have individually and jointly acted in

concert and in bad faith, such that they should be ordered to pay sanctions to the court and, as well, pay all of Wife's reasonable fees in connection with this matter.

5.7   The court should order Studen and Gardikas to pay $4,800 to Nissenbaum Law Offices in or within 10 days from date of the order, and order that they not seek to have Husband reimburse them or pay any part of this sanction which is person to them.

5.8   The court should order Husband and the firm of Burns & Levenson to pay over all money it has or may receive on account of legal work for or on behalf of Husband to the Wife, as additional child support.

5.9   The court should order Husband, as a sanction for his bad conduct, to pay the Norfolk Probate Court the sum of $1000, by equal weekly payments commending on the Monday following the date of this order and on each of the following Mondays until paid in full.

5.10  Also, in order to obviate the need for another motion or a complaint for contempt against Husband, the court should now order him to promptly pay Wife the sum of $4,000 as his half of the $8,000 she paid on account of the container expenses.

A proposed order is attached

Respectfully submitted,

NISSENBAUM LAW OFFICES

By

Gerald L. Nissenbaum, BBO #372400
Counsel for Plaintiff
160 Federal Street, 24th floor
Boston, MA 02110
617.330.9090        fax at: 6909

## Certificate of Service

I hereby certify that a copy of the above document was served upon Husband's counsel, in hand, this 24th day of March 2006.

Gerald L. Nissenbaum

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

NORFOLK, DIVISION                                No. 04D-0759

**BARBARA KAUSITS**
**a/k/a BARBARA ANTELMAN,**
                    Plaintiff,

v.

**PERRY ANTELMAN,**
                    Defendant

## Order on:
## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION TO CONTINUE DEPOSITION
## and Request for Sanctions.

After hearing, it is hereby ordered:

1.   Defendant, Perry Antelman's (Husband) motion for a continuance of the court-ordered deposition is hereby **denied with prejudice** both on the merits and because he and his present counsel, Attorneys Laura R. Studen and Francine Gardikas failed to comply with the mandatory provisions of the Standing Order on Motions for Reconsideration.

2.   Husband is hereby ordered to go immediately to Nissenbaum Law Offices, Boston, MA where he shall commence his deposition and where he shall continue until he has completed 3.5 hours of testimony. Recesses and breaks, including those to talk with counsel, shall not be counted toward testimony time.

3.   If, as a result of the above order, Husband is not able to pick the children up from school this afternoon, then Wife shall do so; and she shall take them to her home. If, Husband does not finish his deposition testimony in time to get to Sharon, MA and pick up the children at Wife's house before sunset, then this weekend's visitation will not start until Saturday after sunset; and he shall have no make-up time.

Page 1 of Order

4.   The court accepts the representation of Attorney Gerald L. Nissenbaum, counsel for Barbara Kautsis, about the amount of time (no less than 8.0 hours) he spent on this matter and on his $600 per hour rate. The court finds that both his time and his hourly rate are reasonable and in line with other top divorce lawyers in the Boston area with similar education, training, experience and reputation. In making this finding I incorporate by reference Nissenbaum's biographical listing in Martindale Hubbel.

5.   The court finds that Studen and Gardikas (i) assisted their client in evading a court order, (ii) knowingly filed a motion for reconsideration without complying with the Standing Order, (iii) marked their motion for a day and time which required Nissenbaum to be in court when he was to be at his office deposing Husband , (iv) could have no reasonable subjective or objective justification for believing the court would allow the relief requested; and (v) could not reasonably expect the court would condone what if finds to be reprehensible tactics.

6.   Based upon an evaluation of the conduct of Husband and his current counsel, the court finds they individually and jointly acted in concert and in bad faith, such that an order that they pay sanctions to the court and, as well, pay all of Wife's reasonable legal fees in connection with this matter, is well justified. The conduct of Husband's present counsel is an affront to the dignity of the court.

7.   The court orders Studen and Gardikas, individually and jointly, to pay $4,800 to Nissenbaum Law Offices in or within 10 days from date of the order, and further orders they not seek to have Husband reimburse them or pay any part of this sanction which is person to them. This order is made to both ensure that the Wife does not suffer the further indignity of having to pay her own counsel for work that should not have, but was necessitated by Studen and Gardikas. Further, this order is made with the intention to signal to other lawyers, similarly inclined, that this court will not condone or tolerate such conduct.

Page 2or Order

8.  The court orders Husband and the firm of Burns & Levenson to pay over all money he or the firm has or may receive on account of legal work for or on behalf of Husband in connection with litigation with the Wife, to the Wife, as additional child support. Any money already paid to Burns & Levenson shall be paid to Wife within three days of this order. Any other funds shall be paid directly to Wife or paid to her within three days of receipt by either Husband or Burns & Levenson.

9.  The court orders Husband, as a sanction for his bad conduct, to pay the Norfolk Probate Court the sum of $1,000, by equal weekly payments commending on the Monday following the date of this order and on each of the following Mondays until paid in full. This order is made as a sanction on Husband for his improper conduct which the court finds was a direct affront to it and to its orders. Husband is cautioned that similar conduct on his part in the presence of the court may subject him to contempt of court and incarceration for a term of days, weeks or months.

10. Upon payment to Nissenbaum by Studen and Gardikas, they shall file with the court their joint affidavit of compliance.

11. In the event the Husband does not meet his court ordered payment obligations for the above $1,000, the court, sua sponte or on the Wife's motion, will issue an order to show cause why he ought not to be held in criminal contempt.

12. The court orders Husband to pay the Wife the sum of $4,000 in or within seven days from date hereof, as his half share of the $8,000 Wife paid on account of expenses relating to the container in Israel, which is the subject of a prior order.

13. All until further order of the court.

March 24, 2006                          By the court,

                                        _____
                                        First Justice
                                        Norfolk Probate Court

                                             Page 3 of Order

RECEIVED
MAR 2 8 2006

FILED
MAR 24 2006
NORFOLK PROBATE COURT

COMMONWEALTH OF MASSACHUSETTS
The Trial Court
Probate and Family Court Department

NORFOLK DIVISION                                    DOCKET # 04D-0759-DV1

| | |
|---|---|
| BARBARA KAUSITS, | |
| PLAINTIFF | |
| v. | |
| PERRY ANTELMAN, | |
| DEFENDANT | |

*[handwritten notations, partially illegible]*

JUDGE

## PERRY ANTELMAN'S
## EMERGENCY MOTION TO CONTINUE DEPOSITION DATE

Now comes the Defendant, Perry Antelman, and respectfully requests that this Court

continue his deposition currently scheduled for Friday, March 24, 2006 at 9:00 a.m. As reasons

therefore, the Defendant states as follows:

1.    The Defendant met with Attorney Laura Studen of Burns & Levinson LLP, on

Tuesday, March 21, 2006. At that time, it was agreed that Attorney Studen would represent Mr.

Antelman in the pending divorce action.

2.    On Wednesday, March 22, 2006, Attorney Studen faxed Attorney Nissenbaum a

letter indicating that she will be representing Mr. Antelman and that her Notice of Appearance

will be filed with the Court shortly and upon receipt of Attorney King's Notice of Withdrawal.

Attorney Studen also requested that the deposition be rescheduled, as she would be out of state

and could not attend the deposition of Mr. Antelman on March 24, 2006. (See letter attached as

Exhibit A.)

3/24/06



RECEIVED

MAR 30 2006

REC. BY FAX
NISSENBAUM LAW OFFICE

# Kausits
## vs.
# Antelman

# Perry Antelman

## Volume 1

March 24, 2006
pp 1-173

**JonesReporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Perry Antelman

41

```
04:38    1       A. He has a consulting company.
3:04:43   2       Q. So the contract is with Aidance and the
3:04:46   3   consulting company?
3:04:47   4       A. Correct.
3:04:47   5       Q  What is the name of the consulting company?
3:04:49   6       A. E3 Commerce
3:04:51   7       Q. E3 Commerce?  The Number 3?
3:04:54   8       A. Yes.
3:04:55   9       Q. Commerce?
3:04:55  10       A. Mm-hmm.
3:04:56  11       Q. Is that located at 60 Pleasant Street, so far
05:00    12   as you know?
3:05:00  13       A  I don't know.
3:05:01  14       Q. Okay  What does E3 Commerce consult on?
3:05:07  15       A. On Internet technology.
3:05:12  16       Q. Does he do the Web site or does he try to do
3:05:16  17   Internet sales?
3:05:16  18       A. Both.  He works with the Web site,
3:05:21  19   infrastructure of the Web site, marketing on the Web
3:05:24  20   site, editing on the Web site and advertising
3:05:29  21   related to the Web site.
3:05:33  22       Q  What advertising is on the Web site, if any?
3:05:40  23       A. Selling our skin creams.
05:43    24       Q. You don't have outside advertisers on your
```

Perry Antelman

42

```
05:46    1   Web site --
3:05:50   2       A. We have distributors.
3:05:52   3       Q. -- listed on the Web site?
3:05:54   4       A. No.  I don't recall.  I don't believe so, no.
3:05:57   5       Q  Do you have distributors?
3:05:59   6       A. Yes.
3:06:00   7       Q. And where are they located?  How many
3:06:03   8   distributors?
3:06:07   9       A. I don't have that  I don't know that
3:06:09  10   information exactly.
3:06:10  11       Q. Are each of the distributors independent
06:14    12   contractors?
3:06:15  13       A  They are independent from our company.
3:06:17  14       Q. Yes.
3:06:18  15       A. Yes.
3:06:18  16       Q. They are not employed by Aidance, correct?
3:06:20  17       A  No.
3:06:22  18       Q. I'm incorrect.  Are they employed by Aidance?
3:06:26  19       A. No.
3:06:27  20       Q. Do you sell products to the distributors for
3:06:31  21   resale by them?
3:06:33  22       A. Correct.
3:06:33  23       Q. Is this a party plan type thing or an Amway
6:36     24   kind of sale setup or Fuller Brush?
```

Perry Antelman

43

```
06:40    1       A. No.  They buy it and resell it.
3:06:43   2       Q. Buy it and resell it?
3:06:45   3       A. Yes.
3:06:45   4       Q. Do they typically have the product presold
3:06:47   5   before they buy it from you?
3:06:48   6       A. No.
3:06:50   7       Q  How many distributors does Aidance have?
3:06:54   8       A  We have several distributors, and we have
3:06:58   9   many resellers.
3:06:59  10       Q. We will get to the resellers  First of all,
3:07:02  11   several isn't a number.
07:05    12       A. I don't deal directly with that, so I don't
3:07:07  13   have an exact number
3:07:08  14       Q. What is the range?
3:07:11  15           MS. GARDIKAS:  Only if you know.
3:07:12  16       A. I don't know the range.
3:07:14  17       Q  Who would know?
3:07:15  18       A. David Goldsmith.
3:07:19  19       Q. Does he have a title with the company?
3:07:22  20       A. Yes.
3:07:23  21       Q. He is the managing director?
3:07:26  22       A  Manager of business development
3:07:32  23       Q  And does he have an office?
7:36     24       A. Yes.
```

Perry Antelman

44

```
07:36    1       Q. Is his office One Turks Head Place, Suite 810
3:07:43   2   in Providence?
3:07:43   3       A. No
3:07:44   4       Q  Where is his office?
3:07:47   5       A  10 Elm Grove Avenue.
3:07:48   6       Q. Is there an office at One Turks Head Place in
3:07:52   7   Providence?
3:07:53   8       A. Not anymore, no.
3:07:54   9       Q. What was that?
3:07:55  10       A  That was a previous office location.
3:07:58  11       Q  For?
07:59    12       A  For -- Aidance had leased -- subleased space.
3:08:09  13       Q. Who is Tobias Lederberg?  L E D E R B E R G,
3:08:13  14   T O B I A S.
3:08:15  15       A. I don't know.
3:08:23  16       Q. Where does Mr. Goldsmith live?
3:08:26  17       A  In Harmony, Rhode Island.
3:08:28  18       Q. Where in Harmony?
3:08:30  19       A. I don't know.
3:08:35  20       Q. Does Mr  Goldsmith have an ownership interest
3:08:38  21   in Aidance?
3:08:39  22       A. Yes.
3:08:39  23       Q. What is his percentage?
8:49     24       A  Between 7 and a half and 16 percent.
```

45

| | |
|---|---|
| 8:56 | 1 |

Somewhere between 7 and a half and 15 percent, I

3:08:59  2  believe.  I don't have an exact number.

3:09:00  3    Q.  Okay.  Is there a list somewhere where these

3:09:04  4  percentages of the various owners are stated?

3:09:06  5    A  Yes.

3:09:07  6    Q.  Who has that list?

3:09:08  7    A  Our accountant.

3:09:09  8    Q.  Who is the accountant?

3:09:12  9    A.  Richard Streitfeld.

3:09:14  10    Q.  Spell his last name

3:09:17  11    A.  S T R E I T F E L D.

3:09:23  12    Q.  S T R E I T F E L D?

3:09:26  13    A.  Yes

3:09:27  14    Q  Where is his office?

3:09:28  15    A.  In Cranston, Rhode Island, I believe.

3:09:33  16    Q.  Does he have a firm?

3:09:37  17    A.  Yes.  His name might be part of the name of

3:09:40  18  the firm.  I'm not sure

3:09:43  19    Q  How long has he been the accountant?

3:09:46  20    A.  Since the incorporation.

3:09:49  21    Q.  Okay.  Do you have an ownership interest in

3:09:56  22  Aidance?

3:09:56  23    A.  Yes, I do.

9:57  24    Q.  What is your ownership interest?

46

9:58  1    A.  It is a few percent

3:10:04  2    Q.  Three?

3:10:05  3    A.  It's somewhere between 3 and 4 percent, I

3:10:08  4  believe.

3:10:09  5    Q.  Does your father have an ownership interest?

3:10:11  6    A.  Yes.

3:10:11  7    Q.  What is his interest?

3:10:13  8    A.  His interest is around approximately 25

3:10:19  9  percent.

3:10:19  10    Q.  Okay.  Who are the other people who have

3:10:23  11  ownership interests?

10:28  12    A.  You will have to look at the list.

3:10:29  13    Q.  I don't have it, sir.  I'm asking you.

3:10:31  14    A  There is about another 35 names.  If you

3:10:37  15  like, I can ...

3:10:49  16    Q.  Didn't you tell somebody that your father

3:10:52  17  owned 44 percent of Aidance and that you owned 10

3:10:55  18  percent?

3:10:56  19    A.  No.

3:10:56  20    Q.  No.

3:10:57  21      Is Aidance owned by some other company?

3:11:00  22    A.  No.

3:11:01  23    Q.  It's owned by these individuals, right?

1:03  24    A  Correct.

47

1:03  1    Q  Is there a company in which you own 10

3:11:07  2  percent in?

3:11:09  3    A.  Yes.

3:11:09  4    Q.  What company is that?

3:11:11  5    A.  Marantech.

3:11:13  6    Q.  Spell it

3:11:13  7    A  M A R A N T E C H.

3:11:16  8    Q.  Is that company still operating?

3:11:19  9    A.  I believe it is, yes

3:11:21  10    Q.  Where is that company organized?

3:11:24  11    A.  It was organized also in Delaware.

11:27  12    Q.  Who was the lawyer?

3:11:29  13    A.  That organized it?  Douglas Leonard

3:11:38  14    Q.  What firm?

3:11:46  15    A.  I believe it was called DLB.

3:11:49  16    Q.  DLB, that's the name of the law firm?

3:11:52  17    A.  I believe so, yes

3:11:53  18    Q.  Where is that located?

3:11:55  19    A.  That was located in Providence, Rhode Island

3:12:00  20    Q.  Has Aidance Skincare ever filed any tax

3:12:04  21  returns anywhere?

3:12:07  22    A.  I believe this is the first filing this year.

3:12:11  23  They are about to file taxes this year.

2:15  24    Q.  Where?

48

2:15  1    A.  Where are they filing taxes?  In the United

3:12:25  2  States and in Rhode Island.

3:12:29  3    Q  And who will be signing the tax return on

3:12:32  4  behalf of the company?

3:12:35  5    A  I might be signing that.

3:12:37  6    Q.  Are you the president of the company?

3:12:40  7    A.  I'm an officer.  I don't recall what my

3:12:45  8  officership is.

3:12:45  9    Q.  Wasn't David Goldsmith the president?

3:12:47  10    A.  No

3:12:50  11    Q.  Who is the president?

12:52  12    A.  I don't know that we have someone actually

3:12:54  13  that is labeled "president."  We have two officers,

3:12:58  14  and I don't know what -- the officers are me and

3:13:02  15  Andy Warren

3:13:04  16    Q  Who is May Warren?

3:13:07  17    A.  Andy Warren.

3:13:10  18    Q.  "Me and Andy Warren'?

3:13:10  19    A.  Yes.  Andy Warren and I.

3:13:13  20    Q.  I misunderstood.

3:13:21  21      Is David Goldsmith -- he is the manager

3:13:24  22  of what again?

3:13:25  23    A  He is the manager of business development.

3:32  24    Q.  What exactly does he do?

Perry Antelman

49

| | | |
|---|---|---|
| .3:33 | 1 | A  He works on business development as well |
| 3:13:44 | 2 | as -- |
| 3:13:44 | 3 | Q.  What does that mean? |
| 3:13:46 | 4 | A.  Business development is an area that involves |
| 3:13:54 | 5 | strategic planning.  It involves strategizing |
| 3:14:03 | 6 | marketing and sales.  It involves the overall |
| 3:14:09 | 7 | development of the structure of the business as far |
| 3:14:13 | 8 | as people that maybe need to be hired. |
| 3:14:17 | 9 | Q.  I'm going to stop you there, but I get the |
| 3:14:21 | 10 | gist.  How many hours a week or a month does Mr. |
| 3:14:26 | 11 | Goldsmith spend, if you know? |
| 3:14:31 | 12 | A.  Approximately 60 hours a week. |
| 3:14:36 | 13 | Q.  Does he get paid for this? |
| 3:14:37 | 14 | A.  Yes. |
| 3:14:38 | 15 | Q.  How much does he get paid? |
| 3:14:40 | 16 | A.  Approximately $6,000 a month. |
| 3:14:42 | 17 | Q.  Does he have a consulting company, too? |
| 3:14:45 | 18 | A.  Yes, he does. |
| 3:14:47 | 19 | Q.  I see a trend.  What is the name of his |
| 3:14:50 | 20 | company? |
| 3:14:50 | 21 | A.  Soul Strategy. |
| 3:14:53 | 22 | Q.  S O U L? |
| 3:14:56 | 23 | A.  Strategy. |
| 4:56 | 24 | Q.  Does he have a contract with Aidance for |

50

| | | |
|---|---|---|
| .4:59 | 1 | $6,000 a month? |
| 3:15:01 | 2 | A.  No.  I mean he doesn't have a written |
| 3:15:04 | 3 | contract. |
| 3:15:04 | 4 | Q.  An oral contract? |
| 3:15:06 | 5 | A.  Yes. |
| 3:15:07 | 6 | Q.  And where does the money come from to pay Mr. |
| 3:15:11 | 7 | Goldsmith and Mr. Warren? |
| 3:15:15 | 8 | A  A combination of sales. |
| 3:15:16 | 9 | Q.  Yes. |
| 3:15:18 | 10 | A.  And investors' money. |
| 3:15:25 | 11 | Q.  So you raised money to start the company? |
| 3:15:28 | 12 | A.  Correct. |
| 3:15:28 | 13 | Q.  You got financing from these various owners? |
| 3:15:33 | 14 | A.  Correct. |
| 3:15:33 | 15 | Q.  How much did you raise at the outset? |
| 3:15:38 | 16 | A.  Approximately $250,000 |
| 3:15:42 | 17 | Q.  How much is left? |
| 3:15:44 | 18 | A.  Approximately $90,000. |
| 3:15:49 | 19 | Q.  Where is that money kept? |
| 3:15:51 | 20 | A.  In a savings account and checking account. |
| 3:15:54 | 21 | Q.  Where is that account?  What bank? |
| 3:15:59 | 22 | A.  Freedom Savings. |
| 3:16:01 | 23 | Q.  Is that in Providence or Rhode Island |
| .6:03 | 24 | somewhere? |

Perry Antelman

51

| | | |
|---|---|---|
| .6:03 | 1 | A.  That's in Rhode Island. |
| 3:16:07 | 2 | Q.  Who has signature authority on that account? |
| 3:16:10 | 3 | A.  Myself, Andrew Warren, and David Goldsmith |
| 3:16:16 | 4 | All three of us do. |
| 3:16:17 | 5 | Q.  Each individually or jointly? |
| 3:16:19 | 6 | A.  Each individually. |
| 3:16:21 | 7 | Q.  Does the business have any other accounts |
| 3:16:23 | 8 | other than the savings account, the savings checking |
| 3:16:27 | 9 | at Freedom Savings? |
| 3:16:29 | 10 | A.  I'm sorry.  What is the question? |
| 3:16:30 | 11 | Q.  Any other accounts owned by Aidance? |
| 3:16:33 | 12 | A.  Besides Freedom Savings? |
| 3:16:34 | 13 | Q.  Yes, sir. |
| 3:16:35 | 14 | A.  There may still be some accounts in other |
| 3:16:40 | 15 | locations. |
| 3:16:41 | 16 | Q.  What are those locations? |
| 3:16:43 | 17 | A  We -- when we first launched our company, we |
| 3:16:46 | 18 | had an account at bank Rhode Island |
| 3:16:48 | 19 | Q.  Okay.  Anyplace else? |
| 3:16:54 | 20 | A.  I don't believe so. |
| 3:16:56 | 21 | Q.  Do you have a credit card that you can use |
| 3:17:00 | 22 | which is under the Aidance name? |
| 3:17:01 | 23 | A.  Yes. |
| 7:02 | 24 | Q.  What card is that?  A MasterCard?  Who issues |

52

| | | |
|---|---|---|
| .7:07 | 1 | the card? |
| 3:17:08 | 2 | A  Freedom Savings. |
| 3:17:14 | 3 | Q.  Can you do cash advances on the savings -- on |
| 3:17:17 | 4 | the checking account with that card? |
| 3:17:18 | 5 | A.  You can. |
| 3:17:19 | 6 | Q.  Okay.  And do you use this to make charges |
| 3:17:26 | 7 | for business expenses? |
| 3:17:28 | 8 | A.  Yes, yes. |
| 3:17:31 | 9 | Q.  Then Aidance pays the bills? |
| 3:17:33 | 10 | A.  Yes. |
| 3:17:34 | 11 | Q.  Do you ever charge any personal expenses to |
| 3:17:36 | 12 | that account? |
| 3:17:37 | 13 | A.  No. |
| 3:17:38 | 14 | Q  Does anybody else have credit cards through |
| 3:17:43 | 15 | Freedom Savings for Aidance? |
| 3:17:44 | 16 | A.  Yes. |
| 3:17:45 | 17 | Q.  Andrew and Goldsmith? |
| 3:17:48 | 18 | A  Correct. |
| 3:17:49 | 19 | Q.  Do you have any other credit cards besides |
| 3:17:51 | 20 | this one for Aidance? |
| 3:17:56 | 21 | A  Yes |
| 3:17:59 | 22 | Q.  What are they? |
| 3:17:59 | 23 | A  I have a credit card for Tivian Industries. |
| .8:08 | 24 | Q.  List out your credit cards. |

Perry Antelman

53

| | | |
|---|---|---|
| 8:10 | 1 | A. And I have a credit card for Shoshi, |
| 3:18:14 | 2 | S H O S H I. |
| 3:18:19 | 3 | Q. All one word or two words? |
| 3:18:20 | 4 | A. One word.  International. |
| 3:18:23 | 5 | Q. Where is that organized? |
| 3:18:28 | 6 | A. I don't know. |
| 3:18:31 | 7 | Q. The United States? |
| 3:18:32 | 8 | A. I believe so, yes. |
| 3:18:36 | 9 | Q. Shoshi is your father's company? |
| 3:18:38 | 10 | A. Correct. |
| 3:18:40 | 11 | Q. Does anyone besides your company have an |
| 3:18:43 | 12 | interest in that company? |
| 3:18:44 | 13 | A. No. |
| 3:18:44 | 14 | Q. What is the address for Shoshi? |
| 3:18:49 | 15 | A. I don't know what the street address is of |
| 3:18:51 | 16 | Shoshi, but I do know it has a Post Office box. |
| 3:18:55 | 17 | Q. Which is where? |
| 3:18:55 | 18 | A. In Providence, Rhode Island. |
| 3:18:58 | 19 | Q. Okay.  What credit card exactly do you have |
| 3:19:05 | 20 | with Tivian?  A MasterCard, AMEX? |
| 3:19:10 | 21 | A. It's a debit card.  All these cards are |
| 3:19:14 | 22 | debit.  They are not credit per se.  We can't get |
| 3:19:17 | 23 | credit on them. |
| 3:17 | 24 | Q. What about Shoshi? |

Perry Antelman

54

| | | |
|---|---|---|
| 3:18 | 1 | A. It's a debit card. |
| 3:19:21 | 2 | Q. What bank? |
| 3:19:25 | 3 | A. BankAmerica. |
| 3:19:26 | 4 | Q. And what about Tivian; what bank? |
| 3:19:30 | 5 | A. Sovereign Bank. |
| 3:19:36 | 6 | Q. Any other credit or debit cards that you |
| 3:19:39 | 7 | have? |
| 3:19:40 | 8 | A. My own personal. |
| 3:19:41 | 9 | Q. What are those? |
| 3:19:43 | 10 | A. I have a debit card with my name on it from |
| 3:19:46 | 11 | BankAmerica. |
| 3:19:47 | 12 | Q. You have a personal BankAmerica debit card? |
| 3:19:50 | 13 | A. Mm-hmm. |
| 3:19:50 | 14 | Q. Yes? |
| 3:19:51 | 15 | A. Yes. |
| 3:19:51 | 16 | Q. Mm-hmm she can't take it down. |
| 3:19:55 | 17 | A. Yes. |
| 3:19:55 | 18 | Q. Any other credit or debit cards? |
| 3:19:59 | 19 | A. No. |
| 3:20:00 | 20 | Q. Okay.  In the past five years have you had |
| 3:20:02 | 21 | any other cards, debit or credit cards personally? |
| 3:20:06 | 22 | A. Yes  Actually, we had a debit card in |
| 3:20:10 | 23 | Israel.  Barbara and I had a joint account. |
| 3:12 | 24 | Q. Other than that, any other credit or debit |

Perry Antelman

55

| | | |
|---|---|---|
| 0:15 | 1 | cards in the United States personally? |
| 3:20:18 | 2 | A. I do not currently, no. |
| 3:20:20 | 3 | Q. The last five years? |
| 3:20:21 | 4 | A. Yes, we did. |
| 3:20:23 | 5 | Q. That's my question.  In the last five years |
| 3:20:26 | 6 | what other debit or credit cards did you have other |
| 3:20:28 | 7 | than the ones you told me about? |
| 3:20:31 | 8 | A. I do not remember because it's been a long |
| 3:20:35 | 9 | time since we had them. |
| 3:20:36 | 10 | Q. What about two years ago?  Did you have them |
| 3:20:40 | 11 | then? |
| 3:20:40 | 12 | A. We might have had some  I don't recall what |
| 3:20:45 | 13 | they were.  It's been more than two years since we |
| 3:20:50 | 14 | ever used any of them. |
| 3:20:51 | 15 | Q. Did you ever open a credit card in Barbara's |
| 3:20:55 | 16 | name? |
| 3:20:55 | 17 | A. Open a credit card in her name? |
| 3:20:57 | 18 | Q. Yeah.  Sign her name to an application for |
| 3:21:01 | 19 | credit under her name? |
| 3:21:02 | 20 | A. I don't recall ever doing that. |
| 3:21:03 | 21 | Q. Did you ever charge on a credit card in her |
| 3:21:07 | 22 | name? |
| 3:21:08 | 23 | A. Yes. |
| 1:09 | 24 | Q. Okay.  When did you do that? |

Perry Antelman

56

| | | |
|---|---|---|
| 1:10 | 1 | A. Many years ago. |
| 3:21:16 | 2 | Q. What kind of things did you charge on that |
| 3:21:20 | 3 | card, if you recall? |
| 3:21:29 | 4 | A. We moved into our house in Sharon, Mass., |
| 3:21:33 | 5 | and we bought items for the house. |
| 3:21:36 | 6 | Q. Okay.  Now, you have told me about Aidance |
| 3:21:50 | 7 | Skincare, LLC? |
| 3:21:51 | 8 | A. Mm-hmm. |
| 3:21:52 | 9 | Q. Is there another company called Aidance |
| 3:21:56 | 10 | Skincare & Topical Solutions? |
| 3:21:58 | 11 | A. It's the same company |
| 3:21:59 | 12 | Q That's the -- |
| 3:22:02 | 13 | A. Aidance Skincare & Topical Solutions, LLC. |
| 3:22:11 | 14 | Q. Who does the web site for that company? |
| 3:22:14 | 15 | A. Andrew Warren. |
| 3:22:22 | 16 | Q. Now, what substance is it that actually is |
| 3:22:26 | 17 | the operative electronic substance in what you sell? |
| 3:22:33 | 18 | A. Ask the question again. |
| 3:22:34 | 19 | Q. You say that your skin care has something |
| 3:22:39 | 20 | called electronic jumping compounds? |
| 3:22:42 | 21 | A. Electron jumping. |
| 3:22:44 | 22 | Q. Okay.  Electron jumping compounds, EJC? |
| 3:22:48 | 23 | A. Mm-hmm. |
| 2:49 | 24 | Q. What are they? |

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

NORFOLK, DIVISION                                          No. 04D-0759-DV1

**BARBARA KAUSITS**
**a/k/a BARBARA ANTELMAN,**
      Plaintiff,

v.

**PERRY ANTELMAN,**
      Defendant.

## PLAINTIFF'S MOTION TO COMPEL DEFENDANT TO TESTIFY and FOR SANCTIONS.

### 1.0   RELIEF REQUESTED.

1.1    As explained in detail below, the court should order Defendant, Perry

Antelman (Husband) to answer questions asked of him during his March 24,

2006 deposition and all other related questions.  By way of summary, either

before (**because he signed, under oath, and filed his September 29, 2005**

**financial statement**)[1] or during his deposition (because he testified to certain

---

[1]On his financial statement, Husband claims his "Employer" is "Shoshi International,"
and that he is a "Business Consultant." He gives Shoshi's address at post office box 6448,
Providence, R.I., which is the same office as Aidance Medical Diagnostics, LLC and Aidance
Skin Care and Treatment, LLC. At his deposition, Husband claimed he was a Consultant to
Aidance Skin Care , which paid Shoshi money for Husband's time, and, in turn, Shoshi, a
corporation allegedly owned by his father, then gave Husband "gifts." **In court, on September
28, 2006, Husband did not claim the Fifth Amendment,** instead telling the court he works for
Shoshi which "contracts me out to Aidance Skin Care;" that Shoshi is a "flow-through" so that

facts) Husband improperly refused to answer questions concerning his income, cash flow and other financial details and, as well, refused to answer to questions about Ms. K.,[2] each time claiming his rights under the Fifth Amendment to the U.S. Constitution and the similar provision under the Massachusetts Declaration of Right (hereafter, collectively, Fifth Amendment privilege, Fifth Amendment or Fifth).

1.2    The court should also sanctions Husband by ordering him to fully pay the Plaintiff's, Barbara Kausits's (Wife) reasonable counsel fees and costs[3] which she incurred in connection with preparing this motion, the accompanying memorandum, travel to and from and arguing this motion to the court.

1.3    In the event the court finds Husband, either:

   (a)    waived his Fifth Amendment privilege, gives him the opportunity to and he chooses to continue to not answer the questions; or

   (b)    did not waive his Fifth Amendment privilege, but gives him the opportunity to change his mind and he does not,

---

everything it is paid by Aidance comes out to Husband. (Tr. pp. 48-53.)

   [2]Wife knows Ms. K's full name, but chooses to not dignify her by using her name in this record.

   [3] Wife requests permission to have her counsel submit their affidavit after the hearing, so that all of her fees and costs can be included.

then the court should also order, as a sanction, that Husband is prevented from offering evidence at trial relating to awards of child support, alimony, division of the marital estate, financial circumstances of the parties, conduct of the parties during the marriage, his station, amount and sources of his income, his employability and his estate.

## 2.0 BASIS FOR RELIEF.

2.1 Husband thwarted the discovery process. He did not appear for his first scheduled deposition. Upon Wife's motion to compel, he was ordered to appear on March 24, 2006. Again, he chose to not appear. Wife moved that same day for a motion to compel. On that second occasion, Husband was ordered (Boorstein, J.) to immediately start his deposition, that day.[4] He also failed to produce documents; and upon Wife's motion, he was ordered so to do by April 4, 2006.[5]

2.2 As explained in detail in Wife's accompanying memorandum, Husband prevented Wife from obtaining important, relevant and admissible information

---

[4]On March 15, 2006, the parties appeared in court and Husband was ordered to appear for his deposition on March 24, 2006 (Roberts, J.). Husband was also ordered to produce his documents by April 4, 2006. Husband subsequently hired new counsel who was not available on March 24th and sought to have the deposition date changed. Rather than show up for the deposition, Husband appeared in court with his lawyer. Husband was ordered to immediately go to Wife's counsel's office for his deposition with or without his new counsel (Boorstein, J.).

[5]As this motion is being served, Husband has yet to comply with that order.

at his March 24, 2006 deposition relating to income, assets and the like and, as well about his conduct with Ms. K.

2.3     Husband asserted his claim of his Fifth Amendment privilege as a shield, protecting him from having to answer certain questions. But, because he signed and filed his Financial Statement and because of testimony he voluntarily gave at the deposition, Husband actually waived his privilege.

2.4     The court should now order Husband to answer those questions for which he previously asserted his Fifth Amendment privilege, together with all other questions that may be related to those questions; and also order the relief requested in ¶ 1.3, supra.

2.5     The leading case on point is ***Wansong v. Wansong***, 395 Mass. 154 (1985), in which the SJC sustaining imposition of the same sanctions requested at bar by Wife. In ***Wansong,*** the Hon. Haskell C. Freedman gave the husband this choice: answer the questions or sanctions will be imposed. Husband chose to continue to assert his Fifth Amendment privilege. Sanctions were imposed.

2.6     Wife incorporates by reference the content of her detailed memorandum in support of this motion filed herewith.

### 3.0     CONCLUSION.

3.1     The Husband should be ordered to answer the questions to which he previously

asserted his Fifth Amendment privilege and questions which flow therefrom.

3.2    The court should grant the other relief requested above, as more fully set forth

in the attached proposed order.

A proposed order is attached.

Respectfully submitted
**BARBARA KAUSITS**, by her attorneys
**NISSENBAUM LAW OFFICES**

April 7, 2006

By: _Gerald L Nissenbaum_
Gerald L. Nissenbaum, BBO #342700
Wendy J. Overbaugh, BBO # 657457
160 Federal Street, 24th floor
Boston, MA 02110
617.330.9090;        fax at: 6909

## Affidavit of Notice

I hereby certify that a copy of the above was served this day upon defendant's counsel by hand delivery to his address of record this 7th day of April, 2006 together with notice that the same will be presented to the court on April 19, 2006 in Canton.

April 7, 2006

_Wendy J Overbaugh_

Z:\Kausits v Antelman\Probate Court Pleadings\04 05 06 compel sanctions 5th wpd

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

NORFOLK, DIVISION                                    No. 04D-0759-DV1

**BARBARA KAUSITS**
**a/k/a BARBARA ANTELMAN,**
            Plaintiff,

v.

**PERRY ANTELMAN,**
            Defendant.

### [Proposed]  Order on:
### PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS

1.    After hearing, it is hereby ordered as follows:

2.    [Alternative one]

    (1)    Defendant waived his Fifth Amendment privilege and his similar privilege provided in the Massachusetts Declaration of Rights (hereafter, collectively, Fifth Amendment privilege) by (a) voluntarily signing and filing his September 28, 2005 Financial Statement and by answering certain deposition questions about his cash flow, earning money from one or more companies, how he billed one company which sent money to another company which in turn made "gifts" to him and so on and so forth; and (b) by his answering questions about a certain woman identified as Ms. K.

    (2)    Defendant's shall continue his deposition, presently scheduled for May 3, 2006. At his deposition, Defendant is ordered to fully respond to all questions asked by Plaintiff, including, without limitation, questions which Defendant previously refused to answer by claiming his Fifth Amendment privilege. Defendant shall also respond, without asserting his Fifth Amendment privilege, to all questions reasonably flowing from his answers and respond, as well, to other questions related to the same and other topics.

2.    [or Alternative two]

    Defendant has chosen to assert and the court finds he has not waived his Fifth Amendment privilege and his similar privilege provided in the Massachusetts Declaration of Rights (hereafter, collectively, Fifth Amendment privilege) in response to various questions surrounding his conduct with Ms. K. during the parties' marriage and his income and assets, tax returns, and the like.

3    Within 3 business days of this order, the court shall be in receipt (with a copy to plaintiff's counsel) of defendant's sworn statement advising if he will continue to assert or now waive his Fifth Amendment Privilege and fully respond to all questions as to (a) Ms. K.; and (b) his income, assets, tax returns, etc. If defendant chooses to continue to assert his privilege, then sanctions, as described below in paragraph 4, shall automatically enter and be imposed against him.

4.   If, pursuant to the provision of the next prior paragraph, Defendant continues to assert his Fifth Amendment privilege and not testify about the above referenced matters, then, in furtherance of the holding and teaching of *Wansong v. Wansong*, 395 Mass. 154 (1985), defendant will, ipso facto, be prohibited from offering any evidence at trial relating to an award of child support, alimony, division of the marital estate, financial circumstances of the parties, conduct of the parties during the marriage, his station, amount and sources of his income, his employability and his estate.

[To be used if court finds Defendant Waived the Fifth Amendment.]

5.   Defendant shall, as a sanction, pay plaintiff's counsel's legal fees and costs in connection with this motion, including fees for expedited transcripts. Within ten days, Plaintiff's counsel shall submit his affidavit of fees and costs to defendant's counsel. If Defendant does not agree to pay the full amount requested, defendant's counsel shall promptly prepare a written opposition and send it to plaintiff's counsel who shall, in turn send the court their affidavit and defendant's opposition. The court will then decide if it shall hold a hearing, or simply rule on the amount of sanctions to be paid to plaintiff's counsel.

By the court,

Date: April ___, 2006

_____
Hon. David H. Kopelman
First Justice, Norfolk Probate Court

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

NORFOLK, DIVISION                               No. 04D-0759

BARBARA KAUSITS
a/k/a BARBARA ANTELMAN,
                    Plaintiff,

v.

PERRY ANTELMAN,
                    Defendant.

## Memorandum in Support of
## Plaintiff's Motion to Compel and for Sanctions

## Preliminary Statement.

While considering the content of this memorandum, the court is asked

to keep in mind that on September 28, 2005, defendant, Perry Antelman

(Husband) signed and filed his Financial Statement (Exhibit 1)

> under the pains and penalties of
> perjury that my income and expenses,
> assets and liabilities as stated
> herein are true to the best of my
> knowledge and belief.

At that point, Husband irrevocably waived all future claims he might

have under the Fifth Amendment to refuse to provide information and answer

questions about his income, expenses, assets and liabilities and related topics.

And yet, Husband has been obdurate in refusing to provide this critical

information, seeking refuge in the Fifth Amendment.

This court and plaintiff, Barbara Kausits (Wife) are not obligated to accept Husband's unsubstantiated claims about his income, cash flow, And so on and so forth. Wife has a right to seek this discovery, which is the norm in divorce cases. The court has an obligation to insure such discovery is provided so that it can make a fair decision. If Husband refuses to provide his testimony, sanctions must be imposed.

## I.    Issues Presented.

1.1    a.    Whether the Husband waived his Fifth Amendment privilege and rights under the Massachusetts Declaration of Rights (hereafter, "Fifth Amendment," "Fifth Amendment privilege," or "Fifth") with regard to his income, expenses, assets and liabilities and related topics by signing and filing his sworn financial statement and/or by effectively waiving his privilege by his testimony, where such testimony, individually or collectively, was inconsistent with his assertion of the privilege, or both.

   b.    Whether Husband waived his Fifth Amendment privilege with regard to his relationship and interaction with Ms. K.[1] when he testified (i) that, other than as to Ms. K, he did not have sexual intercourse with anyone

---

[1] Wife knows the full identity of Ms. K. For purposes of this motion, Wife is not entering Ms. K.'s name into this memorandum. A copy of the relevant portions of the transcript of Husband's deposition will be provided to the court at the hearing on this motion.

other than Wife; (ii) that he knew Ms. K. from the "community" and that Ms.

K was not at his R.I. apartment during the evening of August 9, 2004, where

such testimony, individually or collectively, was inconsistent with his

assertion of the privilege

1.2    Whether, assuming this court concludes Husband waived his Fifth

Amendment privilege he must be ordered to testify and, as well, be ordered to

pay Wife her full reasonable attorneys' fees for having prepared the motion

and memorandum, traveled to and argued the matter to the court.

1.3    Whether, assuming this court concludes Husband did not waive his

Fifth Amendment privileges, sanctions should be entered against Husband,

preventing him from offering evidence or testimony with regard, but not

limited, to child support, alimony and equitable distribution of marital assets.

1.4    Whether, in addition, to sanctions, an adverse inference should be

drawn against Husband in this civil action because of Husband's assertion of

the privilege.

1.5    Whether, in addition, Husband should be ordered to pay fees and costs

to Wife incurred in connection with this motion and proceeding.

## II.   Relevant Facts.

**Money.**

2.1    In connection with Wife's Motion for a Temporary Order of Support,
both parties filed sworn financial statements. Obviously, at deposition and in
discovery, Wife needed to inquire into the underlying substantive matters on
which Husband's financial statement is based.

2.2    During the course of his March 24, 2006 deposition Husband asserted
his Fifth Amendment privilege several dozen times. He refused to answer
questions relating directly or indirectly to whether he had ever filed income
tax returns and the nature and extent of his income, cash flow from or related
to his work for Aidance Skincare and Topical Solutions, LLC, One Turks
Head Place, Suite 810, Providence, RI 02903 (Aidance Skincare) (Tr. P. 40)
or related companies, as more fully described in detail below (Tr. pp. 33-35,
84-85, 87, 89-91, 105, 146-147, 151-153).

2.2    Later in his deposition, Husband testified about the money paid to two
other consultants who work for Aidance Skincare (Tr. p. 40).

2.3    Husband further testified he was paid for work for Aidance Medical
Diagnostics, LLC, Suite 810, Providence, RI 02903 (Aidance Diagnostics),[2]
but claimed an inability to recall how much he earned (Tr. pp. 84-85).

---

[2] The court will note both corporations have the identical addresses.

2.4    Husband then described his 2005 cash flow; and from where it was

derived (Tr. pp. 151-152).

2.5    Husband testified the sole purpose of Shoshi International Corp. LLC,

P.O. Box 6448, Providence, RI 02940-6448 (Shoshi), a corporation owned by

his father (Tr. p. 53) is to give Husband money (Tr. pp. 168.)

2.6    Husband also testified that Aidance Skincare (Tr. p. 36), Aidance

Medical (Tr. 70), and Tivian Industries (Tr. 89) were each Delaware

corporations.

2.7    Wife asserts that, beyond his signing and filing his financial statement,

Husband's testifying, individually and collectively to the above describe facts

constitutes a waiver of his Fifth Amendment privilege with regard to his

income, assets, expenses, liabilities and related topics.

**Alleged Girlfriend.**

2.8    Husband also refused to answer questions relating to whether he

engaged in sexual relations with (Tr. pp. 26-27, 30-33) or had various

conversations with Ms. K. (Tr. p. 32.)

2.9    Husband specifically denied having sexual intercourse with any woman

other than his Wife *when the group in question specifically excluded Ms. K*

(Tr. p. 33.) He admitted knowing Ms. K from the "community" (Tr. p. 26); but denied she was at his apartment on August 9, 2004 (Tr. p. 26-27.)[3]

2.10    Wife asserts this testimony and denial constitutes a waiver of Husband's Fifth Amendment privilege with regard to Ms. K.

**Sanctions.**

2.11    Husband refused to timely comply with proper discovery requests. That required Wife to go to court twice (March 15, and March 24, 2006)[4] to get him to start his deposition; and once over the production of his documents (March 15, 2006.)

2.12    In her current motion, Wife also seeks an award of fees, even if, after being served with the motion and this memorandum, Husband now agrees to fully testify.

---

[3] This is important beyond the divorce, as Husband testified he intends to pursue a criminal complaint against Wife for an alleged assault and battery upon him on the evening in question, when he tried to eject Wife from his apartment, at a time when Ms. K. was in his bed. Wife claims Ms. K. was a witness to what was, in fact, Husband's assault upon Wife.

[4] See Wife's March 14, 2006 Amended Emergency Motion to Compel Defendant to Attend His Deposition; and for Sanctions (Exhibit 2); and Husband's March 23, 2006 Emergency Motion to Continue Deposition Date (Exhibit 3) and orders entered on March 15, 2006 (Roberts, J.) (Exhibit 4) and March 24, 2006 (Boorstein, J.) (Exhibit 5).

## III.    Argument.

A.    **The Husband Waived His Fifth Amendment Privilege By Effectively (1) Signing and Filing his sworn Financial Statement; and (2) Testifying About the (a) Income of Two Similarly Situated Aidance Skincare Consultants; (b) That He Was Paid Money By Aidance Medical, But Could Not Recall The Amount; (c) About His Cash Flow; (d) About The Purpose of Shoshi International; (e) He Had Not Had Sexual Intercourse With Anyone Other Than His Wife Once Ms. K's Name Was Removed From The Equation; (f) that he knew Ms. K from the "community;" and (g) Ms. K. was not at his apartment on a certain evening, Since Such Testimony Was Inconsistent With His Assertion Of The Privilege.**

**Further Facts.**

In his March 24, 2006 deposition, Husband refused to answer questions as to his income, the source thereof, and whether he had filed income tax returns. Husband also refused to answer questions about whether he had had sexual relations with Ms. K., instead taking the Fifth numerous times in response to relevant questions.

In these circumstances, by refusing to testify about his income and related topics, Husband demonstrated his obdurate litigation tactics. The proper time, if he was going to claim the Fifth, was before he signed under oath and filed his financial statement. Once Husband passed that threshold he could no longer properly claim the Fifth. But, that is just what he did, dozens of time, all while guided by counsel.

On the one hand Husband claimed the Fifth dozens of times. On the other hand, he testified that while in the USA, he worked for Aidance Skincare some 40-60 hours per week (Tr. p. 38); and up to 80 hours per week when he is in Israel (Tr. pp. 103-104.) Husband also testified that there are two other consultants who work 40-60 hours per week for Aidance Skincare (Tr. pp. 38-39) for which they each receive approximately $6,000 per month (Tr. p. 40.)

Husband also testified that he worked for Aidance Medical, was paid for his work, but was unable to recall the amount of his pay. (Tr. p. 84). "I don't recall" is quite different from "I assert my rights not to incriminate myself under the Fifth Amendment." By testifying he was paid, albeit he could not recall how much, Husband, at the least, waived his Fifth Amendment privilege to as to the amount of income from and his relationship with Aidance Medical.

During his deposition, with his counsel at his side, Husband repeatedly claimed the Fifth and refused to testify about income. But, later, when asked to describe his current cash flow, he testified:

```
A:    "Yes.  I say about $5,750 a month.
Q:    From Where?
A:    From Shoshi International."
Tr.  pp. 151-  152).
```

When this line of inquiry was followed up with the source of his cash flow, Husband again claimed the Fifth (Tr. p. 152.) Wife's counsel pointed out to Husband and his counsel that, by his testimony, Husband had waived his Firth Amendment privilege with regard to all cash flow and income. Nevertheless, Husband's counsel insisted Husband continue to – and Husband continued to assert the Fifth (Tr. p. 153.) By providing testimony about his cash flow, Husband, for the second time, effectively waived his Fifth Amendment privilege as to his income.

Finally, Husband was asked "What does Shoshi International do other than give you money," to which he responded "Nothing." (Tr. p. 168). Husband was then asked:

```
Q:   "Where does [Shoshi] get its money from?
A:   From the billing, from my consultant billing.
Q:   Your consultant billing goes to [Aidance
     Skincare]?
A:   Yes.
Q.   [Aidance Skincare] sends Shoshi the money?
A.   Yes.
Q.   And Shoshi gives you the money?
A.   Yes, that's correct.
Q.   You think that that's enough to get it under the
     gift?
A.   That's correct."  (Tr.  p. 168.)
```

In sum, Husband admitted working for Aidance Skincare as an independent contractor, billing Aidance Skincare for his time, that Aidance Skincare sends money in payment of Husband's time to Shoshi which, in turn,

makes gifts of money to Husband. In providing this testimony, Husband, for a third time, effectively waived his Fifth Amendment privilege as to his income.

Husband has a right, at a proper time, to claim the Fifth, but he has no right to file his sworn financial statement and to then pick and chose to respond to some, but not all questions about his income and cash flow.

**As to the Alleged Girlfriend.**

Husband denied having had sexual relations with anyone other than Wife or Ms. K. In so doing, Husband offered substantive testimony on the very subject as to which he had previously asserted his Fifth Amendment privilege. And, in so doing, Husband must be deemed to have waived his Fifth Amendment privilege as to Ms. K.

Further, when asked if he knew Mrs. K., instead of taking the Fifth, Husband admitted he knew her "from the community" (Tr., p. 26.) When asked if Ms. K. was at his apartment on August 9, 2004, Husband responded: "No." (Tr. pp. 26-27.) If Husband wanted to effectively assert the Fifth with regard to his relationship, if any, with Ms. K., he was obligated to take the Fifth each and every time Ms. K.'s name came up in the deposition. He cannot pick and chose the Ms. K.-related questions he wants to respond to; and not respond to other Ms. K-related questions. In such circumstances, the law

requires, therefore, that Husband should now be compelled to answer these and other related questions asked by Wife's counsel about Ms. K.[5]

**The Law.**

The Fifth Amendment permits a person to refuse to testify against himself at a criminal trial in which he is a defendant. That amendment also privileges a person to not answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in a future criminal proceeding. *See Commonwealth v. Delisle*, 440 Mass. 137, 143 (2003), *citing Minnesota v. Murphy*, 465 U.S. 420, 426 (1983). *See also U. S. Trust Co. of New York v. Herriott*, 10 Mass. App. Ct. 313, 316 (1980) (Fifth Amendment privilege against self-incrimination applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it.); *Kaye v. Newhall*, 356 Mass. 300, 304-306, (1969) (party may comment on invocation of Fifth Amendment by his adversary in a civil case).

But, that privilege is not absolute. A person may waive his Fifth Amendment privilege, either explicitly, *Commonwealth v. Barnes-Miller*, 59 Mass. App. Ct. 832, 834-835 (2003), or implicitly through his conduct. *Commonwealth v. Fiore*, 53 Mass. App. Ct. 785, 789 (2002). As to the latter

---

[5] Ms. K. was deposed on April 3, 2005. After stating her name and address, she took the Fifth on every other question.

circumstance, generally referred to as the "waiver by testimony" rule " **'[a]**

**witness who voluntarily testifies regarding an incriminating fact**

**waives his privilege against self-incrimination "as to subsequent**

**questions seeking related facts.' "** *Id.* (emphasis added,) quoting

*Commonwealth v. Martin*, 423 Mass. 496, 500 (1996) and *Taylor v.*

*Commonwealth*, 369 Mass. 183, 189 (1975). See *Commonwealth v. Barnes-*

*Miller*, 59 Mass. App. Ct. at 834 n.1 (recognizing but not addressing claim

that witness's answers to questions may preclude a subsequent claim of

privilege.)

    In this case, Husband is trying to have things both ways. He wants to

eat his cake and have it too. During his deposition, Husband asserted his

Fifth Amendment privilege when asked questions about his income (Tr. pp.

33-35, 84-85, 87, 89-91, 105, 146-147, 151-153) and his relationship with and

sexual relations with Ms. K. (Tr. pp. 26-27, 30-33). But, Husband had

previously signed and filed his sworn financial statement. This was followed,

as described in detail above, by his testifying about numerous parts of his

financial life, including cash flow and certain aspects of how he receives

money and, as well, opened the door in responding to questions regarding Ms.

K. Husband cannot now use the Fifth Amendment to shield him from having

to answer other questions about his income and the source thereof, nor to shield him from having to answer questions about the full extent of his relationship with Ms. K.

Husband was represented by counsel, Francine Gardikas of Burns & Levinson, at the deposition. During the deposition, Husband and Attorney Gardikas had two off-the record discussions (Tr. pp. 30, 154.) Despite his counsel being present, despite his having the two discussions, despite his having claimed the Fifth, Husband voluntarily offered his testimony about the amount of his cash flow, the number of hours he worked, the number of hours and money paid to two other consultants, his working for Aidance Medical, but not remembering how much he got paid, and, among other things, how it is that he bills Aidance Skincare for his time, how Aidence Skincare sends invoices and money to Shoshi and how Shoshi makes "gifts" to Husband. As to Ms. K., Husband claimed the Fifth, but also gave crucial testimony, thus opening the door. Once Husband opened the door, even a bit, it is open for all purposes. By testifying on these subjects, Husband waived his privilege; and he must now be compelled to answer further questions asked by Wife's counsel. *See Id.*

**B.**    **Assuming This Court Concludes That Husband Did Not Waive His Fifth Amendment Privilege, Sanctions Should Be Entered Against Husband, Preventing Him From Offering Evidence Or Testimony With Regard To Child Support, Alimony and Equitable Distribution Of Marital Assets and his so-called Good Conduct and Wife's so-called Bad Conduct.**

The development and application of the Child Support Guidelines was designed to bring uniformity and to require that parents provide a minimum level of support for their children, based upon the income and standard of living of the parties. So, too, the issue of alimony should be relatively easy to resolve, depending on the length of the marriage, the needs of one party and the ability of the other party to pay.

But, as here, when one party refuses to testify about and disclose the amount, nature and source of income and assets, it is impossible for the court to employ the usual guideposts for entry of alimony and child support orders; and, as well, orders for equitable distribution. Equitable distribution often swirls around the conduct of the parties during the marriage, contributions of each party, and other factors in Section 34. At bar, Husband has refused to respond to questions about whether, since the time of his marriage to Wife, he has had sexual relations with Ms. K, while claiming that, other than his Wife and Ms. K. he never had sexual relations outside his marriage.

Husband refused to provide information which can be used by Wife to investigate and verify Husband's claims about the source and amount of his income and cash flow. This in light of Husband's off-the record claims that, at his age 42, he has never filed a U.S. or State Income Tax Return!

At bar, even though he filed his sworn financial statement, instead of information, when asked relevant questions, Husband took the Fifth (e.g. Tr. pp. 26-27, 30-33.)

**Law on Sanctions.**

The court must impose specific sanctions against Husband either in the event the court finds Husband (i) did NOT waive his privilege, or (ii) did waive his privilege, orders Husband to answer these and related questions, but Husband continues to refuse to answer.

The precedent for and nature of sanctions to be imposed was established by the late Hon. Haskell C. Freedman in *Wonsong v. Wonsong*, 395 Mass. 154 (1985) (copy attached). In a case remarkably similar to the case at bar, husband refused to answer questions about his financial condition and his having had sexual relations with another woman. The husband claimed his Fifth Amendment privilege. The husband sought, but the court denied his motion for a protective order. Wife sought a motion to compel husband to answer. The court ordered husband to answer, husband stipulated

he would continue to refuse to answer; so therefore, the court imposed

sanctions.

The sanctions imposed included striking husband's financial statement

and, among other things, prevented husband:

> personally from introducing documentary
> or testimonial evidence relating to an
> award of support, division of marital
> assets, or the custody of the minor child
> and prohibited him from testifying
> regarding his financial circumstances,
> conduct of the parties during the
> marriage, his station, amount and sources
> of his income, his employability and his
> estate. *Wonsong, supra* 395 Mass. at 155.

Judge Freedman reserved and reported the interlocutory matter to The

Appeals Court. On its own motion, the Supreme Judicial Court took the case

on direct appellate review. In affirming Judge Freeman's orders, the SJC

approved the "[balancing] any prejudice to the other civil litigants which

might result . . . against the potential harm to the party claiming the privilege

if he is compelled to choose between defending the civil action and protecting

himself from criminal prosecution." *Wonsong, supra,* 395 Mass. at 157

(internal citations omitted.)

The SJC specifically agreed that:

> such a balancing is the proper method to be
> used in determining whether discovery
> sanctions should be imposed on a [husband]
> who claims [his Fifth Amendment] privilege
> in a civil action. In the instant case,

> the judge implicitly balanced the prejudice
> to the [husband], against the prejudice to
> the [wife].  The judge also considered the
> need for the particular information sought
> in order to make a "fair determination" in
> this actions. … Furthermore, the judge
> limited the effect of the order to the
> [husband] individually. Other sources of
> evidence are still available to the
> [husband]. *Wonsong, supra*, 395 Mass. at 158.

At bar, this court is asked to find that Husband waived his Fifth

Amendment privilege, as discussed in the prior section of this memorandum.

But, whether the court (i) finds no waiver or (ii) if the court finds waiver and

orders Husband to testify, but Husband still refuses to testify, this court must

then undertake a balancing, on the one hand, of Wife's rights and needs to

gather evidence to present in what Husband is intentionally making a

complicated and difficult case and, on the other hand, Husband's claim of

privilege which necessarily prevents Wife from full discovery on critical parts

of this case, including Wife's need for child support, alimony and an equitable

division of the marital assets.

Simply, Husband used his Fifth Amendment privilege as a shield,

preventing Wife from obtaining important information.  While such a claim is

certainly permissible, in this civil case, the court is permitted to order

Husband to testify, or suffer the consequences of having sanctions imposed

against him.  Here, Wife asks this court to impose all of the same sanctions on

Husband as were imposed upon Mr. Wonsong, as set forth in detail in the proposed order.

**C.    Assuming Husband Continues to Assert His Fifth Amendment Privilege, Beyond the Sanctions Requested in Section II, An Adverse Inference Should Be Drawn Against Him.**

Appellate courts in this Commonwealth have "long recognized that, in civil cases, an adverse inference may be drawn against a party who invokes the Fifth Amendment privilege against self-incrimination." *Lentz v. Metropolitan Property And Casualty Ins. Co.*, 437 Mass. 23, 26 (2002); *Kaye v. Newhall*, 356 Mass. 300, 305-306 (1969); *Phillips v. Chase*, 201 Mass. 444, 450 (1909); *Commonwealth v. Barnes-Miller*, 59 Mass. App. Ct. 832, 835 (2003). *See also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). In this case, the circumstances evident in the deposition transcript strongly support drawing such an adverse inference.

Not only did the Husband assert his Fifth Amendment privilege several dozen times, but he did so notwithstanding the fact that as a practical matter, he would not realistically have faced criminal liability even if he had testified or admitted his affair with Ms. K. Indeed, appellate courts in this Commonwealth have noted that "[i]t seems beyond dispute that the statutes defining or punishing the crimes of fornication, adultery, and lewd and lascivious cohabitation have fallen into a very comprehensive desuetude."

*Fort v. Fort*, 12 Mass. App. Ct. 411, 417 (1981). *See Commonwealth v. Stowell*, 389 Mass. 171, 176 (1983) (the crime of adultery is rarely made the subject of criminal prosecution).

It is inescapable, based on the totality of his testimony, that an inference should be drawn that the Husband works for a living and earns income as a result of that work; and that he engaged in extramarital sexual relations with Ms. K. And, as to what may be Husband's failure to file income tax returns, Wife has represented to Husband's counsel it is not her intention to report Husband to the IRS or DOR, as this is counterproductive for her and their children. But, on the other hand, if Husband refuses to provide Wife with all needed documents and back up for various claims Husband has made over the years regarding gifts received and his work, cash flow and income then Wife has no choice but to try this case to seek an order based upon their "standard of living." Thereafter, Wife is as concerned as Husband might be, that the court will feel obliged to send a copy of the transcript and its findings and judgment to both the IRS and DOR.

At the very least, at this stage of the case, when considering sanctions, this court should draw adverse inferences from Husband's assertion of the privilege in this case. Further, especially where Husband asserted his privilege in circumstances where he would not have faced criminal

prosecution, and where he did so selectively and for the purpose of withholding relevant information from the court and Wife, she asks that this court impose any other sanction deemed appropriate in the circumstances.

**D.    Husband Should Be Ordered To Pay Wife Her Legal Fees And Costs of this Motion and Stenographic Fees For Attendance and Expedited Copies of Transcripts.**

Although discovery is now stalled here in the early stages, Husband has already made a habit of forcing Wife to file two motions to compel him to attend his deposition and to produce documents.

Husband knows it is costly to have Wife's lawyer prepare motions to compel, including needed research, to mark the motions, to get ready for hearings, to travel to and from, wait at and then present and argue motions to the court. On this occasion, even if Husband now decides to testify in full, without claiming his Fifth Amendment privilege, the court is still asked to impose a monetary sanction to fully cover Wife's legal fees and related costs of this motion.

## V.  Conclusion

Based on the above reasons and authorities, Wife requests that this

court grant her the relief requested.

<div style="margin-left: 40%;">

Respectfully submitted,
**Barbara Kausits,** by *her attorneys,*
**NISSENBAUM LAW OFFICES**

By:
Gerald L. Nissenbaum, BBO # 372400
Wendy J. Overbaugh, BBO #657457
160 Federal Street, 24th Floor
Boston, MA 02110
617 / 330.9090;        fax at:  6909

</div>

April 7, 2006

### Certificate of Service

I hereby certify that this day a copy of the above was served, in hand, upon counsel
for the defendant at her office address, as of record.

April 7, 2006

☑ Display Cross-Citations
421 Mass. 333 / 412 Mass. 100 / 412 Mass. 1015 / 402 Mass. 581 / 396 Mass. 610 / 33 Mass. App. Ct. 147

Citation:      395 Mass. 154
Parties:       JOSEPH F. WANSONG vs. ELIZABETH A. WANSONG (AND A COMPANION
CASE[1]).
County:        Essex
Hearing Date:  March 5, 1985
Decision Date: June 11, 1985
Judges:        HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.


    The judge in a divorce proceeding did not abuse his discretion in denying
      the plaintiff's motion for a protective order which sought to prohibit
      the defendant from resuming the taking of the plaintiff's deposition
      after the plaintiff had invoked his privilege against self-incrimination
      in refusing to answer questions respecting his relationship with another
      woman, and in imposing discovery sanctions. [156-157] Imposition of discovery
sanctions against the plaintiff in a divorce case
      who had invoked his privilege against self-incrimination in refusing at
      a deposition to answer questions about his relationship with another
      woman did not, in the circumstances, violate the plaintiff's rights
      under the Fifth Amendment to the United States Constitution and art. 12
      of the Declaration of Rights of the Constitution of Massachusetts.
      [157-158]

    COMPLAINTS for divorce filed in the Essex Division of the Probate and Family
Court Department on March 3 and April 22, 1983, respectively.
    Interlocutory orders were reported to the Appeals Court by Haskell C.
Freedman, J. The Supreme Judicial Court transferred the case on its own
initiative.
    Earl M. Weissman for Joseph F. Wansong.
    Jacob M. Atwood (David E. Cherny with him) for Elizabeth A. Wansong.

    NOLAN, J. Pursuant to G. L. c. 215, Section 13 (1984 ed.), a Probate and
Family Court judge reserved and reported the propriety of certain interlocutory
orders which: (1) denied the plaintiff's motion for a protective order; (2)
dismissed the complaint

--------------------------

[1] Elizabeth A. Wansong vs. Joseph F. Wansong.

    Page 155

for divorce of the plaintiff, Joseph F. Wansong,[2] (3) prohibited the plaintiff
personally from introducing documentary or testimonial evidence relating to an
award of support, division of marital assets, or the custody of the minor child
of the marriage; and (4) struck the financial statement filed by the plaintiff
and prohibited him from testifying regarding his financial circumstances, conduct
of the parties during the marriage, his station, amount and sources of his
income, his employability and his estate. This reservation and report presents
the question whether discovery sanctions may be imposed against a litigant in a
civil case who invokes protection against self-incrimination pursuant to the
Fifth Amendment to the United States Constitution and art. 12 of the Declaration
of Rights of the Constitution of Massachusetts.

The plaintiff filed a complaint for divorce alleging that "an irretrievable breakdown of the marriage . . . occurred due to loss of love and affection and lack of communication." The defendant filed a cross complaint for divorce alleging that the plaintiff "was guilty of cruel and abusive treatment towards [the defendant]." On June 13, 1983, the defendant took the deposition of the plaintiff. During the deposition, defendant's counsel questioned the plaintiff regarding his relationship to and financial arrangements with a woman who was not a party to the divorce actions. On advice of counsel, the plaintiff invoked his privilege not to incriminate himself. The defendant suspended the deposition upon the plaintiff's invocation of his privilege under the United States and Massachusetts Constitutions.

On June 20, 1983, the defendant filed motions to compel answers at the deposition and for sanctions, to dismiss the plaintiff's complaint for divorce, to prohibit the plaintiff's testimony or introduction of evidence at trial and to strike the plaintiff's financial statement and testimony. The judge ruled on the motion to compel answers and for sanctions and ordered

_____

[2] Joseph F. Wansong initially filed a complaint for divorce. Elizabeth A. Wansong filed a cross complaint for divorce. For the sake of clarity, Joseph F. Wansong is referred to as the plaintiff in this opinion. Elizabeth A. Wansong is referred to as the defendant.

Page 156

the plaintiff "to resume his Deposition and to respond to questions which he previously refused to answer and other such questions that may be posed relating to those issues." Subsequent to this order, the parties determined that the plaintiff would continue to assert his privilege against self-incrimination. To avoid the expense of further depositions, the plaintiff asserted and the parties stipulated "that if his deposition is resumed and the questions previously posed to him . . . were asked of him he would again refuse to answer those questions based upon his Fifth Amendment right under the United States Constitution and his other rights under Article 12 of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts."

As a result of this stipulation, the judge determined that it was appropriate to rule on the plaintiff's motion for a protective order and the defendant's remaining motions. The judge denied the plaintiff's motion. To the extent that the defendant's motions concerned limiting the plaintiff's right to present evidence at trial, the judge limited his order to the plaintiff "individually, and not against any witnesses he may offer." The judge also dismissed the plaintiff's complaint for divorce.

1. Motion for a protective order. The plaintiff asserts that it was error for the judge to deny the motion for a protective order which sought to prohibit the defendant from resuming the taking of the plaintiff's deposition. The plaintiff argues that further discovery would not produce any additional, meaningful information and such discovery was sought to harass him. He submits, therefore, that denial of his motion for a protective order was error.

In determining whether a protective order should issue, a judge must assess the competing interests of preventing "annoyance, embarrassment, oppression, or undue burden or expense," Mass. R. Dom. Rel. P. 26 (c) (1985), and considerations of an efficient and just resolution of the action. See Matter of Roche, 381 Mass. 624, 637 (1980). "In making this assessment [a judge is] entitled to a broad measure of discretion." Id. at 638. "[O]n appeal our task is again simply to review

Page 157

whether that discretion has been abused." Merles v. Lerner, 391 Mass. 221, 226 (1984). In the instant case, the plaintiff continually refused to answer questions related to his financial condition and conduct as affected by an allegedly adulterous relationship. The judge properly weighed the plaintiff's concerns in asserting his privilege against self-incrimination against the need for further discovery. See part 2, infra. The judge did not abuse his discretion in denying the plaintiff's motion for a protective order.

2. Privilege against self-incrimination as related to discovery sanctions. The plaintiff argues that by imposing discovery sanctions the judge erroneously penalized the plaintiff in the exercise of his right not to incriminate himself. A litigant may not be subjected to a penalty such as "the imposition of any sanction which makes assertion of the Fifth Amendment privilege `costly.'" Spevack v. Klein, 385 U.S. 511, 515 (1967). "Yet not every undesirable consequence which may follow from the exercise of the privilege against self-incrimination can be characterized as a penalty." Flint v. Mullen, 499 F.2d 100, 104 (1st Cir. 1974). "In a civil action, a reasonable inference adverse to a party may be drawn from the refusal of that party to testify on the grounds of self-incrimination." Labor Relations Comm'n v. Fall River Educators' Ass'n, 382 Mass. 465, 471 (1981). See Kay v. Newhall, 356 Mass. 300, 305 (1969) (counsel may comment during closing argument on a civil defendant's invocation of the privilege against self-incrimination). See also Note, Toward a Rational Treatment of Plaintiffs Who Invoke the Privilege Against Self-Incrimination During Discovery, 66 Iowa L. Rev. 575, 579, 580 n.41 (1981) (Note).

The Appeals Court recently stated that, in examining the effect a litigant's claim of privilege should have on a civil action, "[t]he judge's task is to balance any prejudice to the other civil litigants which might result . . . against the potential harm to the party claiming the privilege if he is compelled to choose between defending the civil action and protecting himself from criminal prosecution." United States Trust Co. v. Herriott, 10 Mass. App. Ct. 313, 317 (1980), citing Arthurs v.

Page 158

Stern, 560 F.2d 477, 478-480 (1st Cir. 1977), cert. denied, 434 U.S. 1034 (1978). We view this method as the preferable approach to take when examining the effect of a plaintiff's invocation of the privilege against self-incrimination. See Black Panther Party v. Smith, 661 F.2d 1243, 1272 (D.C. Cir. 1981). See also Note, supra at 594-602. Cf. Wehling v. Columbia Broadcasting Sys., 608 F.2d 1084, 1088 (5th Cir. 1979). We agree that such a balancing is the proper method to be used in determining whether discovery sanctions should be imposed on a plaintiff who claims this privilege in a civil action. In the instant case, the judge implicitly balanced the prejudice to the plaintiff, against the prejudice to the defendant. The judge also considered the need for the particular information sought in order to make a "fair determination" in this action. See Note, supra at 598. Furthermore, the judge limited the effect of the order to the plaintiff individually. Other sources of evidence are still available to the plaintiff. The judge did not impose a sanction that abrogated "the traditional policy against default judgments in domestic relations cases." Imprescia v. Imprescia, 392 Mass. 101, 104 (1984). Rather, after balancing the competing interests, the judge imposed sanctions explicitly provided for in Mass. R. Dom. Rel. P. 37 (b) (2) (1985). We conclude that the judge did not abuse his discretion by dismissing the plaintiff's complaint for divorce and by imposing other discovery sanctions against the plaintiff. Cf. Arthurs v. Stern, 560 F.2d 477, 479-480 (1st Cir. 1977) (based on a balancing test, the denial of a motion to stay a civil action to allow a party to invoke a privilege against self-incrimination is reviewed "simply for abuse of discretion").

For the reasons set forth above, the judge properly entered the interlocutory orders presently before this court on reservation and report. We remand this

action to the Probate and Family Court for further proceedings consistent with
this opinion.

                              So ordered.

End Of Decision

Exhibit t

Commonwealth of Massachusetts
The Trial Court

_Norfolk_ Division     Probate and Family Court Department    Docket No. _04 D0959_

DOCKETED

### Financial Statement
(SHORT FORM)

OCT 03 2005

_Barbara Kawsit_      v. _PERRY ANTELMAN_
Plaintiff/Petitioner          Defendant/ Petitioner

**INSTRUCTIONS:** If your income equals or exceeds $75,000.00 you must complete the LONG FORM financial statement, unless otherwise ordered by the Court. All questions on both sides of this form must be answered in full or the word "none" inserted. If additional space is needed for any answer, an attached sheet may be filed in addition to, but not in lieu of, the answer. Information contained herein is confidential and only available to the parties and persons authorized under Probate and Family Court Department Supplemental Rule 401.

1. Your Name _PERRY ANTELMAN_    Soc. Sec. No. _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_
   Address _412/1 N of HARADYON ST. NEVE DANIEL, ISRAEL_
         (street and no.)               (city or town)         (state)        (zip)

   Age _41_ Tel. No. ( _401_ ) _709-9593 (US. & ISRAEL)_ No. of Children living with you _7_
   Occupation _BUSINESS CONSULTANT_ Employer _SHOSHI INTERNATIONAL_
   Employer's Address _POB 6448_   _PROVIDENCE, RI_   _02940_
                 (street and no.)         (city or town)        (state)        (zip)

   Employer's Tel. No. ( _401_ ) _432-7750 XT. 711_    Health Ins. Coverage [ ] YES [ ✓ ] NO
   Health Insurance Provider _____    Cert. No. _____

**Gross Weekly Income from All Sources (strike inapplicable words)**

| | | |
|---|---|---|
| a). Base pay from salary, wages | $ | 1,395 |
| b). Self Employment Income (attach a completed Schedule A) | $ | |
| c). Income from overtime-commissions-tips-bonuses-part-time job | $ | |
| d). Dividends - interest | $ | |
| e). Income from trusts or annuities | $ | |
| f). Pensions and retirement funds | $ | |
| g). Social Security | $ | |
| h). Disability, unemployment insurance or worker's compensation | $ | |
| i). Public Assistance (welfare, A.F.D.C. payments) | $ | |
| j). Rental from Income Producing Property (attach a completed Schedule B) | $ | 186 |
| k). All other sources (including child support, alimony) | $ | |
| l). Total Gross Weekly Income (a through k) | $ | 1,581 |

3. **Itemize Deductions from Gross Income**

| | | |
|---|---|---|
| a). Federal income tax deductions (claiming _____ exemptions) | $ | |
| b). State income tax deductions (claiming _____ exemptions) | $ | |
| c). F.I.C.A./Medicare | $ | |
| d). Medical Insurance _(DENTAL only)_ | $ | 26 |
| e). Union Dues | $ | |
| f). Total Deductions (a through e) | $ | 26 |

4. **Adjusted Net Weekly Income**
   2 (l) minus 3 (f)        $ _1,555_

5. **Other Deductions from Salary**

| | | |
|---|---|---|
| a). Credit Union (Loan Repayment or Savings) | $ | 264 |
| b). Savings | $ | |
| c). Retirement | $ | |
| d). Other - Specify (such as Deferred Compensation or 401K) | $ | |
| e). Total Deductions (a through d) | $ | 264 |

6. **Net Weekly Income**      4 minus 5 (e)   $ _1,291_

7. **Gross Yearly Income from Prior Year** _____ $ ~66,000
   (attach copy of all W-2 and 1099 forms for prior year)

CJ-D 301S (11/97)

9 mos. @ 6,000 = 66,000
3 mos. @ 4,000

Exhibit A-1     9/28/05

| | | | | | |
|---|---|---|---|---|---|
| | Weekly Expenses (Do Not Duplicate Weekly Expenses) | | | 13 | 13 |
| a) | Rent - Mortgage (PIT) | $ 209 | 349 | l) Life Insurance | $ 20 | 256 |
| b) | Homeowner's/Tenant Insurance | $ | 9 | m) Medical Insurance | $ — | — |
| c) | Maintenance and Repair | $ | 25 | n) Uninsured Medicals | $ 50 | 75 |
| d) | Heat (Type _____) | $ 58 | 81 | o) Incidentals and Toiletries | $ 153 | 153 |
| e) | Electricity and/or Gas | $ 69 | 69 | p) Motor Vehicle Expenses | $ 175 | — |
| f) | Telephone | $ 47 | 50 | q) Motor Vehicle Loan Payment | $ — | — |
| g) | Water/Sewer | $ 58 | — | r) Child Care | $ — | — |
| h) | Food | $ 150 | 306 | s) Other (attach additional schedule if necessary) | $ | |
| i) | House Supplies | $ 50 | 50 |    SCHOOL | $ 25 | 770 |
| j) | Laundry and Cleaning | $ 10 | 40 |    LAWYER PAYMENTS | $ 500 | 500 |
| k) | Clothing | $ 50 | 100 | | | |

Total **Weekly** Expenses (a through s)    $ 1,637 | 2,840

9. Counsel Fees
   a) Retainer amount(s) paid to your attorney(s)      $ 2,000
   b) Legal fees incurred, to date, against retainer(s)   ALL    $ 30,000
   c) Anticipated range of total legal expense to prosecute this action    $ 50,000 to $ 80,000

10. Assets (Attach additional schedule for additional real estate and other assets, if necessary)
   a) Real Estate.
     Location 36 TASHUR ST., BET SHEMESH, ISRAEL
     Title
     Fair Market Value $ 225,000 - Mortgage(s) $ 121,250 = Equity    $ 103,750
   b) IRA, Keough, Pension, Profit Sharing, Other Retirement Plans
     **List Financial Institution or Plan Names and Account Numbers**
     $ Ø
     $
     $ Ø
   c) Tax Deferred Annuity Plan(s)    $ Ø
   d) Life Insurance: Present Cash Value
   e) Savings & Checking Accounts, Money Market Accounts, and CDs - which are held
     individually, jointly, in the name of another person for your benefit, or held by you for the
     benefit of your minor child(ren). List Financial Institution Names and Account Numbers
     X IN BARBARA'S NAME    $ 290,000
     X IN PERRY'S NAME    $ 1,000
   f) Motor Vehicles   (BARBARA'S TRUCK)
     Fair Market Value $ 20,000 - Motor Vehicle Loan $ ____ = Equity    $ 20,000
     Fair Market Value $ 2,000 - Motor Vehicle Loan $ ____ = Equity    $ 2,000
   g) Other (such as - stocks, bonds, collections)
     MARANTECH LLC MEMBERSHIP UNITS (STOCK)    $ 30,000
     AIDANCE SKINCARE MEMBERSHIP UNITS    $ 60,000 +
     ($40,000) VIVIAN INDUSTRIES (PRE-MARITAL)   h) Total Assets (a through g)    $ 546,750
     AIDANCE SKINCARE    $ 40,000
     TOTAL ASSETS

11. Liabilities (DO NOT list weekly expenses but DO list all liabilities) TOTAL ASSETS

| Creditor | Nature of Debt | Date of Origin | Amount Due | Weekly Payment |
|---|---|---|---|---|
| a) BANK JERUSALEM | PAST DUE MORTGAGE PAYMENTS | | $7,000 | |
| b) PAST DUE CREDIT CARDS - BARBARA $80,000 to PERRY $180,000 | | | $109,000 | WHEN DIVIDE BY 52 WK |
| c) PERSONAL LOANS | | | $39,000 | $1,251 |
| d) SCHOOLS | | OTHER $3,100 | | |
| | | CONTAINER IN ISRAEL $15,000 | | |

e) Total Amount Due and Total **Weekly** Payment    $ 273,100    Ø
12. Number of Years you have paid to Social Security    Ø years

I certify under the penalties of perjury that my income and expenses, assets, and liabilities as stated herein are true to the best
of my knowledge and belief. I have carefully read this financial statement and I certify the information is true and complete.
Date 9/28/05      Signature _____

**STATEMENT BY ATTORNEY**
I, the undersigned attorney, am admitted to practice law in the Commonwealth of Massachusetts -- am admitted pro hac vice for
the purposes of this case -- and am an officer of the court. As the attorney for the party on whose behalf this Financial Statement
is submitted, I hereby state to the court that I have no knowledge that any of the information contained herein is false.

Attorney's Signature _____    Date 9/28/05
Address _____    Tel. No. (781) 793-0575
B.B.O. # 600853

Exhibit A-2



RECEIVE D

MAY 1 2006

REC. BY FAX _____
NISSENBAUM LAW OFFICE

**Commonwealth of Massachusetts**
**The Trial Court**
**Probate and Family Court Department**

**Norfolk Division**                                    **Docket No. 04D 0759-DV1**

Barbara Kausits, Plaintiff

v.

Perry Antelman, Defendant

**TEMPORARY ORDER**
**(Pursuant to Temporary Order dated 12/7/05)**

Pending a hearing on the merits or until further order of the Court it is hereby ORDERED that:

1.   As the parties cannot mutually agree on a location to which to ship the container (with their household goods) from Israel, the container shall be shipped to the plaintiff's home

2.   Plaintiff's and Defendant's attorneys shall arrange to have a local police officer there to supervise the removal and division of the personal property by the parties or their designees, pursuant to the "scheme" set forth by Judge Kopelman in Temporary Order of 12/7/05, #6.

3.   Notwithstanding the foregoing, all furniture used in the former marital home in Sharon by the children in their rooms shall be for them and uncrated into the mother's home as shall also be the children's pharmaceuticals, clothing, jewelry, toys, books, hobbies, pictures, draperies, and computers. None of which shall be attributed to either party.

4.   Notwithstanding the foregoing, heirloom items given by the parties first or second degree relatives to the parties or either of them shall be uncrated and given to the related party without prejudice to further division at the hearing on the merits.

5.   Each party shall take from property in the container his/her own clothing, jewelry, pharmaceuticals, and items of personal care and grooming.

6.   Beds, cribs, bureaus, desks, chairs, mattresses, box springs, blankets, sheets, pillowcases,

towels, and the like shall first be uncrated to the home in which the wife and seven
children reside as shall all basic items usually and routinely used in the kitchen, by the
family (including, but not limited to: every day dishes, glasses, napkins, cooking utensils
and equipment, as well as any table and chairs formerly used by the family for its daily
meals).

7.   Family photographs shall be taken by the wife. She shall keep them safe and at anytime
until April 8, 2008 upon written request deliver them to a photo lab to be duplicated at
husband's expense.

8.   Thereafter, the items shall be inventoried and divided as per Judge Kopelman's order,
except that groups or sets shall not be split unless agreed (eg. a set of china, 2 matching
candlesticks, or a bedroom set, shall be considered as one choice–not chosen in individual
pieces).

9.   All items shall be inventoried when removed from the crate and both parties shall sign the
inventory and each retain a copy for his/ her attorney. The inventory shall reflect which
of the 2 parties has the pieces.

10.  Each party shall pay the cost of moving the property from the container into his/her home
or storage.

11.  The Court has not made a determination or any distribution of marital assets in
Temporary Orders unless so specifically designated as advance(s).

12.  From the proceeds of the sale of the real property in Israel, wife shall be paid a.) the sum
of $500.00 ordered on March 24, 2006, if unpaid; b.)$10,000.00 towards her legal fees (to
be applied toward fees in Israel or here, at her discretion); and c.) further the Zim bill
shall be paid up to $26,740.00 to the extent that either party has advanced monies toward
that bill, he/she shall be reimbursed those monies first in the order those monies were
advanced. The balance of the proceeds shall be paid to husband.

13   The husband shall appear at a deposition to be scheduled on or before May 30, 2006 at a
time convenient to both counsel, but not on a Friday or Saturday. He shall 15 days prior

thereto provide to Wife's attorney copies of all income tax returns, including those prepared jointly, corporate and/or partnership returns of whatever nature worldwide, which he has executed individually or as an officer, director, agent, trustee or in any other capacity. To the extent that the husband fails to provide personal income tax returns for any year, the Court may determine that none have been filed and husband shall be responsible for any and all taxes for such period including interest and penalties, if any.

14    The husband, shall upon inquiry and reinquiry answer under oath at his deposition all questions regarding finances (including but not limited to expenditures, income, expenses, assets, and liabilities whether brought into the marriage and/or accruing during the marriage, to date, including with respect to Ms. K).

15.    The husband may assert and continue to assert his privilege with respect to illegal conduct or sexual conduct outside of the marriage.

16.    To the extent that defendant fails to comply with any orders regarding financial discovery (items #12 and #13 above) and continues to assert his fifth amendment privilege with respect thereto he will be personally prohibited from offering any evidence at trial relating to child support, alimony, division of the marital estate, his finances and employability.

April 24, 2006
Date

Beverly Weinger Boorstein, Justice

3

**Commonwealth of Massachusetts**
**The Trial Court**
**Probate and Family Court Department**

**Norfolk Division**

Docket No. 04D0759-DV1

Barbara Kausits, Plaintiff

v.

Perry W. Antelman, Defendant

**TEMPORARY ORDER**

Pending a hearing on the merits or until further order of the Court, it is Ordered that:

1. The husband's motion to dismiss the wife's complaint for divorce for lack of subject matter jurisdiction is hereby denied.

2. The husband's motion to stay proceedings pending the Hague Convention litigation in the federal court is hereby denied, except as to the entry of any permanent judgment by this Court regarding custody and visitation.

3. Notwithstanding paragraph two above, this Court reserves the right to enter temporary orders with respect to the wife's pending complaint for divorce.

4. The wife shall continue to have sole physical custody of the seven minor children, ages 13, 11, 9, 7, 5, 3 and two weeks.

5. The husband shall have reasonable rights of visitation with his seven minor children as set forth in a stipulation dated September 7, 2005. (This was the same stipulation regarding visitation which was filed in the Federal District Court.)

6. Commencing Friday, September 30, 2005, and on each and every Friday thereafter, the husband shall pay $600 per week for support of his seven minor children.

7. The aforesaid child support shall be made payable to the Commonwealth of Massachusetts and shall be sent to the Department of Revenue Child Support Enforcement Division, P.O. Box 55140, Boston, MA 02205-5140, by means of an implemented wage assignment.

Exh.6. + 8 -1

9/28/05

8.      If for any reason that the wage assignment is not implemented it shall be the
        father's responsibility to pay the aforesaid child support directly to the Department
        of Revenue each and every Friday without excuse and without delay.

9.      Notwithstanding the automatic restraining order. the husband is hereby given
        leave to promptly sell real estate located at 36 Tashur Street,Bet Shemesh. Israel

10.     Thereafter, the husband shall have the right to utilize the net proceeds of the sale
        of the Israeli real estate to assist him in obtaining housing and to defray his living
        expenses. (The husband has represented to the Court that he intends to purchase a
        residence located in Massachusetts in order to be close to his seven minor
        children).

11.     The wife shall have the right to utilize the net proceeds arising from the sale of her
        Sharon real estate to defray her living expenses, after paying a total of $60,000 to
        various creditors who had placed liens upon said real estate prior to its sale.

12.     The parties and their counsel of record are again urged by this Court to utilize
        their assets, energies and talents in the direction of resolving their pending
        disputes, if not for their own sake, then for the sake of their seven children, rather
        than dissipating the aforesaid resources in endless and expensive litigation

_____September 28. 2005_____                    _____
        Date                                              Justice

                                                   Exhibit E-2